UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/012,496 | 09/11/2012 | 7353229 | AAA 12-03 | 7567 |

152          7590          11/13/2013
CHERNOFF, VILHAUER, MCCLUNG & STENZEL, LLP
601 SW Second Avenue
Suite 1600
PORTLAND, OR 97204-3157

| EXAMINER |
|---|
| REICHLE, KARIN M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/13/2013 | PAPERPAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

**EXHIBIT A**

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

ROBERT RYAN MORISHITA MORISHITA LAW FIRM, LLC

8960 WEST TROPICANA AVENUE SUITE 300

LAS VEGAS, NV 89147

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/012,496*.

PATENT NO. *7353229*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| **Office Action in Ex Parte Reexamination** | **Control No.** 90/012,496 | **Patent Under Reexamination** 7353229 | |
|---|---|---|---|
| | **Examiner** KARIN REICHLE | **Art Unit** 3992 | **AIA (First Inventor to File) Status** No |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --***

a. ☒ Responsive to the communication(s) filed on *9/27/2013* .
☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on ______.

b. ☐ This action is made FINAL.

c. ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire *2* month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☒ Information Disclosure Statement, PTO/SB/08.
3. ☐ Interview Summary, PTO-474.
4. ☐ ______.

Part II SUMMARY OF ACTION

1a. ☒ Claims *1-80* are subject to reexamination.

1b. ☐ Claims ______ are not subject to reexamination.

2. ☒ Claims *1-8,11-18,21 and 22* have been canceled in the present reexamination proceeding.

3. ☐ Claims ______ are patentable and/or confirmed.

4. ☒ Claims *9,10,19,20 and 23-80* are rejected.

5. ☐ Claims ______ are objected to.

6. ☐ The drawings, filed on ______ are acceptable.

7. ☐ The proposed drawing correction, filed on ______ has been (7a) ☐ approved (7b) ☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All b) ☐ Some* c) ☐ None of the certified copies have
   1 ☐ been received.
   2 ☐ not been received.
   3 ☐ been filed in Application No. ______ .
   4 ☐ been filed in reexamination Control No. ______.
   5 ☐ been received by the International Bureau in PCT application No. ______.

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: ______

cc: Requester (if third party requester)

Application/Control Number: 90/012,496                                    Page 2
Art Unit: 3992

## DETAILED ACTION

### *Introduction*

1.  This Office Action is responsive to Patent Owner's amendment filed September 27,

2013 in the *ex parte* reexamination of claims 1- 22 of U.S. Patent No. 7,353,229 (hereinafter also

referred to as '229, the '229 patent or the patent ('229)) issued to Vilcauskas, Jr. et al for which a

Substantial New Question of Patentability has been deemed to exist. The status of the claims is

as follows:

  Claims 1-8, 11-18 and 21-22 are canceled.

  Claims 9-10 and 19-20 are rejected.

  New claims 23-80 have been added and are rejected.

### *Patents, Non-Patent Literature, Other Evidence*

*Patents*

-U.S. Patent No. 6,128,651, filed April 14, 1999 and issued October 3, 2000, to Cezar
(hereinafter also referred to as '651 or Cezar '651).

-U.S. Patent No. 6,441,831, filed April 4, 2000 and issued August 27, 2002, to Abramowitz et al
(hereinafter also referred to as '831 or Abramowitz '831).

-U.S. Patent No. 6,886,017, filed December 13, 1999 and issued April 26, 2005, to Jackson et al
(hereafter also referred to as '017 or Jackson '017).

-U.S. Patent No. 5,937,392, filed July 28, 1997 and issued August 10, 1999, to Alberts
(hereinafter also referred to as '392 or Alberts '392).

Application/Control Number: 90/012,496                              Page 3

Art Unit: 3992

*Non-Patent Literature*

-The website, Unfaithful.com (hereinafter also referred to as Unfaithful), as represented by
Exhibits A-E:

> Exhibit A is a webpage that was archived by the Internet Archive on November
> 14, 1999 and may be viewed on archive.org at
> http://web.archive.org/web/19991114093811/http://unfaithful.com;
>
> Exhibit B is source HTML and JavaScript that was archived on October 13, 1999
> and may be viewed at
> http://web.archive.org/web/19991114093811/http//unfaithful.com;
>
> Exhibit C is a pop-under that was archived on February 29, 2000 and may be
> viewed at
> http://web.archive.org/web/2000111229081255/http://www.intergal.com/
> cgi-bin/BAN_record?entrycon_un/003601000b/1;
>
> Exhibit D is a pop-under that was archived on October 12, 1999 and may be
> viewed at
> http://web.archive.org/web/19991012135827//http://unfaithful.com/exitcon.html.
>
> Exhibit E is an automatic pop-under of Exhibit C and the load triggering pop-
> under of Exhibit D after they are both generated and the first browser/foreground
> window is removed.

-The website Cotac.com (hereinafter also referred to as Cotac), as represented by Exhibits C-1 to
C-6:

> Exhibit C-1 is a webpage published at http://www.cotac.com/~knight/NICK3,
> archived by Internet Archive's Wayback Machine on May 7, 1999 and
> downloaded at http://web.archive.org/web/1999050732055/http://www.
> cotac.co/~knight/NICK3/;
>
> Exhibit C-2 is source code listing for the archived webpage shown in Exhibit C-1,
> which includes the source code of the original webpage published at
> http://www.cotac.com/~knight/NICK3/
>
> Exhibit C-3 is a webpage published at http://cotac.com/, which was publically
> available at least as early as May 7, 1999 and downloaded at
> http://web.archive.org/web/19990503161625/http://cotac.com
>
> Exhibit C-4 is a screen capture of a foreground browser window displaying the
> archived webpage shown in Exhibit C-1 and a background browser window

Application/Control Number: 90/012,496                                    Page 4
Art Unit: 3992

showing the archived webpage shown in Exhibit C-3, the background browser
window being a "pop-under" window automatically generated by the foreground
browser window upon execution of the source code shown in Exhibit C-2;

Exhibit C-5 is a webpage maintained at the www.cotac.com Internet address,
archived by Internet Archive's Wayback Machine on January 8, 1997 and
downloaded at
http://web.archive.org/web/19970108002037/http://www.cotac.com/;

Exhibit C-6 is a webpage returned from the www.cun.tv.com address, archived by
Internet Archive's Wayback Machine on May 8, 1999 and downloaded at
http://web.archive.org/web/19990508232325/http://www.cun-tv.com/freexxx/.

(Note MPEP 2256 and 2258, V., B. with respect to the consideration of the
Comtac.com publication.)

- JavaScript Bible, Goodman Danny, third edition, 1998, ISBN 0-7645-3188-3 (hereinafter also
referred to as Java).

### *Response to Arguments*

### 37 CFR 1.131 Declaration

The declaration under 37 CFR 1.131 filed September 27, 2013, including an

accompanying Exhibit, hereinafter also referred to as the declaration, has been received. Such

declaration under 37 CFR 1.131 has been considered but is deemed ineffective to establish

"reduction to practice of the claimed invention of this application in the United States at a date

prior to October 12, 1999, which is the effective date of the 'Unfaithful.com' reference cited by

the Examiner" (emphasis added)(paragraph 1 of the declaration) and "[t]he embodiment shown

in the Exhibit was conceived and reduced to practice prior to the effective date of

Unfaithful.com" (e.g., page 21 of the 9-27-2013 response).

Application/Control Number: 90/012,496                                              Page 5
Art Unit: 3992

Specifically, the declaration submitted is directed to another application, patent and

reexamination control number.  See heading on page 1 of the declaration, i.e. "Patent No. :

7,386,555", "App. No. : 10/764,663" and "Control No. : 90/012344".

**Explanation of Support-Pages 16-17 of 9/27/2013 Response**

The discussion on pages 16-17 has been considered.  See discussion in paragraphs 2 and

7 *infra*.  It is noted no explanation was provided for the amendments to claims 10 and 20.

**Rejections-35 USC 102-Pages 18-21 of the 9/27/2013 Response**

Cotac:

Patent Owner's remarks regarding now cancelled claims 1-3, 6, 8, 11-13, 16, 18 and 21-

22 have been noted.

With regard to claims 9 and 19 Patent Owner (hereinafter also referred to as PO) presents

two arguments:

> The Cotac reference fails to disclose a system or method wherein an event handler
> selects and returns one of a plurality of advertisements maintained at an Internet
> address. Cotac only discloses the second browser window displaying the Web
> page shown in Exhibit C-3. (Footnote 1: This Exhibit cited by the Examiner is
> described under the "Patents, Non-Patent Literature, Other Evidence" section on
> p.3 of the 6/26/13 Office Action but is not attached to the Office Action, is not
> described in the Notice of References Cited, and does not appear in the Request.)

Application/Control Number: 90/012,496                                          Page 6
Art Unit: 3992

> While this single Web page might advertise several businesses this fails to
> disclose what is claimed in the '229 Patent. Either the Web page in the second
> browser as a whole constitutes a single advertisement, in which case there is no
> "plurality of advertisements" as claimed, or the second browser includes a
> plurality of advertisements, in which case no "selection" occurs as all of the
> advertisements are returned instead of one of a plurality of advertisements, as
> claimed. The term "selects" in the claim is used interchangeably with "chooses"
> as is evident from the portion of the specification quoted by the Examiner at
> column 10, line 18. Whether the event handler "selects" or "chooses" an
> advertisement to return, both terms imply that more than one outcome is possible,
> that the event handler has options of several different advertisements to return.
> Even if Cotac.com maintains a plurality of advertisements in the Web pages
> shown in exhibits C-5 and C-6, the JavaScript in the Cotac reference only permits
> one advertisement to be returned: that shown in Exhibit C-3. Any additional
> advertisements which Cotac.com maintains are irrelevant because the event
> handler cannot choose to return them in the second browser.
>
> … More fundamentally, the code of the Cotac reference does not disclose any
> selecting and returning of advertisements, either expressly or inherently, and so
> fails to anticipate claim 9 of the '229 patent.

and

> Moreover, Exhibit C-3 (http://cotac.com) is asserted to be available May 7, 1999;
> Exhibit C-5 (http://www.cotac.com) is asserted to be available January 8, 1997;
> and Exhibit C-6 (http://www.cun-tv.com/freeexxx/) is asserted to be available
> May 8, 1999. There are no overlapping time periods in which the Exhibits
> asserted to be the returned advertisements (e.g., Exhibit C-3 and Exhibit C-5) are
> necessarily available, or even maintained at the same Internet address (i.e.,
> www.cotac.com) to even be capable of being selected by the code of Exhibit C-1
> archived on May 7, 1999. By way of example, one of the Exhibits C-3 and C-5
> may be available on the server on a particular date and later replaced with the
> other Exhibit, thus removing the previous Exhibit's availability, and thus
> removing the capability of being selected.

With regard to the first argument, it is initially noted that the Exhibit C-3 was made of

record in the Office Communication of August 30, 2013 prior to Patent Owner's 9/27/2013

response.  Continuing such first argument is narrower than the claim language as interpreted, see

discussion of claim 1, first full paragraph, i.e. MPEP 2258, I. G, and sequence of approach for

construing claims, of the 6/26/2013 Office Action.  Specifically, the words of claim 9 recite

Application/Control Number: 90/012,496                                          Page 7
Art Unit: 3992

"[t]he system of claim 1 where <u>said event handler</u> selects and returns **one of a plurality of advertisements** maintained at <u>said Internet address</u>" (emphasis added).  Such referenced claim 1 recited "<u>an event handler</u> that receives, from <u>an Internet address</u>, *a link to an advertisement* and loads *said advertisement* into said second browser while said second browser is in a said background window." (emphasis added).  Therefore, according to the words of the claims the handler and address in claims 1 and 9 are one and the same whereas the link/said advertisement in claim 1 may or may not be the one of a plurality of advertisements of claim 1.  Furthermore, the words of claim 19 recite "[t]he method of claim 11 where <u>an event handler</u> selects and returns **one of a plurality of advertisements** maintained at <u>said Internet address</u>" (emphasis added). Such referenced claim 11 recited "said post-session instructions receiving, from <u>an Internet address</u>, *a link to an advertisement*…loading *said advertisement* into said second browser while said second browser is in said background window." (emphasis added).  Therefore according to the words of the claims the address of claims 11 and 19 are one and the same whereas the link/said advertisement in claim 11 may or may not be the one of a plurality of advertisements of claim 19.  Furthermore the meaning of the term "select" according to its usual meaning is "to choose from a number or group usu. by fitness, excellence, or other distinguishing feature" or in other words to choose based upon some criteria.  Therefore while in accordance with Patent Owner's argument a selection is a choice or a choosing from a plurality, contrary to Patent Owner's argument such does not necessarily imply more than one outcome/option absent specification of a criteria for such selection, i.e. there may be only one outcome choice based upon a selection criteria.  Continuing and turning to the '229 specification, see, e.g., the paragraph bridging cols. 6-7 ("…At some point the viewer 26 initiates a load triggering event 58.

Application/Control Number: 90/012,496                                    Page 8

Art Unit: 3992

This load triggering event causes a post-session platform to open 60 in the background

(physically behind or otherwise hidden from the viewer) and also causes the post-session

platform to request a post-session display 62.  In one alternative embodiment, the post-session

platform 24 that opens is of a type different from the foreground platform 32.  The event handler

44 receives the request for a link 45a, 62 and returns a link to post-session display 45b, 64.  In an

alternative preferred embodiment, the client 20 includes an event handler 44 that receives request

62 and returns a post-session display 64 into a secondary post-session platform…."), col. 7, first

full paragraph ("…At some point the surfer 26 initiates a load triggering event 58, usually by

exiting the initially viewed client's Web page.  This load triggering event causes a post-session

browser to open 60 behind the foreground browser and also causes the post-session browser to

request a post-session display 62.  The Web server 22 receives request 62 and returns a link or

address to a post-session display 64."), col. 9, lines 43-56 (i.e. "Post-Session Platform.  As

shown in FIGS. 3B and 3C, the post-session platform 24 requests from the Web server 22 the

address of display 30.  In one preferred embodiment, the address of display 30 is the client 20.

In alternative embodiments, the address may be, for example, other clients or the Web server.

When display 30 is returned, the post-session platform 24 displays display 30.  In one preferred

embodiment, display 30 is advertising content for a client 20.  In an alternative preferred

embodiment, display 30 is a Web site or Web page of a client 20.  In one preferred embodiment,

as shown in FIG. 9, the post-session platform 24 shows the display 30 in a frameset with

branding information of the Web server 22 in one frame and client advertising content in another

frame."), col. 10, lines 15-19 (i.e., "Event Handler.  As shown in FIGS. 3B and 5, the event

handler 44 is invoked by a request for a display link 45a by the newly opened post-session Web

Application/Control Number: 90/012,496                                      Page 9
Art Unit: 3992

browser.  The event handler 44 chooses and delivers a link to a client's Web site 45b.") and col.

14, lines 44-57 (i.e., "As shown in FIG. 8, a load triggering event 58 causes a post-session

platform to open 60 and also causes the post-session platform to request a post-session display

62.  In one preferred embodiment, the event handler 44 returns a link to a single post-session

display 45b, 64.  In alternative embodiments, the post-session display may be refreshed one or

more times.  In other words, the event handler may deliver multiple links to the post-session

platform that are downloaded at periodic intervals while the post-session platform remains in the

background.  In these alternative embodiments, the post-session display may be refreshed even

though a new load triggering event has not occurred.").  Note especially the portions of the

specification quoted by the Examiner were Figures 3B and 5 and col. 10, lines 15-19, not just

col. 10, line 18 referred by Patent Owner and that those portions describe the event handler

"chooses", i.e. selects, the link requested.  From such description, while a plurality of

advertisements/links are maintained at an address, the event handler selects or chooses, as best

understood, the link/advertisement requested by the post session platform/instructions, i.e. the

event handler as described does not have the option of more than one outcome.  Therefore, and

contrary to Patent Owner's argument, the words of the claim itself given the broadest reasonable

interpretation consistent with the specification do not require the event handler to select and

return or be capable of selecting and returning any one of a plurality of advertisements

maintained at an Internet address.

     With regard to the second argument, it is again initially noted that Exhibits C-1, C-3 and

C-4 were made of record in the Office Communication of August 30, 2013 prior to Patent

Owner's 9/27/2013 response.  Continuing, this second argument is narrower than the content of

Application/Control Number: 90/012,496                                    Page 10
Art Unit: 3992

the Exhibits.  For example, the source code, Exhibit C-2, for the web page Exhibit C-1, archived

on May 7, 1999 sets forth http://www. cotac.com/~knight/NICK3/, i.e. Exhibit C-1, at, e.g., page

1, lines 2 and 17,   /http://cotac.com, i.e. Exhibit C-3 and Exhibit C-5, at, e.g., page 6, line 12,

and http://www.cun-tv.com/freexxx/, i.e. Exhibit C-6, at page 6, lines 20-21.  Furthermore note

the Wayback Machine toolbar in Exhibits C-1, C-3 and C-5-C-6 (Exhibit C-1 shows 5 captures

between May 7, 1999- November 10, 2000, Exhibit C-3 shows 340 captures between November

1996 and April 29 2011, Exhibits C-5 and C-6 show multiple captures including the 1999 and

2000) and, e.g., page 5, lines 2-3 of Exhibit C-2.  The Wayback Machine is a web site from the

Internet Archive (www.archive.org) that records the content of most web sites for each year of

their existence since 1996.  In other words there is clearly evidence of overlapping availability

time periods of the Exhibits and maintenance at the same Internet address.

   With regard to claims 10 and 20 Patent Owner presents two arguments:

   The Cotac reference fails to disclose the claimed functions of the event handler.
   Claim 10 is dependent on claim 9, and therefore the event handler in claim 10
   includes the limitations of the event handler claimed in claim 9. As discussed
   above in regard to claim 9, the Cotac reference does not disclose that "said event
   handler selects and returns one of a plurality of advertisements maintained at said
   Internet address." ('229 Patent, Claim 9.) By way of example, an event handler, as
   described by the '229 Patent in column 10, lines 15-19, "is invoked by a request
   for a display link **45**a by the newly opened post-session Web browser. The event
   handler **44** chooses and delivers a link to a client's Web site 45b."(Emphasis
   added.) Because the event handler in the '229 Patent chooses one link, there must
   inherently be more than one link from which to choose to provide to each second
   browser. The Cotac reference discloses no such choice and only a single link
   asserted to be to an advertisement for the second browser. (Footnote 2: The
   Exhibits cited by the Examiner as C-1, C-3 and C-4 are described under the
   "Patents, Non-Patent Literature, Other Evidence" section on p.3 of the 6/26/13
   Office Action but are not attached to the Office Action, are not described in the
   Notice of References Cited, and do not appear in the Request.)

Application/Control Number: 90/012,496                                          Page 11
Art Unit: 3992

and

> Moreover, the Cotac reference fails to also disclose while the first browser and
> each of the plurality of second browsers are simultaneously maintained. The
> Cotac reference therefore does not anticipate claim 10.

With regard to the first argument, it is initially noted that Exhibits C-1, C-3 and C-4 were made of record in the Office Communication of August 30, 2013 prior to Patent Owner's 9/27/2013 response.  Continuing such first argument is substantially the same as that made with regard to claims 9 and 19.  Therefore see the discussion of such argument *supra*.

With regard to the second argument, see discussion in paragraph 3 *infra*.  It is again noted no explanation of support was provided for the amendments to claims 10 and 20.

Unfaithful:

Patent Owner's arguments with regard to claims 1-6, 11-16 and 21-22 have been considered but are deemed not persuasive.  See discussion in **37 CFR 1.131 Declaration** section *supra*.

**Rejections-35 USC 103-Pages 22-29 of the 9/27/2013 Response**

Cotac:

Patent Owner's remarks regarding now cancelled claims 4-5, 7, 14-15 and 17 have been noted.

Application/Control Number: 90/012,496                                      Page 12
Art Unit: 3992

Unfaithful:

Patent Owner's arguments with regard to claims 4-5, 7-10, 14-15 and 17-20 and the 37

CFR 1.131 Declaration section have been considered but are deemed not persuasive, see *supra*.

Patent Owner's remarks regarding claims 4-5, 7-8, 14-15 and 17-18 being cancelled have

been noted.

Patent Owner's remarks with regard to claims 9-10 and 19-20 have been noted.  See

discussion in paragraph 6 *infra*.  It is again noted no explanation of support was provided for the

amendments to claims 10 and 20.

### *Claim Rejections-Patent Claims 9-10 and 19-20*

The text of those sections of Title 35, U.S. Code not included in this action can be found

in a prior Office action.

The following is a quotation of 35 U.S.C. 112(a):
(a) IN GENERAL.—The specification shall contain a written description of the invention, and of the
manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any
person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use
the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying
out the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), first paragraph:
The specification shall contain a written description of the invention, and of the manner and process of
making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the
art to which it pertains, or with which it is most nearly connected, to make and use the same and shall
set forth the best mode contemplated by the inventor of carrying out his invention.

The following is a quotation of 35 U.S.C. 112(b):
(b)  CONCLUSION.—The specification shall conclude with one or more claims particularly pointing
out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the
invention.

Application/Control Number: 90/012,496                                         Page 13
Art Unit: 3992

> The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
> The specification shall conclude with one or more claims particularly pointing out and distinctly
> claiming the subject matter which the applicant regards as his invention.

## Claim Rejections - 35 USC § 112

2. **Claims 10 and 20 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first paragraph, as failing to comply with the written description requirement. The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the application was filed, had possession of the claimed invention.**

Claim 10 now recites "wherein said event handler opens a plurality of second browsers, each maintained in a separate said background window" (emphasis added) rather than said system being capable of opening such plurality of browsers in combination with "said event handler receiving a link to an advertisement for each said second browser and loading a respective said advertisement into each said second browser while each said second browser remains in its respective said background window" rather than said event handler capable of receiving a link to an advertisement for each said second browser and loading a respective said advertisement into each said second browser while each said second browser remains in its respective said background window.  Patent Owner did not provide an explanation of support for such opening function of the event handler.  See '229 at col. 3, last full paragraph ("Two events that are important to understanding the experience of a viewer browsing the Web are the 'focus' and 'blur' events.  Typically, a viewer accesses the Internet using a platform, such as a Web

Application/Control Number: 90/012,496                                        Page 14
Art Unit: 3992

browser, on media, such as a computer.  For example, a viewer accessing the Internet using the

Internet Explorerm [sic] Web browser as a platform on media consisting of a computer running

the WindowsTM operating system observes the platform as appearing in a window. Focus and

blur describe states of a window.  A focus event occurs if a window is selected so that it may

currently receive input from a viewer.  A blur event occurs if focus is removed from a window.

While it is possible to simultaneously have multiple windows open, only one window may have

focus at any time.  If a window is in the focus state, it always fully visible (i.e., it appears "on

top" of other open windows) and is sometimes referred to as the 'active' window.  Windows that

are in the blur state are said to be in the 'background' and are at least partially obscured by the

window in the focus state.  A viewer 'clicks on' or otherwise selects a window to create a focus

event.  Alternatively, a computer program may cause a focus event.  A focus event may also be

referred to as a 'view triggering event."), the paragraph bridging cols. 6-7 ( "FIG. 8 is a flow

diagram showing the sequence of steps in the process of delivering display content in the

embodiment of the present invention shown in FIGS. 3A-3C.  In the first step, a client 20 adds

post-session instructions to its display 50.  A viewer 26 requests a foreground display 52 from a

first or foreground platform with post-session instructions embedded (or otherwise linked)

therein.  After the foreground display 34 loads, the post-session instructions cause a post-session

procedure 43a to be requested 54 and, in turn, the script handler 42 returns a post-session

procedure 43b, 56.  At some point the viewer 26 initiates a load triggering event 58.  This load

triggering event causes a post-session platform to open 60 in the background (physically behind

or otherwise hidden from the viewer) and also causes the post-session platform to request a post-

session display 62.  In one alternative embodiment, the post-session platform 24 that opens is of

Application/Control Number: 90/012,496                                       Page 15
Art Unit: 3992

a type different from the foreground platform 32.  The event handler 44 receives the request for a

link 45a, 62 and returns a link to post-session display 45b, 64.  In an alternative preferred

embodiment, the client 20 includes an event handler 44 that receives request 62 and returns a

post-session display 64 into a secondary post-session platform….The post-session platform 24

and display 30 remain in the background until the viewer 26 initiates a view triggering event

68...It should be noted that the script handler 42, event handler 44, and focus handler 46 may be

processes implemented by the Web server 22 as shown or may be processes implemented by a

plurality of servers or may be multiplied or divided into any number of processes.") (emphasis

added), col. 7, first full paragraph ("Applying the basic flow shown in FIGS. 3A-3C and 8 to an

exemplary embodiment of a Web surfer viewer surfing the Internet, a commercial client 20 adds

post-session instructions (HTML code) to its Web page display 50.  A surfer 26 requests the

client's Web page 52 with the post-session instructions (HTML code) embedded therein.  After

the foreground Web page 34 loads, the post-session instructions (HTML code) cause a script

code 54 to be requested and, in turn, the Web server 22 returns a script code 56.  At some point

the surfer 26 initiates a load triggering event 58, usually by exiting the initially viewed client's

Web page.  This load triggering event causes a post-session browser to open 60 behind the

foreground browser and also causes the post-session browser to request a post-session display

62.  The Web server 22 receives request 62 and returns a link or address to a post-session display

64.  Optionally, the Web server 22 also returns a focus timer 66.  The post-session browser 24

and display 30 remain in the background until the surfer 26 initiates a view triggering event 68

such as exiting the foreground browser 32….") (emphasis added), col. 9, lines 50-63 ("Load

Triggering Event.  At some point while viewing the display 34, the viewer activates a load

Application/Control Number: 90/012,496                                        Page 16
Art Unit: 3992

triggering event.  Load triggering events may include, for example, the viewer leaving or exiting

the specific display 34 or the viewer closing the foreground platform 32.  Exemplary alternative

load triggering events may include clicking on an off-site link or entering a new address in a

dialogue box, time delay, load, unload, click, resize, submit, focus, blur, drag, key press

(including a mouse button key), select, change (contents of a form field), refresh, open, close,

redirect, enter, exit, move, minimize, maximize, end of program, beginning of program,

beginning of session, end of session, 'switching services,' or change of service.  These load

triggering events are meant to be exemplary."), col. 10, first full paragraph ("Post-Session

Procedure.  The post-session procedure consists of a set of actions to be taken in response to the

load triggering event.  The post-session procedure causes no immediate visible change to the

foreground display 34, but when the load triggering event occurs, a new platform (post-session

platform 24) opens and is immediately sent to the background.  The post-session platform 24

may be a full sized window or any other sized window."), the paragraph bridging cols. 9-10 (i.e.

"Additional Load Triggering Events. In one exemplary preferred embodiment, if a first load

triggering event is followed by a second load triggering event, a second post- session platform 24

is opened and sent to the background...."), col. 10, lines 15-56 ("Event Handler. As shown in

FIGS. 3B and 5, the event handler 44 is invoked by a request for a display link 45a by the newly

opened post-session Web browser. The event handler 44 chooses and delivers a link to a client's

Web site 45b. In one preferred embodiment, the event handler delivers a link to an HTML

frameset. There is no requirement, however, that the post-session browser link to HTML code. In

alternative preferred embodiments, the post-session browser links to any form of network

content including sound, animation, streaming video, or any other form of rich media. In one

Application/Control Number: 90/012,496                                           Page 17
Art Unit: 3992

preferred embodiment, the event handler 44 delivers links to automatically load the focus timer

45c….In an exemplary preferred embodiment, the post-session procedure is an advertising

session consisting of opening a post-session platform 24, linking to the Web server 22, sending

the post-session platform 24 to the background (or conversely, bringing the viewer's platform to

the foreground),…In other words, one preferred embodiment of the present invention uses the

load triggering event to trigger an advertising session.  Post-Session Platform. As shown in

FIGS. 3B and 3C, the post-session platform 24 requests from the Web server 22 the address of

display 30. In one preferred embodiment, the address of display 30 is the client 20. In alternative

embodiments, the address may be, for example, other clients or the Web server. When display 30

is returned, the post-session platform 24 displays display 30. In one preferred embodiment,

display 30 is advertising content for a client 20. In an alternative preferred embodiment, display

30 is a Web site or Web page of a client 20. In one preferred embodiment, as shown in FIG. 9,

the post-session platform 24 shows the display 30 in a frameset with branding information of

thes Web server 22 in one frame and client advertising content in another frame.") and col. 14,

lines 39-55 ("As has been discussed above, a load triggering event causes a post-session platform

to be opened and immediately sent to the background….As shown in FIG. 8, a load triggering

event 58 causes a post-session platform to open 60 and also causes the post-session platform to

request a post-session display 62. In one preferred embodiment, the event handler 44 returns a

link to a single post-session display 45b, 64. In alternative embodiments, the post-session display

may be refreshed one or more times. In other words, the event handler may deliver multiple links

to the post-session platform that are downloaded at periodic intervals while the post-session

platform remains in the background. In these alternative embodiments, the post-session display

Application/Control Number: 90/012,496                                                    Page 18
Art Unit: 3992

may be refreshed even though a new load triggering event has not occurred."). Therefore, while a

plurality of second browsers which may be opened or a single second browser which may be

refreshed a plurality of times is described, such opening is not performed by the event handler

but rather by a load triggering event and such refreshing causes the event handler to deliver

multiple links to the same browser, not open multiple browsers.

      Claim 20 now similarly recites "where <u>said event handler opens</u> a plurality of second

browsers, each maintained in a separate said background window" (emphasis added) rather than

said method including a step of such plurality of browsers being opened in combination with "a

link to an advertisement for each said second browser and a respective said advertisement being

loaded into each said second browser while each said second browser remains in its respective

said background window".  Patent Owner also did not provide an explanation of support for an

event handler performing such function.  See the discussion of claim 10 *supra*.  Therefore, while

a plurality of second browsers being opened or a single second browser being refreshed a

plurality of times is described, such opening is not performed by the event handler but rather by a

load triggering event and such refreshing causes the event handler to deliver multiple links to the

same browser, not open multiple browsers.


    **3.  Claims 10 and 20 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-**

**AIA), second paragraph, as being indefinite for failing to particularly point out and**

**distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA**

**the applicant regards as the invention.**

Application/Control Number: 90/012,496                                    Page 19
Art Unit: 3992

       Both of these claims now recite a link to an advertisement for each said second browser being received (in claim 10, such is received by the event handler) and a respective said advertisement being loaded into each said second browser, while each said second browser remains in its respective said background window, while said first browser and each of said second browsers are simultaneously maintained".  However since each claim already recites a plurality of second browsers "each maintained in a separate said background window" thereby at least inferring, see claims 1 and 11 from which these claims respectively depend, a foreground window/first browser as well as already also reciting the respective said advertisement being loaded into each said second browser "while each said second browser remains in its respective said background window", the additional limitation is unclear, i.e. if such limitation is not redundant, what is being further claimed?  It is noted Patent Owner also did not provide an explanation of support for such additional limitation.


**Claim Rejections - 35 USC § 102**

       4. **Claims 9 and 19 are rejected under 35 U.S.C. 102(b) as being anticipated by Cotac.**

       The Cotac website as a whole includes a publication date of no later than May 8, 1999 which is more than one year prior to the earliest effective date of '229 (May 26, 2000) for which benefit may be claimed and thus is available as prior art under 35 USC 102(b) and 35 USC 103(a).

Application/Control Number: 90/012,496                                   Page 20

Art Unit: 3992

<u>Claim 9:</u>

As set forth in MPEP 2258, I., G, "During reexamination, claims are given the broadest

reasonable interpretation consistent with the specification and limitations in the specification are

not read into the claims (*In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984)).  It is

also noted that, as stated by the Federal Circuit, claims must be constructed in light of the

intrinsic evidence which includes the claims, the written description and the prosecution history.

The sequence of the approach for construing the claims is as follows: (i) first, look to the words

of the claims themselves. The words in the claim are generally given their ordinary and

customary meaning. However, a patentee may choose to be his own lexicographer and use terms

in a manner other than their ordinary meaning, so long as that definition is clearly set forth in the

patent specification or the file history; (ii) then, the specification is reviewed to determine

whether the patentee used terms in the claim in a manner inconsistent with their ordinary

meaning. In that case, the specification acts as a dictionary when it expressly defines the term

used in the claim; and (iii) then the prosecution history may also be considered.  *Vitronics Corp.*

*v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

**The system of claim 1**

*1. A system for Internet advertising capable of simultaneously maintaining a foreground window*
*and at least one background window and capable of displaying a first browser in a said*
*foreground window for selectively browsing the Internet, said system comprising:*

(Note '229 at, e.g., title ("POST-SESSION INTERNET ADVERTISING SYSTEM"),

abstract ("The present invention is directed to a post-session advertising system that may be used

Application/Control Number: 90/012,496                                    Page 21
Art Unit: 3992

in media such as computers, personal digital assistants, telephones, televisions, radios, and

similar devices. In one preferred embodiment, a first display is viewed in a first platform in the

foreground of a media by a viewer. A viewer initiates a load triggering event and in response, a

post-session platform is opened to display a post-session display in the background of the

media….”), “BACKGROUND OF THE INVENTION” section, col. 1, line 10-col. 4, line 6

(“The post-session Internet advertising system of the present invention is a system and method

for delivering displays to viewers browsing displays with platforms, for exchanging traffic

between platforms,…Web pages can be created using Hypertext Mark-up Language (‘HTML’)

and Extensible Mark-up Language (‘XML’).…In addition to its use in creating Web pages,

HTML and XML can be used to create advertising for the Internet.  The developer or maintainer

of a Web site can insert HTML or XML code in their Web pages so that when potential

customers view the Web page an advertisement and a link to another Web site is displayed. Web

pages and Internet advertising may be enhanced by small programs written in the Java language

that are built into a Web page to perform a specific function (such as displaying an animation),

often referred to as ‘applets.’…Typically, a viewer accesses the Internet using a platform, such as

a Web browser, on media, such as a computer.  For example, a viewer accessing the Internet

using the Internet Explorerm [sic] Web browser as a platform on media consisting of a computer

running the WindowsTM operating system observes the platform as appearing in a

window….While it is possible to simultaneously have multiple windows open, only one window

may have focus at any time.  If a window is in the focus state, it always fully visible (i.e., it

appears ‘on top’ of other open windows) and is sometimes referred to as the ‘active’ window.

Windows that are in the blur state are said to be in the ‘background’ and are at least partially

Application/Control Number: 90/012,496                                        Page 22
Art Unit: 3992

obscured by the window in the focus state…."), "BRIEF SUMMARY OF THE INVENTION"

section, col. 4, lines 8 et seq ("…The computer and the Internet are exemplary media that might

be used in the present invention.  In this exemplary embodiment, Web browsers are the

platforms.  Further, in this exemplary embodiment, Web sites and advertisements are exemplary

display content.  More specifically, while a participating Web site (display content) is being

visited by a viewer using a first Web browser (platform), a second or post-session Web browser

(platform) loads with a second or post-session advertisement (display content)…."), Figure 1,

col. 5, lines 4-7 ("FIG. 1 is a block diagram of an exemplary embodiment of a client, a Web

server, media, and at least one viewer, platforms and displays of the post-session Internet

advertising system of the present invention."), DETAILED DESCRIPTION OF THE

INVENTION section, col. 5, line 41-col. 6, line 39 ("The post-session Internet advertising

system of the present invention is a system and method for delivering displays to viewers

browsing displays with platforms, for exchanging traffic between platforms….As shown in

FIGS. 1 and 2, a client 20 interacts with a Web server 22 to deliver,…a post-session platform 24

to a viewer's 26 media 28 so that the viewer 26 may view the client's 20 post-session display 30

after the viewer 26 has exited…a foreground platform 32.  Specifically, when the viewer 26 who

is viewing a first or foreground display 34 in a first or foreground platform 74 exits a client's

foreground platform 32…, a post-session platform 24 is opened and is immediately sent to the

background 78….Throughout this specification terminology will be used to describe the present

invention.  The following definitions and examples of the terminology are not meant to exclude

broader concepts, unspecified examples, or undeveloped technology that would logically fall

within the scope of the invention.  Viewers 26, for example, may be potential voters viewing a

Application/Control Number: 90/012,496                                               Page 23
Art Unit: 3992

television program or potential customers browsing the Internet on a computer.  The term

'viewer' is also used to describe a telephone user, a radio listener, or any media user.  Clients 20

are entities that want to advertise or direct traffic such as commercial enterprises, political,

governmental, non-profit, or charitable organizations, individuals, hobbyists, or any other person

or entity that wants to advertise or direct traffic.  The Web server 22, as will be described in

detail below, substantially controls or directs the system of the present invention.  Media 28 may

be any communication device, including but not limited to computers, personal digital assistants,

telephones, televisions, radios, and similar devices.  Platforms 24, 32 are means through which a

viewer accesses a display to the exclusion of other displays.  A platform may allow the viewer to

play, show, enable, perform, transmit, update, or record the selected display.  Platforms 24, 32

may include, for example, Web browsers, browser windows, media channels, media stations,

media frequencies, audio connections, streaming media, content delivery applications, media

viewing or interacting technology, and similar means.  A foreground platform 32 is a platform

that can be primarily sensed by a viewer 26.  A post-session platform 24 is a platform that begins

its life in the background and that can be fully sensed by a viewer 26 only after it has been

brought to the foreground.  Displays 30, 34 have content that a viewer 26 sees, hears, or

otherwise senses within or from a platform 24, 32.  Displays 30, 34 may include, for example,

Internet content (such as streaming video, Web sites, Web pages), video broadcast content (such

as television programs, movies, videos, commercials, and infomercials), audio broadcast content

(such as radio programs, commercials, and sound recordings or such as commercials or sound

recordings played over a telephone connection), and any other content capable of being

Application/Control Number: 90/012,496                                   Page 24
Art Unit: 3992

transmitted over media.").  Note also page 8 of the 9/11/2012 Request with regard to the

preamble and 2111.02(ii).)

      See Cotac which includes a set of webpages (i.e. HTML coded document(s) on the Web,

i.e. a service on the Internet for storing, finding, accessing and disseminating such document(s))

which is/are accessible/used by a browser (i.e. application/program for rendering pages on

screen, executing embedded scripts, invoking additional software)) and corresponding source

code (Exhibits C-1-C-6).  The first Cotac webpage (Exhibit C-1) is displayed in a window (i.e. a

frame surrounded viewing area of a screen) of a first web browser (note in upper left corner of

frame "Windows Internet Explorer"), and its source code (Exhibit C-2) is executed.  Execution

of the source code causes a second webpage (Exhibit C-3), which includes advertisements for

other webpages and a 1-800 phone service, to be displayed in a window (i.e. a frame surrounded

viewing area of a screen) of a second web browser (note in upper left corner of frame "Windows

Internet Explorer") positioned behind the first browser window (Exhibit C-4).  Exhibit C-4 is a

screen capture of a foreground browser window displaying the archived webpage shown in

Exhibit C-1 and a background browser window showing the archived webpage shown in Exhibit

C-3, the background browser window being a "pop-under" window automatically generated by

the foreground browser window upon execution of the source code shown in Exhibit C-2.  Note

additionally that both windows are within/in front of a screen viewing area contained within a

surrounding frame labeled "Microsoft Word".  (Attention is again invited to the

"BACKGROUND OF THE INVENTION" section of '229, col. 1, line 10-col. 4, line 6

("…Typically, a viewer accesses the Internet using a platform, such as a Web browser, on media,

such as a computer.  For example, a viewer accessing the Internet using the Internet Explorerm

Application/Control Number: 90/012,496                                    Page 25
Art Unit: 3992

[sic] Web browser as a platform on media consisting of a computer running the WindowsTM

operating system observes the platform as appearing in a window….While it is possible to

simultaneously have multiple windows open, only one window may have focus at any time.  If a

window is in the focus state, it always fully visible (i.e., it appears 'on top' of other open

windows) and is sometimes referred to as the 'active' window.  Windows that are in the blur

state are said to be in the 'background' and are at least partially obscured by the window in the

focus state….").)  Therefore, "[a] system for"/capable of "Internet advertising capable of

simultaneously maintaining a foreground window and at least one background window and

capable of displaying a first browser" (i.e. Windows® Internet Explorer®), "in a said foreground

window for"/capable of "selectively browsing the Internet" is disclosed by or inherent in the

teachings of Cotac.  Note also the discussion of sections (a)-(c), *infra*.


*(a) a device that interacts with a display device to display to a user at least one browser, each
said at least one browser within a respective window;*

*(b) a script handler that invokes a post-session procedure in said first browser, said post-session
procedure opening a second browser in a said background window such that  said opening is
free from said background window obscuring any portion of said foreground window while said
first browser is simultaneously displayed in said foreground window; and*


(Note '229 at, e.g., the abstract ("The present invention is directed to a post-session

advertising system that may be used in media such as computers, personal digital assistants,

telephones, televisions, radios, and similar devices.  In one preferred embodiment, a first display

is viewed in a first platform in the foreground of a media by a viewer.  A viewer initiates a load

triggering event and in response, a post-session platform is opened to display a post-session

display in the background of the media…."), "BACKGROUND OF THE INVENTION" section,

Application/Control Number: 90/012,496                                              Page 26
Art Unit: 3992

col. 1, line 10-col. 4, line 6 ("…Typically, a viewer accesses the Internet using a platform, such

as a Web browser, on media, such as a computer.  For example, a viewer accessing the Internet

using the Internet Explorerm Web browser as a platform on media consisting of a computer

running the WindowsTM operating system observes the platform as appearing in a

window…While it is possible to simultaneously have multiple windows open, only one window

may have focus at any time.  If a window is in the focus state, it always fully visible (i.e., it

appears 'on top' of other open windows) and is sometimes referred to as the 'active' window.

Windows that are in the blur state are said to be in the 'background' and are at least partially

obscured by the window in the focus state…."), "BRIEF SUMMARY OF THE INVENTION"

section, col. 4, lines 11 et seq ("…The computer and the Internet are exemplary media that might

be used in the present invention.  In this exemplary embodiment, Web browsers are the

platforms.  Further, in this exemplary embodiment, Web sites and advertisements are exemplary

display content.  More specifically, while a participating Web site (display content) is being

visited by a viewer using a first Web browser (platform), a second or post-session Web browser

(platform) loads with a second or post-session advertisement (display content) upon a first or

load triggering event such as exiting the specific Web page.  The post-session Web browser does

not disrupt the viewer's browsing experience in his first Web browser…."), Figures 1-3B, 4 and

8, col. 5, lines 4-33 ("FIG. 1 is a block diagram of an exemplary embodiment of a client, a Web

server, media, and at least one viewer, platforms and displays of the post-session Internet

advertising system of the present invention.  FIG. 2 is a flow diagram showing the sequence of

steps that a viewer observes or initiates in the process of delivering a display in an exemplary

embodiment of the post-session Internet advertising system of the present invention. FIGS. 3A,

3B, and 3C are block diagrams of an exemplary embodiment of a Web server, a client, media,

and a count daemon of the present invention showing a load triggering event, a view triggering

event, and data flow of the post-session Internet advertising system of the present invention. FIG.

4 is a flow diagram of the script handler of an exemplary preferred embodiment the post-session

Internet advertising system of the present invention...FIG. 8 is flow diagram of the process of the

post-session Internet advertising system of the present invention…."), DETAILED

DESCRIPTION OF THE INVENTION and ALTERNATIVE EMBODIMENTS sections, col. 5,

line 42-col. 14, line 63 ("The post-session Internet advertising system of the present invention is

a system and method for delivering displays to viewers browsing displays with platforms, for

exchanging traffic between platforms….As shown in FIGS. 1 and 2, a client 20 interacts with a

Web server 22 to deliver, upon the occurrence of a 'load triggering event,' a post-session

platform 24 to a viewer's 26 media 28….Specifically, when the viewer 26 who is viewing a first

or foreground display 34 in a first or foreground platform 74 exits a client's foreground platform

32…, a post-session platform 24 is opened and is immediately sent to the background 78.

Because it is in the background, the post-session platform 24 does not disrupt the viewer's 26

browsing experience.…Throughout this specification terminology will be used to describe the

present invention.  The following definitions and examples of the terminology are not meant to

exclude broader concepts, unspecified examples, or undeveloped technology that would logically

fall within the scope of the invention.  Viewers 26, for example, may be potential voters viewing

a television program or potential customers browsing the Internet on a computer.  The term

'viewer' is also used to describe a telephone user, a radio listener, or any media user.  Clients 20

are entities that want to advertise or direct traffic such as commercial enterprises, political,

Application/Control Number: 90/012,496                                                                 Page 28
Art Unit: 3992

governmental, non-profit, or charitable organizations, individuals, hobbyists, or any other person

or entity that wants to advertise or direct traffic.  The Web server 22, as will be described in

detail below, substantially controls or directs the system of the present invention.  Media 28 may

be any communication device, including but not limited to computers, personal digital assistants,

telephones, televisions, radios, and similar devices.  Platforms 24, 32 are means through which a

viewer accesses a display to the exclusion of other displays.  A platform may allow the viewer to

play, show, enable, perform, transmit, update, or record the selected display.  Platforms 24, 32

may include, for example, Web browsers, browser windows, media channels, media stations,

media frequencies, audio connections, streaming media, content delivery applications, media

viewing or interacting technology, and similar means.  A foreground platform 32 is a platform

that can be primarily sensed by a viewer 26.  A post-session platform 24 is a platform that begins

its life in the background and that can be fully sensed by a viewer 26 only after it has been

brought to the foreground.  Displays 30, 34 have content that a viewer 26 sees, hears, or

otherwise senses within or from a platform 24, 32.  Displays 30, 34 may include, for example,

Internet content (such as streaming video, Web sites, Web pages), video broadcast content (such

as television programs, movies, videos, commercials, and infomercials), audio broadcast content

(such as radio programs, commercials, and sound recordings or such as commercials or sound

recordings played over a telephone connection), and any other content capable of being

transmitted over media. As mentioned above, FIG. 2 is a flow diagram showing the sequence of

events from the viewer's 26 perspective.  The viewer 26 first views 74 a first or foreground

display 34 in a first or foreground platform 32 of media 28.  The viewer 26 then initiates 76 a

load triggering event.  This event causes the opening 78 of a second or post-session platform 24

Application/Control Number: 90/012,496                                          Page 29
Art Unit: 3992

in the background of the media 28.  The post-session platform 24 remains in the background

until the viewer 26 initiates 80 a view triggering event….FIGS. 3A-3C show an exemplary

system of the present invention with data flow between elements of the system.  It should be

noted that the functions shown in the Web server 22 element may be implemented by the Web

server 22 alone (as shown), by a combination of the Web server 22 and the client 20, or by the

client 20 alone.  It should also be noted that the media 28 is shown as providing the foreground

platform 32, the post-session platform 24 while it is in the background,…foreground.  Exemplary

individual elements of the system are detailed in separate figures.  Specifically, FIG. 4 details an

exemplary script handler 42,….FIG. 8 is a flow diagram showing the sequence of steps in the

process of delivering display content in the embodiment of the present invention shown in FIGS.

3A-3C.  In the first step, a client 20 adds post-session instructions to its display 50.  A viewer 26

requests a foreground display 52 from a first or foreground platform with post-session

instructions embedded (or otherwise linked) therein.  After the foreground display 34 loads, the

post-session instructions cause a post-session procedure 43a to be requested 54 and, in turn, the

script handler 42 returns a post-session procedure 43b, 56.  At some point the viewer 26 initiates

a load triggering event 58.  This load triggering event causes a post-session platform to open 60

in the background (physically behind or otherwise hidden from the viewer) and also causes the

post-session platform to request a post-session display 62...The post-session platform 24 and

display 30 remain in the background until the viewer 26 initiates a view triggering event 68.  It

should be noted that the script handler 42,…may be processes implemented by the Web server

22 as shown or may be processes implemented by a plurality of servers or may be multiplied or

divided into any number of processes.  Applying the basic flow shown in FIGS. 3A-3C and 8 to

Application/Control Number: 90/012,496                                    Page 30
Art Unit: 3992

an exemplary embodiment of a Web surfer viewer surfing the Internet, a commercial client 20

adds post-session instructions (HTML code) to its Web page display 50.  A surfer 26 requests the

client's Web page 52 with the post-session instructions (HTML code) embedded therein.  After

the foreground Web page 34 loads, the post-session instructions (HTML code) cause a script

code 54 to be requested and, in turn, the Web server 22 returns a script code 56.  At some point

the surfer 26 initiates a load triggering event 58, usually by exiting the initially viewed client's

Web page.  This load triggering event causes a post-session browser to open 60 behind the

foreground browser...The post-session browser 24…remain in the background until the surfer 26

initiates a view triggering event 68….As shown in FIGS. 3A-3C, the functions of the Web server

22 may be divided into the three Web services: the script handler 42 (FIG. 4),…These services

may be implemented as separate processes by a Web server (as shown), as a single process, or as

any number of processes on any number of servers.  These services may also be implemented by

the client's system or on the viewer's media.  These services are similar in some functions, but

there are differences in which portion of a single transaction each service handles.…These

services will be discussed individually in the order they appear in the system as shown and

described in FIGS. 3A-3C and 8. Adding Post Session Code.  In order to activate the method of

the present invention, a client 20 obtains post-session instructions from a Web Server 22 and

adds them to its display 34.  In one exemplary preferred embodiment, the post-session

instructions are post-session HTML code that a client 20 adds to its Web pages.  In an alternative

preferred embodiment, the post-session instructions are post-session XML code that a client 20

adds to its Web pages. Viewer Opens a Platform.  A viewer 26 opens a client's 20 display 34

with a foreground platform 32.  In one preferred embodiment, a viewer 26 opens a client's 20

Application/Control Number: 90/012,496                                       Page 31
Art Unit: 3992

Web page with a Web browser. Script Code Delivery.  As shown in FIG. 3A, when a viewer 26

opens a client's 20 display 34 with a foreground platform 32, the post-session instructions that

the client 20 added to its display 34 cause the foreground platform 32 to download 43a, 43b a

post-session procedure from the Web server 22.  In one exemplary preferred embodiment the

post-session procedure downloaded from the Web server 22 to the platform 32 is script

code….Script Handler.  In the exemplary preferred embodiment shown in FIGS. 3A and 4, when

a viewer requests a display 34 to which post-session HTML code has been added, a request for a

post-session procedure 43a is sent to the script handler 42.  The time at which the request for the

post-session procedure is made is preferably recorded, noted, and/or stored.  In addition, the

script handler 42 may verify that the account number present in the requesting link is valid.  The

script handler 42 then returns a post-session procedure 43b to the platform 32.…At some point

while viewing the display 34, the viewer activates a load triggering event.  Load triggering

events may include, for example, the viewer leaving or exiting the specific display 34 or the

viewer closing the foreground platform 32.  Exemplary alternative load triggering events may

include clicking on an off-site link or entering a new address in a dialogue box, time delay, load,

unload, click, resize, submit, focus, blur, drag, key press (including a mouse button key), select,

change (contents of a form field), refresh, open, close, redirect, enter, exit, move, minimize,

maximize, end of program, beginning of program, beginning of session, end of session,

'switching services,' or change of service.  These load triggering events are meant to be

exemplary…. Post-Session Procedure.  The post-session procedure consists of a set of actions to

be taken in response to the load triggering event.  The post-session procedure causes no

immediate visible change to the foreground display 34, but when the load triggering event

Application/Control Number: 90/012,496                                    Page 32
Art Unit: 3992

occurs, a new platform (post-session platform 24) opens and is immediately sent to the

background.  The post-session platform 24 may be a full sized window or any other sized

window....The post-session procedure downloaded from the Web server 22 to the platform 32

may be written in any supported scripting language, such as JavaScript or VBscript.  In an

exemplary preferred embodiment, the post-session procedure is an advertising session consisting

of opening a post-session platform 24, linking to the Web server 22, sending the post-session

platform 24 to the background (or conversely, bringing the viewer's platform to the

foreground),...In other words, one preferred embodiment of the present invention uses the load

triggering event to trigger an advertising session.  Post-Session Platform.  As shown in FIGS. 3B

and 3C, the post-session platform 24 requests from the Web server 22 the address of display 30.

In one preferred embodiment, the address of display 30 is the client 20.  In alternative

embodiments, the address may be, for example, other clients or the Web server.  When display

30 is returned, the post-session platform 24 displays display 30.  In one preferred embodiment,

display 30 is advertising content for a client 20.  In an alternative preferred embodiment, display

30 is a Web site or Web page of a client 20....Further, although the terms 'Web server,' 'Web

site,' and 'Web page,' are used throughout this disclosure, they are used in the generic sense and

are not meant to exclude their equivalent as associated with intranets, LANs, WANS, or alternate

media.  Alternative embodiments could be developed in which the order of the operations is

changed.  For example, the function of the script handler 42 may be carried out after the load

triggering event.  Another example would be one in which the function of the event handler 44 is

carried out after the view triggering event.  Yet another example would be combining the

functions of the script and event handlers so that the post-session platform is opened and sent to

the background by the 'script handler' prior to the load triggering event…. Although the present

invention has been discussed as a sequence of steps as shown in FIG. 8, it is contemplated that

the functions of the shown steps could be combined into a smaller number of steps or could be

expanded to include additional steps and sub-steps.  In one preferred embodiment, the functions

of opening and sending to the background a post-session platform and display may be performed

in a single step….As has been discussed above, a load triggering event causes a post-session

platform to be opened and immediately sent to the background.  It should be understood that the

term 'immediately' ideally means instantaneously or without any perceptible time delay.  But

this term may also mean a momentary time delay that is perceptible so long as the delay does not

disturb the viewer's viewing experience….").  See also claim 11 of '229, i.e. post-session

instructions.)

     See discussion of Cotac *supra* with regard to the preamble. Therefore, "a device" (i.e. a

communication device, e.g. a computer or similar device running/using Windows®,)  "that

interacts with a display to display to a user" (i.e. capable of imparting content, e.g. Web

sites/web pages, to a viewer that can be seen, heard or otherwise sensed within or from a

platform, e.g. a web browser/browser window (i.e. a screen)) "at least one browser" (i.e.

Windows® Internet Explorer®), "each said at least one browser within a respective window",

see, e.g., Exhibits C-1 and C-3, is disclosed by or inherent in the disclosure of Cotac.

     Continuing, a first browser window (the window in Exhibit C1, i.e. the frame surrounded

viewing area of a screen) of a first web browser (note in upper left corner of frame "Windows

Internet Explorer")) is open and the URL http://www.cotac.com/-knight/NICK3/ is entered in the

address bar causing the first Cotac webpage to be displayed in/loaded into the browser window

Application/Control Number: 90/012,496                                    Page 34
Art Unit: 3992

as shown in Exhibit C-1, i.e. text "New Adult Site.".  The source code of such first webpage

includes JavaScript code/instructions/commands embedded therein that is/are automatically

executed (includes parsing, processing, evaluation of code/instructions/commands) by the

browser, i.e. software, to open another second browser window. Such JavaScript

code/instructions/commands are as follows:

"window.open('http://web.archive.org/web/19990507232055/http://www.cotac.com//','_

best','resizable=yes,scrollbars=yes,toolbar=yes,location=yes,directories=yes,status=yes,

menubar=yes'); if (window.focus) {window.focus();}" (Exhibit C-2).  The

"window.open('http://... ')" command of the source code of Cotac when executed opens a second

browser window named "_best," and displays the second Cotac webpage, as downloaded from

the URL http://www.cotac.com/.  The second webpage within the second browser window is an

advertisement for an adult telephone service and other adult websites (Exhibit C-3).  The "if

(window.focus) {window.focus();}" command when executed causes the second browser

window to be in the background, i.e., behind and at least partially obscured by the first browser

window (Exhibit C-4) (note again in '229 in "an exemplary preferred embodiment the post-

session procedure"/instructions "is an advertising session consisting of opening a post-session

platform 24, linking to the Web server 22, sending the post-session platform 24 to the

background (or conversely, bringing the viewer's platform to the foreground)…In other words,

one preferred embodiment of the present invention uses the load triggering event to trigger an

advertising session.").  See also discussion of section (c) *infra*.

      Therefore a Web service implemented as a process/process(es) by a server or servers or

client system or on the media (e.g. evaluating/parsing/processing software of browser (i.e. "script

Application/Control Number: 90/012,496                                    Page 35
Art Unit: 3992

handler")), "that invokes"/activates/triggers (see also discussion of claim 3 [now new claims 24-

28] *infra*) "a post-session procedure" (i.e. a set of actions to be taken/commands to be executed

(e.g. Javascript code/commands/instructions of webpage for execution upon downloading thereof

into a window of the browser from entered URL http://www.cotac.com/-knight/NICK3/)), "in

said first browser" (see discussion *supra*), such "post-session procedure opening a second

browser in a said background window such that said opening is free from said background

window obscuring any portion of said foreground window while said first browser is

simultaneously displayed in said foreground window" (Exhibits C-1-C-4, esp. e.g., command

"var wbCurrentUrl = http:\/\/www.cotac.com\/~knight\/NICK3\" prior to the

"window.open('http… {window.focus();}'" command in Exhibit C-2) is disclosed by or inherent

in the disclosure of Cotac.

*(c) an event handler that receives from an Internet address, a link to an advertisement and loads*
*said advertisement into said second browser while said second browser is in a said background*
*window,*

   (See '229 at, e.g. the BACKGROUND OF THE INVENTION section, col. 1, line 10-col.

4, line 6 ("…In addition to its use in creating Web pages, HTML and XML can be used to create

advertising for the Internet.  The developer or maintainer of a Web site can insert HTML or

XML code in their Web pages so that when potential customers view the Web page an

advertisement and a link to another Web site is displayed…."), Figures 3A-3C, 5, and 8 and col.

5, lines 12-17, 21-23 and 32-33 ("FIGS. 3A, 3B, and 3C are block diagrams of an exemplary

embodiment of a Web server, a client, media, and a count daemon of the present invention

showing a load triggering event, a view triggering event, and data flow of the post-session

Internet advertising system of the present invention.", "FIG. 5 is a flow diagram of the event

Application/Control Number: 90/012,496                                      Page 36
Art Unit: 3992

handler of an exemplary preferred embodiment the post-session Internet advertising system of

the present invention.", and "FIG. 8 is flow diagram of the process of the post-session Internet

advertising system of the present invention.") and the DETAILED DESCRIPTION OF THE

INVENTION and ALTERNATIVE EMBODIMENT sections, col. 5, line 42-col. 14, line 57

("…FIG. 5 details an exemplary event handler 44,…FIG. 8 is a flow diagram showing the

sequence of steps in the process of delivering display content in the embodiment of the present

invention shown in FIGS. 3A-3C.  In the first step, a client 20 adds post-session instructions to

its display 50.  A viewer 26 requests a foreground display 52 from a first or foreground platform

with post-session instructions embedded (or otherwise linked) therein.  After the foreground

display 34 loads, the post-session instructions cause a post-session procedure 43a to be requested

54 and, in turn, the script handler 42 returns a post-session procedure 43b, 56.  At some point the

viewer 26 initiates a load triggering event 58.  This load triggering event causes a post-session

platform to open 60 in the background (physically behind or otherwise hidden from the viewer)

and also causes the post-session platform to request a post-session display 62.  In one alternative

embodiment, the post-session platform 24 that opens is of a type different from the foreground

platform 32.  The event handler 44 receives the request for a link 45a, 62 and returns a link to

post-session display 45b, 64.  In an alternative preferred embodiment, the client 20 includes an

event handler 44 that receives request 62 and returns a post-session display 64 into a secondary

post-session platform.  Optionally, the event handler 22 returns a focus timer process 45c, 66.

The post-session platform 24 and display 30 remain in the background until the viewer 26

initiates a view triggering event 68.  The viewer 26 views the post-session display in the post-

session platform 69.  After the viewer 26 is done viewing the post-session display 30, the viewer

Application/Control Number: 90/012,496                              Page 37
Art Unit: 3992

26 exits the post-session display 70.  Optionally, when the viewer 26 exits the post-session

display, time data 47 may be returned to the focus handler 72…It should be noted that the script

handler 42, event handler 44, and focus handler 46 may be processes implemented by the Web

server 22 as shown or may be processes implemented by a plurality of servers or may be

multiplied or divided into any number of processes. Applying the basic flow shown in FIGS. 3A-

3C and 8 to an exemplary embodiment of a Web surfer viewer surfing the Internet, a commercial

client 20 adds post-session instructions (HTML code) to its Web page display 50.  A surfer 26

requests the client's Web page 52 with the post-session instructions (HTML code) embedded

therein.  After the foreground Web page 34 loads, the post-session instructions (HTML code)

cause a script code 54 to be requested and, in turn, the Web server 22 returns a script code 56.

At some point the surfer 26 initiates a load triggering event 58, usually by exiting the initially

viewed client's Web page.  This load triggering event causes a post-session browser to open 60

behind the foreground browser and also causes the post-session browser to request a post-session

display 62.  The Web server 22 receives request 62 and returns a link or address to a post-session

display 64.  Optionally, the Web server 22 also returns a focus timer 66.  The post-session

browser 24 and display 30 remain in the background until the surfer 26 initiates a view triggering

event 68 such as exiting the foreground browser 32.  The surfer 26 views the post-session display

in the post-session browser 69.  After the surfer 26 is done viewing the post-session display 30,

the surfer 26 exits the post-session display 70 and time data is optionally returned to the Web

server 72….As shown in FIGS. 3A-3C, the functions of the Web server 22 may be divided into

the three Web services: the script handler 42 (FIG. 4), the event handler 44 (FIG. 5), and the

focus handler 46.  These services may be implemented as separate processes by a Web server (as

Application/Control Number: 90/012,496                                    Page 38
Art Unit: 3992

shown), as a single process, or as any number of processes on any number of servers.  These

services may also be implemented by the client's system or on the viewer's media.  These

services are similar in some functions, but there are differences in which portion of a single

transaction each service handles….Event Handler.  As shown in FIGS. 3B and 5, the event

handler 44 is invoked by a request for a display link 45a by the newly opened post-session Web

browser.  The event handler 44 chooses and delivers a link to a client's Web site 45b.  In one

preferred embodiment, the event handler delivers a link to an HTML frameset.  There is no

requirement, however, that the post-session browser link to HTML code.  In alternative preferred

embodiments, the post-session browser links to any form of network content including sound,

animation, streaming video, or any other form of rich media…A response is assembled and

returned to the platform 24.  The post-session procedure downloaded from the Web server 22 to

the platform 32 may be written in any supported scripting language, such as JavaScript or

VBscript.  In an exemplary preferred embodiment, the post-session procedure is an advertising

session consisting of opening a post-session platform 24, linking to the Web server 22, sending

the post-session platform 24 to the background (or conversely, bringing the viewer's platform to

the foreground), and optionally loading a process used for tracking focus time.  In other words,

one preferred embodiment of the present invention uses the load triggering event to trigger an

advertising session.  Post-Session Platform.  As shown in FIGS. 3B and 3C, the post-session

platform 24 requests from the Web server 22 the address of display 30.  In one preferred

embodiment, the address of display 30 is the client 20.  In alternative embodiments, the address

may be, for example, other clients or the Web server.  When display 30 is returned, the post-

session platform 24 displays display 30.  In one preferred embodiment, display 30 is advertising

Application/Control Number: 90/012,496                                                    Page 39
Art Unit: 3992

content for a client 20.  In an alternative preferred embodiment, display 30 is a Web site or Web

page of a client 20…In one preferred embodiment, the post-session platform 24 is a default

browser window of the same type as the current foreground platform 32.  One alternate

embodiment could have a specific viewer-specified default platform.  Another alternate

embodiment could use a default platform predetermined by the client 20, Web server 22, or the

specific type of display…As shown in FIG. 8, a load triggering event 58 causes a post-session

platform to open 60 and also causes the post-session platform to request a post-session display

62.  In one preferred embodiment, the event handler 44 returns a link to a single post-session

display 45b, 64.  In alternative embodiments, the post-session display may be refreshed one or

more times.  In other words, the event handler may deliver multiple links to the post-session

platform that are downloaded at periodic intervals while the post-session platform remains in the

background.  In these alternative embodiments, the post-session display may be refreshed even

though a new load triggering event has not occurred.").  See also claim 11 of '229, i.e. post-

session instructions.)

        See discussion of section (a) *supra.*  When a first Cotac webpage, which is maintained at

http://www.cotac.com/,-.knight/NICK3/, is loaded into the first browser window (Exhibit C-1),

HTML and Javascript code included therein is executed.   Such JavaScript code is again as

follows:

"window, open ('http://web.archive.org/web/19990507232055/http://www.cotac.com//', '_best',

'resizable=yes,scrollbars=yes,toolbar=yes,location=yes,directories=yes,status=yes ,

menubar=yes'); if (window,focus) {window.focus();}" (Exhibit C-2). The

"window.open('http://... ')" command, when executed/processed/handled, opens a second

Application/Control Number: 90/012,496                                    Page 40
Art Unit: 3992

browser window named "_best" which would receive/display a link/URL to a webpage/a second

webpage, which includes an advertisement for an adult telephone service and other adult

websites (Exhibit C-3), as downloaded from the URL/received from the Internet address

http://www.cotac.com/.  The "if (window.focus) {window.focus();}" command would cause the

second browser window to be in the background, i.e., behind and at least partially obscured by

the first browser window (Exhibit C-4).

Therefore a Web service implemented as a process/process(es) by a server or servers or

client system or on the media, e.g. browser software, i.e., an "event handler", that receives from

an Internet address ( i.e. /http://www.cotac.com//), a link to a webpage, which webpage includes

an advertisement (Exhibit C-3), which said advertisement/webpage is loaded into said second

browser while said second browser is in a said background window (Exhibit C-4) is disclosed by

or inherent in the disclosure of Cotac.  See also the discussion of the remainder of claim 9 *infra*.

Note the discussion of claim 10 *supra* in paragraphs 2-3.


*said event handler maintaining said second browser in said background window until the*
*occurrence of a user-initiated action made after said second browser is opened in said*
*background window, said event handler being free from instructions capable of automatically,*
*without user interaction, causing said second browser in said background window to replace*
*said first browser as said foreground window such that said first browser is then maintained in a*
*background window at least partially behind said second browser, during a time interval*
*beginning incrementally before said advertisement has completely finished loading in said*
*second browser and ending at a time incrementally after a user action navigates said first*
*browser to a different web site than that loaded in said first browser when said event handler*
*received said advertisement.*


(See '229 at, e.g., the abstract ("…Significantly, in the preferred embodiment, the post-

session platform stays in said background until a view triggering event occurs….), the

BACKGROUND OF THE INVENTION SECTI0N, col. 1, line 10-col. 4, line 6 ("…A focus

Application/Control Number: 90/012,496                                    Page 41
Art Unit: 3992

event may also be referred to as a 'view triggering event.'…"), BRIEF SUMMARY OF THE

INVENTION section, col. 4, lines 11 et seq ("…The computer and the Internet are exemplary

media that might be used in the present invention.  In this exemplary embodiment, Web browsers

are the platforms.  Further, in this exemplary embodiment, Web sites and advertisements are

exemplary display content.  More specifically, while a participating Web site (display content) is

being visited by a viewer using a first Web browser (platform), a second or post-session Web

browser (platform) loads with a second or post-session advertisement (display content) upon a

first or load triggering event such as exiting the specific Web page.  The post-session Web

browser does not disrupt the viewer's browsing experience in his first Web browser.  Instead, a

second or view triggering event, such as closing the first Web browser, allows the post-session

Web browser (and the advertisement thereon) to be viewable by the viewer…."), Figures 3A-3C,

col. 5, lines 12-17  ("FIGS. 3A, 3B, and 3C are block diagrams of an exemplary embodiment of

a Web server, a client, media, and a count daemon of the present invention showing a load

triggering event, a view triggering event, and data flow of the post-session Internet advertising

system of the present invention"), the DETAILED DESCRIPTION OF THE INVENTION and

ALTERNATIVE EMBODIMENTS sections, col. 5, line 42-col. 14, line 57 ("…Specifically,

when the viewer 26 who is viewing a first or foreground display 34 in a first or foreground

platform 74 exits a client's foreground platform 32 (or another load triggering event occurs 76), a

post-session platform 24 is opened and is immediately sent to the background 78.  Because it is

in the background, the post-session platform 24 does not disrupt the viewer's 26 browsing

experience.  When the viewer 26 closes the foreground platform 32 (either the original or a

subsequent platform 32) or another view triggering event occurs 80, the post-session platform 24

Application/Control Number: 90/012,496                                   Page 42
Art Unit: 3992

comes to the foreground 82….As mentioned above, FIG. 2 is a flow diagram showing the

sequence of events from the viewer's 26 perspective.  The viewer 26 first views 74 a first or

foreground display 34 in a first or foreground platform 32 of media 28.  The viewer 26 then

initiates 76 a load triggering event.  This event causes the opening 78 of a second or post-session

platform 24 in the background of the media 28.  The post-session platform 24 remains in the

background until the viewer 26 initiates 80 a view triggering event.  The viewer 26 then views 82

the post-session display 30 in the post-session platform 24….FIG. 8 is a flow diagram showing

the sequence of steps in the process of delivering display content in the embodiment of the

present invention shown in FIGS. 3A-3C.  In the first step, a client 20 adds post-session

instructions to its display 50.  A viewer 26 requests a foreground display 52 from a first or

foreground platform with post-session instructions embedded (or otherwise linked) therein.

After the foreground display 34 loads, the post-session instructions cause a post-session

procedure 43a to be requested 54 and, in turn, the script handler 42 returns a post-session

procedure 43b, 56.  At some point the viewer 26 initiates a load triggering event 58.  This load

triggering event causes a post-session platform to open 60 in the background (physically behind

or otherwise hidden from the viewer) and also causes the post-session platform to request a post-

session display 62….The event handler 44 receives the request for a link 45a, 62 and returns a

link to post-session display 45b, 64….The post-session platform 24 and display 30 remain in the

background until the viewer 26 initiates a view triggering event 68.  The viewer 26 views the

post-session display in the post-session platform 69.  After the viewer 26 is done viewing the

post-session display 30, the viewer 26 exits the post-session display 70.…It should be noted that

the script handler 42, event handler 44, and focus handler 46 may be processes implemented by

Application/Control Number: 90/012,496                                      Page 43
Art Unit: 3992

the Web server 22 as shown or may be processes implemented by a plurality of servers or may

be multiplied or divided into any number of processes. Applying the basic flow shown in FIGS.

3A-3C and 8 to an exemplary embodiment of a Web surfer viewer surfing the Internet, a

commercial client 20 adds post-session instructions (HTML code) to its Web page display 50. A

surfer 26 requests the client's Web page 52 with the post-session instructions (HTML code)

embedded therein. After the foreground Web page 34 loads, the post-session instructions

(HTML code) cause a script code 54 to be requested and, in turn, the Web server 22 returns a

script code 56. At some point the surfer 26 initiates a load triggering event 58, usually by exiting

the initially viewed client's Web page. This load triggering event causes a post-session browser

to open 60 behind the foreground browser and also causes the post-session browser to request a

post-session display 62. The Web server 22 receives request 62 and returns a link or address to a

post-session display 64…The post-session browser 24 and display 30 remain in the background

until the surfer 26 initiates a view triggering event 68 such as exiting the foreground browser 32.

The surfer 26 views the post-session display in the post-session browser 69….View Triggering

Event. At some point after viewing the display 34, the viewer activates a view triggering event.

View triggering events may include, for example, the viewer closing the foreground platform 32,

the viewer selecting the post-session platform 24 from the task bar at the bottom of a media

screen or an alternative menu structure, or the viewer minimizing or moving the foreground

platform 32. Exemplary view triggering events could include clicking on an off-site link or

entering a new address in a dialogue box, load, unload, click, resize, submit, focus, blur, drag,

key press (including a mouse button key), select, change (contents of a field), refresh, open,

close, redirect, enter, exit, maximize, end of program, beginning of program, beginning of

Application/Control Number: 90/012,496                    Page 44
Art Unit: 3992

session, end of session, 'switching services,' or change of service.  Still other view triggering

events may be time controlled.  These view triggering events are meant to be exemplary.  It

should be recognized from the exemplary view triggering events set out in the preceding

paragraph that one feature of a view triggering event is that it is preferably viewer driven….")

and claim 11 of '229, i.e. post-session instructions.)

     See discussion of sections (a), (b) and (c) *supra*.  Furthermore the source code (Exhibit

C-2) of Cotac does not include any instructions that would cause the second browser window to

automatically move to the foreground causing said second browser in said background window

to replace said first browser as said foreground window such that said first browser is then

maintained in a background window at least partially behind said second browser.  Exhibits C-1

and C-3 each also show an Archive bar and browser window with an "active" address and a

close button.  The browser window also shows minimize and maximize buttons.  Therefore, the

capability that, until after the user takes some action to bring the second browser window into

view, e.g. navigates said first browser to a different web site than that loaded in said first browser

when said event handler received said advertisement, i.e. other than http://www.cotac.com/,-

.knight/NICK3/, the second browser window will remain obscured behind the first browser

window, e.g. during a time interval beginning incrementally before said advertisement has

completely finished loading in said second browser, see discussion of section (c) *supra*, and

ending at a time incrementally after a user action navigates said first browser to a different web

site than that loaded in said first browser when said event handler received said advertisement, is

disclosed by or inherent in the teachings of Cotac.

Application/Control Number: 90/012,496                                Page 45
Art Unit: 3992

**where said event handler selects and returns one of a plurality of advertisements
maintained at said Internet address.**

(See '229 at, e.g., Figures 3B and 5 and col. 10, lines 15-19 ("Event Handler.  As shown

in FIGS. 3B and 5, the event handler 44 is invoked by a request for a display link 45a by the

newly opened post-session Web browser.  The event handler 44 chooses and delivers a link to a

client's Web site 45b.").)

See the ***Response to Arguments*** section *supra* with regard to this claim ("From such

description, while a plurality of advertisements/links are maintained at an address, the event

handler selects or chooses, as best understood, the link/advertisement requested by the post

session platform/instructions, i.e. the event handler as described does not have the option of more

than one outcome.  Therefore, and contrary to Patent Owner's argument, the words of the claim

itself given the broadest reasonable interpretation consistent with the specification do not require

the event handler to select and return or be capable of selecting and returning any one of a

plurality of advertisements maintained at an Internet address.").  See discussion of  "**The system

of claim 1**" *supra*, e.g., section (c) thereof, when a first Cotac webpage, which is maintained at

http://www.cotac.com/~knight/NICK3/, is displayed in a first browser window, code included

therein causes a "pop-under window" to be opened and display a second Cotac webpage (Exhibit

C-3).  It is noted that such first Cotac webpage is an advertisement for a "NEW ADULT SITE!"

and clicking on such link causes a new webpage (Exhibit C-6) to be selected and returned from

the Internet address www.cun-tv.com for display in the first browser window. In addition, other

advertisements are maintained at the same Internet address as the first and second Cotac

webpages, see, e.g., Exhibit C-5 which include a banner advertisement and links to several other

Application/Control Number: 90/012,496                                    Page 46
Art Unit: 3992

adult websites, i.e. the first Cotac webpage, the second Cotac webpage and the additional

webpages discussed *supra*, i.e. Exhibits C-5-C-6, are all advertisement webpages maintained at

the same internet address (i.e., www.cotac.com).   Therefore, it is disclosed by or inherent in the

teachings of Cotac that when the second Cotac webpage (Exhibit C-3) requested is returned for

display in the "pop-under" window, one of a plurality of advertisements maintained at that

Internet address has also been selected and returned.


Claim 19:

**The method of claim 11**

*11. A post-session advertising method for use in a media capable of simultaneously maintaining a background window and a foreground window, said method comprising the steps of:*

      See discussion of claim 9, and thereby claim 1 *supra*, esp. the preamble thereof.

Therefore a "post-session advertising method for use in a media" (e.g., a device having a screen,

i.e. a communication device, running/using Windows®, e.g. a computer or similar device)

"capable of simultaneously maintaining a background window and a foreground window" is

disclosed by or inherent in the teachings of Cotac.


*(a) embedding post-session instructions into a first browser, said first browser for being displayed in said foreground window;*

*(b) said post-session instructions opening a second browser in said background window such that said opening is free from said background window obscuring any portion of said foreground window while said first browser is being displayed in said foreground window;*

      See discussion of claim 9 and thereby, claim 1 *supra*, esp. section (b) thereof.  Therefore

"embedding post-session instructions into a first browser" which "first browser" is being

Application/Control Number: 90/012,496                                    Page 47
Art Unit: 3992

displayed in the foreground window and "said post-session instructions opening a second

browser in said background window such that said opening is free from said background window

obscuring any portion of said foreground window while said first browser is being displayed in

said foreground window" is disclosed by or inherent in the teachings of Cotac.


*(c) said post-session instructions receiving, from an Internet address, a link to an advertisement;*

*(d) loading said advertisement into said second browser while said second browser is in said
background window;*

    See discussion of claim 9 and thereby, claim 1 *supra*, esp. section (c) thereof.  Therefore

"post-session instructions receiving, from an Internet address, a link to an advertisement" and

"loading said advertisement into said second browser while said second browser is in said

background window" is disclosed by or inherent in the teachings of Cotac.


*wherein said post-session instructions are free from instructions capable of automatically,
without user interaction, causing said second browser in said background window to replace
said first browser as said foreground window such that said first browser is then maintained in a
background window at least partially behind said second browser, during a time interval
beginning incrementally before said advertisement has completely finished loading in said
second browser and ending at a time incrementally after a user action navigates said first
browser to a different web site than that displayed in said first browser when said post-session
instructions received said link to said advertisement.*

    See discussion of claim 9 and thereby claim 1 *supra*, esp. section (c) thereof.  Therefore

"said post-session instructions are free from instructions capable of automatically, without user

interaction, causing said second browser in said background window to replace said first browser

as said foreground window such that said first browser is then maintained in a background

window at least partially behind said second browser, during a time interval beginning

Application/Control Number: 90/012,496                                           Page 48
Art Unit: 3992

incrementally before said advertisement has completely finished loading in said second browser

and ending at a time incrementally after a user action navigates said first browser to a different

web site than that displayed in said first browser when said post-session instructions received

said link to said advertisement" is disclosed by or inherent in the teachings of Cotac.

**where an event handler selects and returns one of a plurality of advertisements maintained
at said Internet address.**

  See discussion of claim 9 *supra*.

**Claim Rejections - 35 USC § 103**

  5. **Claims 9 and 19 are rejected under 35 U.S.C. 103(a) as being unpatentable over**

**Cotac in view of Alberts '392.**

  The reference to Alberts '392 includes a filing date (July 28, 1997) prior to the earliest

effective date of '229 (May 26, 2000) for which benefit may be claimed and thus is available as

prior art under 35 USC 102(a) and (e) and 35 USC 103(a).

Claim 9:

**The system of claim 1**

See the discussion of similar language of claim 9 in paragraph 4 *supra*.

**where an event handler selects and returns one of a plurality of advertisements maintained
at said Internet address.**

  (See '229 at, e.g., Figures 3B and 5 and '229 again at, e.g., the paragraph bridging cols.

6-7 ("FIG. 8 is a flow diagram showing the sequence of steps in the process of delivering display

Application/Control Number: 90/012,496                                    Page 49
Art Unit: 3992

content in the embodiment of the present invention shown in FIGS. 3A-3C…This load triggering

event causes a post-session platform to open 60 in the background (physically behind or

otherwise hidden from the viewer) and also causes the post-session platform to request a post-

session display 62.  In one alternative embodiment, the post-session platform 24 that opens is of

a type different from the foreground platform 32.  The event handler 44 receives the request for a

link 45a, 62 and returns a link to post-session display 45b, 64.  In an alternative preferred

embodiment, the client 20 includes an event handler 44 that receives request 62 and returns a

post-session display 64 into a secondary post-session platform….It should be noted that the

script handler 42, event handler 44, and focus handler 46 may be processes implemented by the

Web server 22 as shown or may be processes implemented by a plurality of servers or may be

multiplied or divided into any number of processes."), col. 7, first full paragraph ("Applying the

basic flow shown in FIGS. 3A-3C and 8 to an exemplary embodiment of a Web surfer viewer

surfing the Internet, a commercial client 20 adds post-session instructions (HTML code) to its

Web page display 50.  A surfer 26 requests the client's Web page 52 with the post-session

instructions (HTML code) embedded therein.  After the foreground Web page 34 loads, the post-

session instructions (HTML code) cause a script code 54 to be requested and, in turn, the Web

server 22 returns a script code 56.  At some point the surfer 26 initiates a load triggering event

58, usually by exiting the initially viewed client's Web page.  This load triggering event causes a

post-session browser to open 60 behind the foreground browser and also causes the post-session

browser to request a post-session display 62.  The Web server 22 receives request 62 and returns

a link or address to a post-session display 64…."), col. 10, first full paragraph ("Post-Session

Procedure.  The post-session procedure consists of a set of actions to be taken in response to the

Application/Control Number: 90/012,496                                              Page 50
Art Unit: 3992

load triggering event.  The post-session procedure causes no immediate visible change to the

foreground display 34, but when the load triggering event occurs, a new platform (post-session

platform 24) opens and is immediately sent to the background.  The post-session platform 24

may be a full sized window or any other sized window."), the paragraph bridging cols. 9-10

("Additional Load Triggering Events. In one exemplary preferred embodiment, if a first load

triggering event is followed by a second load triggering event, a second post- session platform 24

is opened and sent to the background…."), and col. 10, lines 15-56 ("Event Handler. As shown

in FIGS. 3B and 5, the event handler 44 is invoked by a request for a display link 45a by the

newly opened post-session Web browser. The event handler 44 chooses and delivers a link to a

client's Web site 45b. In one preferred embodiment, the event handler delivers a link to an

HTML frameset. There is no requirement, however, that the post-session browser link to HTML

code….In other words, one preferred embodiment of the present invention uses the load

triggering event to trigger an advertising session.  Post-Session Platform. As shown in FIGS. 3B

and 3C, the post-session platform 24 requests from the Web server 22 the address of display 30.

In one preferred embodiment, the address of display 30 is the client 20. In alternative

embodiments, the address may be, for example, other clients or the Web server. When display 30

is returned, the post-session platform 24 displays display 30. In one preferred embodiment,

display 30 is advertising content for a client 20. In an alternative preferred embodiment, display

30 is a Web site or Web page of a client 20. In one preferred embodiment, as shown in FIG. 9,

the post-session platform 24 shows the display 30 in a frameset with branding information of

thes Web server 22 in one frame and client advertising content in another frame.").)

See again the ***Response to Arguments*** section *supra* with regard to this claim.

Application/Control Number: 90/012,496                                    Page 51
Art Unit: 3992

Assuming arguendo, i.e. despite the Examiner's position set forth in paragraph 4 *supra*, that Cotac does not include such an event handler, i.e. an "event handler selects and returns one of a plurality of advertisements maintained at said Internet address", Cotac does, at the very least, teach commercial ad display including the use of banner ads, see, e.g., Exhibit C-5.  Note also PO's remarks bridging pages 18-19, i.e. Cotac "advertise[s] several businesses" and "the second web browser includes a plurality of advertisements".   Furthermore see Alberts '392, hereinafter also referred to as '392, at, e.g., col. 1, lines 9-30 ("Along with other information, Internet information providers can provide ads to users in a number of forms, one of which is as a 'banner' across an Internet page, often at the top of the page. A banner ad can have text and still or moving graphics, and typically serves as an HTML (HyperText Markup Language) link, such that the user is linked to another specified page if the user clicks on the banner. Some Internet sites are always associated with the same particular one or more banner ads; each time the site is accessed, the particular ad or ads are displayed along with the other information that is displayed (an access to a site or page is referred to as a 'hit'). Rather than associate one or more particular banner ads with a page for every hit, banner ads can be sold in terms of frequency--a number of hits per day, particularly from sites that have a large number of hits per day. A system with a small number of different ads that are served (and thus displayed) an equal number of times can easily be envisioned,…"), col. 1, lines 55-65 ("The present invention is an advertising system for use with a large, publicly accessible network, such as the Internet. The system has at least one server for providing information in response to a request from a user. The system includes an advertising server, an advertising database, and an advertising controller for communicating with the ad server and the ad database. The database stores information about the

Application/Control Number: 90/012,496                                          Page 52
Art Unit: 3992

ads, and the controller loads advertising campaign data, preferably in the form of tables, from the

database to the ad server. The ad server uses the information to cause the ads to be served as

desired."), Figure 1, col. 2, lines 15-40 ("The system can predictively model the number of hits

to control the distribution of serves, either to ensure even distribution, or to concentrate ads

during particular times. The system also preferably has triggering information that allows ads to

be targeted. Ads can be targeted to users seeking certain types of information, e.g., on a yellow

pages system or on a search engine, access to 'photography' could cause the serving of an ad for

a manufacturer of film; to users from particular geographic locations; to particular users; or to

users at different times of the day. The system of the present invention also provides statistical,

reporting, and feedback functions to allow a system manager to monitor and report the serves.

This data can be used for control purposes, and also to provide reports to verify the ads that have

been served.  The present invention provides an integrated system that allows ads to be served in

a highly flexible and accurate manner a desired number of times throughout the day and evenly

distributed throughout the day, or intensified at times if desired. Different ads can be served

based on different triggering events, such as the location of the user, the type of information

being accessed by the user, or the categories accessed.."), col. 3, lines 18-25 ("Referring also to

FIG. 2, ad servers 14 can be implemented with common gateway interface (CGI) scripts, or they

can be implemented as software that runs as part of the web server process. When a user contacts

one of web servers 12 with a query or a request for information, ad server 14 causes one or more

ads to be served along with a response to that  request"), col. 4, lines 34-39 ("According to the

present invention, ad servers 14 provide rotational control that ensures that ads are served a

desired number of times per day and with a desired distribution throughout the day, even with a

Application/Control Number: 90/012,496                                             Page 53
Art Unit: 3992

large number of ads, a wide variation in ratios of hits, and/or wide variations of hits per day over

multiple days….”), col. 6, lines 15-20 (“With this system, each ad need only be listed once in a

table, such as the table in FIG. 4, and then accessed with a moving pointer (or other method for

incrementally identifying items in a group), without requiring repetition or duplication of items

to forcibly fix ratios.”) and col. 7, lines 7-21 (“The present invention also provides the control

and flexibility to allow ads to be served based on different triggering events….”).  Therefore to

employ a system with a small number of different ads that are served (and thus displayed) an

equal number of times, i.e. an event handler which selects and returns one of a plurality of

advertisements maintained at said Internet address, as taught by ‘392 for the Internet site

associated with the same particular one or more banner ads, i.e. “the second web browser

includes a plurality of advertisements”, as taught by Cotac, if not already, see paragraph 4 *supra*,

would be obvious to one of ordinary skill in the art in view of the recognition that such

substitution can not only be “easily [be] envisioned” but also better control distribution and

concentration of ads thereby improving the effectiveness of such ads and the desire for such in

any advertising system.


Claim 19:

**The method of claim 11**

    See the discussion of similar language of claim 19 in paragraph 4 *supra*.

**where an event handler selects and returns one of a plurality of advertisements maintained at said Internet address.**

    See discussion of claim 9 *supra*.

Application/Control Number: 90/012,496                                    Page 54
Art Unit: 3992

6. **Claims 9 and 19 are rejected under 35 U.S.C. 103(a) as being unpatentable over Unfaithful as evidenced by JavaScript Bible in view of Alberts '392.**

The Unfaithful website as a whole includes a publication date of no later than February 29, 2000 which is before the earliest effective date of '229 (May 26, 2000) for which benefit may be claimed and thus is available as prior art under 35 USC 102(a) and 35 USC 103(a). The JavaScript Bible publication includes a publication date of no later than 1998 which is more than one year prior to the earliest effective date of '229 (May 26, 2000) for which benefit may be claimed and thus is available as prior art under 35 USC 102(b) and 35 USC 103(a).


Claim 9:

**The system of claim 1**


See the discussion of the language of claim 9 in the ***Response to Arguments*** section *supra*.  See the rejection of claim 1 essentially as proposed on pages 8-11 of the Request which is hereby incorporated into this Office Action by reference.  Note also Patent Owner's response at page 21 and the ***Response to Arguments*** section, **37 CFR 1.131 Declaration,** *supra*.


**where an event handler selects and returns one of a plurality of advertisements maintained at said Internet address.**

(See '229 at, e.g., Figures 3B and 5 and '229 again at , e.g., the paragraph bridging cols. 6-7 ("FIG. 8 is a flow diagram showing the sequence of steps in the process of delivering display content in the embodiment of the present invention shown in FIGS. 3A-3C…This load triggering event causes a post-session platform to open 60 in the background (physically behind or otherwise hidden from the viewer) and also causes the post-session platform to request a post-session display 62.  In one alternative embodiment, the post-session platform 24 that opens is of

Application/Control Number: 90/012,496                                          Page 55
Art Unit: 3992

a type different from the foreground platform 32.  The event handler 44 receives the request for a

link 45a, 62 and returns a link to post-session display 45b, 64.  In an alternative preferred

embodiment, the client 20 includes an event handler 44 that receives request 62 and returns a

post-session display 64 into a secondary post-session platform….It should be noted that the

script handler 42, event handler 44, and focus handler 46 may be processes implemented by the

Web server 22 as shown or may be processes implemented by a plurality of servers or may be

multiplied or divided into any number of processes."), col. 7, first full paragraph ("Applying the

basic flow shown in FIGS. 3A-3C and 8 to an exemplary embodiment of a Web surfer viewer

surfing the Internet, a commercial client 20 adds post-session instructions (HTML code) to its

Web page display 50.  A surfer 26 requests the client's Web page 52 with the post-session

instructions (HTML code) embedded therein.  After the foreground Web page 34 loads, the post-

session instructions (HTML code) cause a script code 54 to be requested and, in turn, the Web

server 22 returns a script code 56.  At some point the surfer 26 initiates a load triggering event

58, usually by exiting the initially viewed client's Web page.  This load triggering event causes a

post-session browser to open 60 behind the foreground browser and also causes the post-session

browser to request a post-session display 62.  The Web server 22 receives request 62 and returns

a link or address to a post-session display 64…."), col. 10, first full paragraph ("Post-Session

Procedure.  The post-session procedure consists of a set of actions to be taken in response to the

load triggering event.  The post-session procedure causes no immediate visible change to the

foreground display 34, but when the load triggering event occurs, a new platform (post-session

platform 24) opens and is immediately sent to the background.  The post-session platform 24

may be a full sized window or any other sized window."), the paragraph bridging cols. 9-10

("Additional Load Triggering Events. In one exemplary preferred embodiment, if a first load

triggering event is followed by a second load triggering event, a second post- session platform 24

is opened and sent to the background…."), and col. 10, lines 15-56 ("Event Handler. As shown

in FIGS. 3B and 5, the event handler 44 is invoked by a request for a display link 45a by the

newly opened post-session Web browser. The event handler 44 chooses and delivers a link to a

client's Web site 45b. In one preferred embodiment, the event handler delivers a link to an

HTML frameset. There is no requirement, however, that the post-session browser link to HTML

code….In other words, one preferred embodiment of the present invention uses the load

triggering event to trigger an advertising session.  Post-Session Platform. As shown in FIGS. 3B

and 3C, the post-session platform 24 requests from the Web server 22 the address of display 30.

In one preferred embodiment, the address of display 30 is the client 20. In alternative

embodiments, the address may be, for example, other clients or the Web server. When display 30

is returned, the post-session platform 24 displays display 30. In one preferred embodiment,

display 30 is advertising content for a client 20. In an alternative preferred embodiment, display

30 is a Web site or Web page of a client 20. In one preferred embodiment, as shown in FIG. 9,

the post-session platform 24 shows the display 30 in a frameset with branding information of

thes Web server 22 in one frame and client advertising content in another frame.").)

    See again the **Response to Arguments** section *supra* with regard to this claim.

    While Unfaithful does not explicitly include an "event handler which selects and returns

any one of a plurality of advertisements maintained at said Internet address", Unfaithful does at

the very least teach commercial ad display including the use of banner ads, see, e.g., Exhibit D,

i.e. a web browser includes a plurality of advertisements.   Furthermore see '392 again at, e.g.,

col. 1, lines 9-30 ("Along with other information, Internet information providers can provide ads

to users in a number of forms, one of which is as a 'banner' across an Internet page, often at the

top of the page. A banner ad can have text and still or moving graphics, and typically serves as

an HTML (HyperText Markup Language) link, such that the user is linked to another specified

page if the user clicks on the banner. Some Internet sites are always associated with the same

particular one or more banner ads; each time the site is accessed, the particular ad or ads are

displayed along with the other information that is displayed (an access to a site or page is

referred to as a 'hit'). Rather than associate one or more particular banner ads with a page for

every hit, banner ads can be sold in terms of frequency--a number of hits per day, particularly

from sites that have a large number of hits per day. A system with a small number of different

ads that are served (and thus displayed) an equal number of times can easily be envisioned,…"),

col. 1, lines 55-65 ("The present invention is an advertising system for use with a large, publicly

accessible network, such as the Internet. The system has at least one server for providing

information in response to a request from a user. The system includes an advertising server, an

advertising database, and an advertising controller for communicating with the ad server and the

ad database. The database stores information about the ads, and the controller loads advertising

campaign data, preferably in the form of tables, from the database to the ad server. The ad server

uses the information to cause the ads to be served as desired."), Figure 1, col. 2, lines 15-40

("The system can predictively model the number of hits to control the distribution of serves,

either to ensure even distribution, or to concentrate ads during particular times. The system also

preferably has triggering information that allows ads to be targeted. Ads can be targeted to users

seeking certain types of information, e.g., on a yellow pages system or on a search engine, access

Application/Control Number: 90/012,496                                          Page 58
Art Unit: 3992

to 'photography' could cause the serving of an ad for a manufacturer of film; to users from

particular geographic locations; to particular users; or to users at different times of the day. The

system of the present invention also provides statistical, reporting, and feedback functions to

allow a system manager to monitor and report the serves. This data can be used for control

purposes, and also to provide reports to verify the ads that have been served.  The present

invention provides an integrated system that allows ads to be served in a highly flexible and

accurate manner a desired number of times throughout the day and evenly distributed throughout

the day, or intensified at times if desired. Different ads can be served based on different

triggering events, such as the location of the user, the type of information being accessed by the

user, or the categories accessed…."), col. 3, lines 18-25 ("Referring also to FIG. 2, ad servers 14

can be implemented with common gateway interface (CGI) scripts, or they can be implemented

as software that runs as part of the web server process. When a user contacts one of web servers

12 with a query or a request for information, ad server 14 causes one or more ads to be served

along with a response to that  request"), col. 4, lines 34-39 ("According to the present invention,

ad servers 14 provide rotational control that ensures that ads are served a desired number of

times per day and with a desired distribution throughout the day, even with a large number of

ads, a wide variation in ratios of hits, and/or wide variations of hits per day over multiple

days…."), col. 6, lines 15-20 ("With this system, each ad need only be listed once in a table, such

as the table in FIG. 4, and then accessed with a moving pointer (or other method for

incrementally identifying items in a group), without requiring repetition or duplication of items

to forcibly fix ratios.") and col. 7, lines 7-21 ("The present invention also provides the control

and flexibility to allow ads to be served based on different triggering events….").  Therefore to

Application/Control Number: 90/012,496                              Page 59
Art Unit: 3992

employ a system with a small number of different ads that are served (and thus displayed) an

equal number of times, i.e. an event handler which selects and returns one of a plurality of

advertisements maintained at said Internet address, as taught by '392 rather than the same

particular one or more banner ads, i.e. a web browser includes the same plurality of

advertisements, as taught by Unfaithful, if not already, would be obvious to one of ordinary skill

in the art in view of the recognition that such substitution can not only be "easily [be]

envisioned", but also better control distribution and concentration of ads thereby improving the

effectiveness of such ads and the desire for such in any advertising system.


Claim 19:

**The method of claim 11**

    See the discussion of the preamble of claim 9 *supra*.

**where an event handler selects and returns one of a plurality of advertisements maintained at said Internet address.**

    See discussion of claim 9 *supra*.


***Claim Rejections-New Claims 23-80***


**Claim Rejections - 35 USC § 112**

    7.  **Claims 36, 38-49, 63, and 65-80 are rejected under 35 U.S.C. 112(a) or 35 U.S.C.**

**112 (pre-AIA), first paragraph, as failing to comply with the written description**

**requirement.  The claim(s) contains subject matter which was not described in the**

**specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the application was filed, had possession of the claimed invention.**

New claims 36 and 63 recite the device or media respectively comprising a radio.  Patent Owner relies upon col. 4, lines 19-22 and col. 6, lines 6-8 for support.  While such citations do recite media such as radios a the term "viewer" describing a radio listener, such citations do not describe such radio as a device or media as claimed in claim 9, and thereby, claim 1, or claim 19, and thereby, claim 11 e.g. as a device in a "system for Internet advertising" "that interacts with a display to display to a user at least one browser, each said one browser within a respective window" or a media used for a "post-session advertising method" which is "capable of simultaneously maintaining a background window and a foreground window".

Therefore, as best understood and for purpose of further discussion, these claims are interpreted as requiring some device capable of audio communication as well as a display to display to a user at least one browser within a window.

New claims 39-45 and 66-72 recite various displays.  Patent Owner relies upon col. 6, lines 32-39 for support.  While such citation does recite displays of various contents, such does not describe such displays as a display as claimed in claim 9 and thereby, claim 1, or claim 19, and thereby, claim 11 (See discussion of claims 66-72 in paragraph 8 *infra*), e.g. as interacting with a display to display to a user at least one browser in a respective window.

Therefore, as best understood and for purpose of further discussion, these claims are interpreted as requiring a device that interacts with a display to display to a user, i.e. a device

Application/Control Number: 90/012,496                                    Page 61
Art Unit: 3992

capable of imparting to a viewer content that can be seen, heard or otherwise sensed, i.e. the

specific claimed content, within or from a platform, e.g. a window (i.e. a screen).

New claims 46-49 and 73-76 recite advertisements comprising framesets, sound,

animation and streaming video.  Patent Owner relies upon col. 10, lines 19-25 for support.

While such citation does recite such framesets, sound, animation and streaming video forms,

such citation does not describe the forms being of advertisements as claimed in the claims but

rather as being of links.

Therefore, as best understood and for purposes of further discussion, these claims are

interpreted as requiring an advertisement or links including such specific claimed form of

network content.

New claims 77 and 78, like claims 10 and 20 discussed *supra,* recite "wherein said event

handler opens a plurality of second browsers, each maintained in a separate said background

window".  Patent Owner relies upon col. 9, line 64-col. 10, line 6 for support.  However, for the

same reasons as set forth in paragraph 2 *supra,* while a plurality of second browsers being

opened or a single second browser being refreshed a plurality of times is described, such opening

is not performed by the event handler but rather by a load triggering event and such refreshing

causes the event handler to deliver multiple links to the same browser, not open multiple

browsers. Cited col. 9, line 64-col. 10, line 6 directed to additional load triggering events further

supports this position.

New claims 79-80 recite "said event handler prevents the opening of a plurality of second

browsers after opening a first one of said second browser [sic]".  Patent Owner again relies upon

col. 9, line 64-col. 10, line 6 for support.  However, for the same reasons as set forth *supra* with

Application/Control Number: 90/012,496                                          Page 62
Art Unit: 3992

regard to claims 77-78 and in paragraph 2 *supra* with regard to claims 10 and 20, while a second

browser is prevented from being opened, such is not described as being performed by the event

handler.

New claim 38 recites "said focus timer tracks the duration that said second browser

displaying said advertisement spends in said foreground window even if said second browser is

moved between said foreground window and said background window multiple times before said

second browser is closed, and the time data tracked by said focus timer is returned to a web

server or secondary server."  Patent Owner relies upon column 11, lines 24-56 for support.

While such citation does disclose a focus timer process which tracks the duration that the post

session platform is brought to the foreground even if the platform is brought to the foreground

and returned to the background multiple times, i.e. the platform is time tracked when in the

foreground even if it moves between the foreground and background, that is not what is claimed,

i.e. the browser with a specific ad display is time tracked when in the foreground window even if

the browser is moved between windows, i.e. platforms (emphasis added).  Note col. 6, lines 17-

39 of '229 also.

Therefore, as best understood and for purposes of further discussion, this claim is

interpreted as requiring said focus timer tracks the duration that said second browser displaying

said advertisement spends in said foreground even if said second browser is moved between said

foreground and said background multiple times before said second browser is closed, and the

time data tracked by said focus timer is returned to a web server or secondary server."

New claim 65 similarly recites "tracking the duration that said second browser displays

said advertisement in said foreground window continues even if said second browser is moved

between said foreground window and said background window multiple times before said

second browser is closed, and the time data so tracked is returned to a web server or secondary

server.


    8. **Claims 38, 65-72, 77-78 and 80 are rejected under 35 U.S.C. 112(b) or 35 U.S.C.**

**112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out**

**and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-**

**AIA the applicant regards as the invention.**

    With regard to claims 77-78 and the claim language "while said first browser and each of

said second browsers are simultaneously maintained", see the discussion in paragraph 2 *supra*

with regard to similar language.

    With regard to claim 38, a positive antecedent basis for "the duration that said second

browser displaying said advertisement spends in said foreground window" should be set forth

(note claim 32 from which claim 38 depends recites "the duration that said second browser is

displayed in said foreground window").

    With regard to claim 65, a positive antecedent basis for "the duration that said second

browser displays said advertisement in said foreground window" should be set forth (note claim

59 from which claim 65 depends recites "the duration that said second browser is displayed in

said foreground window").

    With regard to claims 66-72, a positive antecedent basis for "said display" should be set

forth.

Application/Control Number: 90/012,496                                    Page 64
Art Unit: 3992

With regard to claims 78 and 80, a positive antecedent basis for 'said event handler'

should be set forth.

**Claim Rejections - 35 USC § 102**

9. **Claims 23-28, 31, 33, 39, 46, 50-55, 58, 60, 66, and 73 are rejected under 35**

**U.S.C. 102(b) as being anticipated by Cotac or, in the alternative, under 35 U.S.C. 103(a) as**

**being obvious over Cotac in view of Alberts '392.**

Claim 23:

**The system of claim 9 where said second browser is opened in response to a load-triggering
event.**

See discussion of claims 24-28 *infra*.

Claim 24:

**The system of claim 23 where said load-triggering event comprises clicking on an off-site
link.**

(See '229 at, e.g., the abstract ("…In one preferred embodiment, a first display is viewed

in a first platform in the foreground of a media by a viewer.  A viewer initiates a load triggering

event and in response, a post-session platform is opened to display a post-session display in the

background of the media...."), col. 4, lines 38-62 ("In another alternate preferred embodiment of

the present invention, the number of post-session platforms is limited to, for example, one

platform.  Multiple load triggering events would either be ignored or would cause the display to

refresh (or change) in the already loaded post-session platform….The computer and the Internet

Application/Control Number: 90/012,496                                          Page 65
Art Unit: 3992

are exemplary media that might be used in the present invention.  In this exemplary embodiment,

Web browsers are the platforms.  Further, in this exemplary embodiment, Web sites and

advertisements are exemplary display content.  More specifically, while a participating Web site

(display content) is being visited by a viewer using a first Web browser (platform), a second or

post-session Web browser (platform) loads with a second or post-session advertisement (display

content) upon a first or load triggering event such as exiting the specific Web page…."), Figures

3A-3C, col. 5, lines 12-17 ("FIGS. 3A, 3B, and 3C are block diagrams of an exemplary

embodiment of a Web server, a client, media, and a count daemon of the present invention

showing a load triggering event, a view triggering event, and data flow of the post-session

Internet advertising system of the present invention."), and the DETAILED DESCRIPTION OF

THE INVENTION and ALTERNATIVE EMBODIMENTS sections, col. 5, line 42-col. 14, line

57 ("…As shown in FIGS. 1 and 2, a client 20 interacts with a Web server 22 to deliver, upon

the occurrence of a 'load triggering event,' a post-session platform 24 to a viewer's 26 media 28

so that the viewer 26 may view the client's 20 post-session display 30 after the viewer 26 has

exited (or another 'view triggering event' has occurred) a foreground platform 32.  Specifically,

when the viewer 26 who is viewing a first or foreground display 34 in a first or foreground

platform 74 exits a client's foreground platform 32 (or another load triggering event occurs 76), a

post-session platform 24 is opened and is immediately sent to the background 78.…As

mentioned above, FIG. 2 is a flow diagram showing the sequence of events from the viewer's 26

perspective.  The viewer 26 first views 74 a first or foreground display 34 in a first or foreground

platform 32 of media 28.  The viewer 26 then initiates 76 a load triggering event.…FIG. 8 is a

flow diagram showing the sequence of steps in the process of delivering display content in the

Application/Control Number: 90/012,496                                    Page 66
Art Unit: 3992

embodiment of the present invention shown in FIGS. 3A-3C.  In the first step, a client 20 adds

post-session instructions to its display 50.  A viewer 26 requests a foreground display 52 from a

first or foreground platform with post-session instructions embedded (or otherwise linked)

therein.  After the foreground display 34 loads, the post-session instructions cause a post-session

procedure 43a to be requested 54 and, in turn, the script handler 42 returns a post-session

procedure 43b, 56.  At some point the viewer 26 initiates a load triggering event 58.  This load

triggering event causes a post-session platform to open 60 in the background (physically behind

or otherwise hidden from the viewer) and also causes the post-session platform to request a post-

session display 62….Applying the basic flow shown in FIGS. 3A-3C and 8 to an exemplary

embodiment of a Web surfer viewer surfing the Internet, a commercial client 20 adds post-

session instructions (HTML code) to its Web page display 50.  A surfer 26 requests the client's

Web page 52 with the post-session instructions (HTML code) embedded therein.  After the

foreground Web page 34 loads, the post-session instructions (HTML code) cause a script code

54 to be requested and, in turn, the Web server 22 returns a script code 56.  At some point the

surfer 26 initiates a load triggering event 58, usually by exiting the initially viewed client's Web

page.  This load triggering event causes a post-session browser to open 60 behind the foreground

browser and also causes the post-session browser to request a post-session display 62….Load

Triggering Event.  At some point while viewing the display 34, the viewer activates a load

triggering event.  Load triggering events may include, for example, the viewer leaving or exiting

the specific display 34 or the viewer closing the foreground platform 32.  Exemplary alternative

load triggering events may include clicking on an off-site link or entering a new address in a

dialogue box, time delay, load, unload, click, resize, submit, focus, blur, drag, key press

Application/Control Number: 90/012,496                                         Page 67
Art Unit: 3992

(including a mouse button key), select, change (contents of a form field), refresh, open, close,

redirect, enter, exit, move, minimize, maximize, end of program, beginning of program,

beginning of session, end of session, 'switching services,' or change of service.  These load

triggering events are meant to be exemplary.   Additional Load Triggering Events.  In one

exemplary preferred embodiment, if a first load triggering event is followed by a second load

triggering event, a second post-session platform 24 is opened and sent to the background.  In an

alternative preferred embodiment, a second post-session platform is not opened.  In an additional

preferred embodiment, if a first load triggering event is followed by a second load triggering

event, a second post-session window is opened only if the time period between load triggering

events is shorter than a predetermined time period.  Post-Session Procedure.  The post-session

procedure consists of a set of actions to be taken in response to the load triggering event.  The

post-session procedure causes no immediate visible change to the foreground display 34, but

when the load triggering event occurs, a new platform (post-session platform 24) opens and is

immediately sent to the background….The post-session procedure downloaded from the Web

server 22 to the platform 32 may be written in any supported scripting language, such as

JavaScript or VBscript.  In an exemplary preferred embodiment, the post-session procedure is an

advertising session consisting of opening a post-session platform 24, linking to the Web server

22, sending the post-session platform 24 to the background (or conversely, bringing the viewer's

platform to the foreground), and optionally loading a process used for tracking focus time.  In

other words, one preferred embodiment of the present invention uses the load triggering event to

trigger an advertising session….As has been discussed above, a load triggering event causes a

post-session platform to be opened and immediately sent to the background.  It should be

Application/Control Number: 90/012,496                                    Page 68
Art Unit: 3992

understood that the term 'immediately' ideally means instantaneously or without any perceptible

time delay.  But this term may also mean a momentary time delay that is perceptible so long as

the delay does not disturb the viewer's viewing experience…."). See also discussion of '229 with

regard to claim 9 and thereby, claim 1, sections (a) and (b) *supra*.)

The first Cotac webpage (Exhibit C-l) is designed to be loaded into and executed by the

first browser when a user enters the address http://www.cotac.com/-knight/NICK3/ or otherwise

clicks on a link to that address. Upon loading, the source code of the first webpage (Exhibit C-2)

is executed. This source code includes Javascript instructions for causing the second browser to

open. See also the discussion of Cotac with regard to claim 9 and thereby, claim 1, sections (a)

and (b) *supra*.  Therefore, it is disclosed by or inherent in the teachings of Cotac website that the

"second browser is opened in response to a load-triggering event that comprises clicking on an

off-site link".


Claim 25:

**The system of claim 23 where said load-triggering event comprises entering a new address.**

See the discussion of claim 24 *supra*. Therefore, it is disclosed by or inherent in the

teachings of Cotac website that the "second browser is opened in response to a load-triggering

event that comprises entering a new address".  It is noted that the "new address" is not required

to be a different address.


Claim 26:

**The system of claim 23 where said load-triggering event comprises refreshing a web site.**

Application/Control Number: 90/012,496                                          Page 69
Art Unit: 3992

  (See discussion of '229 with regard to claims 24-25 and claim 9 and thereby, claim 1, sections (a) and (b) *supra*.)

  The load triggering event is an action taken by a user to open a browser.  See discussion of claim 9 and thereby, claim 1, *supra*, esp. with respect to "a user-initiated action".  Such an act includes, e.g., the viewer leaving or exiting the specific display, the viewer closing the foreground platform, clicking on an off-site link or entering a new address in a dialogue box, time delay, load, unload, click, resize, submit, focus, blur, drag, key press (including a mouse button key), select, change (contents of a form field), refresh, open, close, redirect, enter, exit, move, minimize, maximize, end of program, beginning of program, beginning of session, end of session, "switching services," or change of service.  Exhibits C-1 and C-3-C4 each also show a browser window/browser windows with an "active" address, e.g. "archive.org" as well as a refresh button and a stop/escape button to the right thereof.  Therefore, a load-triggering event, e.g. the user taking some action to open a browser, which comprises refreshing a website, e.g. clicking the refresh/reload button of the foreground platform/browser window, is disclosed by or inherent in the teachings of Cotac website, e.g. refreshing/reloading first Cotac webpage (Exhibit C-l) i.e. re-executing the source code of the first webpage (Exhibit C-2), causes the second browser to open.

Claim 27:

**The system of claim 23 where said load-triggering event comprises exiting a web site.**

  (See discussion of '229 with regard to claims 24-26 and claim 9 and thereby, claim 1, sections (a) and (b) *supra*.)

Application/Control Number: 90/012,496                              Page 70
Art Unit: 3992

The load triggering event is an action taken by a user to open a browser.  See discussion

of claim 9 and thereby, claim 1, *supra*, esp. with respect to "a user-initiated action".  Such an act

includes, e.g., the viewer leaving or exiting the specific display, the viewer closing the

foreground platform, clicking on an off-site link or entering a new address in a dialogue box,

time delay, load, unload, click, resize, submit, focus, blur, drag, key press (including a mouse

button key), select, change (contents of a form field), refresh, open, close, redirect, enter, exit,

move, minimize, maximize, end of program, beginning of program, beginning of session, end of

session, "switching services," or change of service.  Exhibits C-1 and C-3-C4 each also show a

browser window/browser windows with an "active" address, e.g. "archive.org" as well as a

refresh button and a stop/escape button to the right thereof.  Therefore, a load-triggering event,

e.g. the user taking some action to open a browser, which comprises exiting a website, e.g.

clicking the refresh/reload button of the foreground platform/browser window, is disclosed by or

inherent in the teachings of Cotac website, e.g. the refreshing/reloading the first Cotac webpage

(Exhibit C-l) replaces/exits the initially loaded webpage, i.e. re-executing the source code of the

first webpage (Exhibit C-2),  which causes the second browser to open.


Claim 28:

**The system of claim 23 where said load-triggering event comprises being redirected to a
web site.**

(See discussion of '229 with regard to claims 24-27, esp. claim 26, and claim 9 and

thereby, claim 1, sections (a) and (b) *supra*.)

The load triggering event is an action taken by a user to open a browser.  See discussion

of claim 9 and thereby claim 1, *supra*, esp. with respect to "a user-initiated action".  Such an act

Application/Control Number: 90/012,496                                          Page 71
Art Unit: 3992

includes, e.g., the viewer leaving or exiting the specific display, the viewer closing the

foreground platform, clicking on an off-site link or entering a new address in a dialogue box,

time delay, load, unload, click, resize, submit, focus, blur, drag, key press (including a mouse

button key), select, change (contents of a form field), refresh, open, close, redirect, enter, exit,

move, minimize, maximize, end of program, beginning of program, beginning of session, end of

session, "switching services," or change of service.  Exhibits C-1 and C-3-C4 each also show a

browser window/browser windows with an "active" address, e.g. "archive.org" as well as a

refresh button and a stop/escape button to the right thereof.  Therefore, a load-triggering event,

e.g. the user taking some action to open a browser, which comprises redirecting to a website, e.g.

clicking the refresh/reload/redirect button of the foreground platform/browser window, is

disclosed by or inherent in the teachings of Cotac website, e.g. refreshing/redirecting to first

Cotac webpage (Exhibit C-l) i.e. re-executing the source code of the first webpage (Exhibit C-2),

causes the second browser to open.  It is noted that the web site redirected to is not required to be

a different web site.


Claim 31:

**The system of claim 9 where said second browser is displayed in a foreground window after
the occurrence of a view-triggering event.**

        (See '229 at, e.g., Figures 3A-3C and 8 and col. 6, line 65-col. 7, line 35 ("FIG. 8 is a

flow diagram showing the sequence of steps in the process of delivering display content in the

embodiment of the present invention shown in FIGS. 3A-3C.  In the first step, a client 20 adds

post-session instructions to its display 50.  A viewer 26 requests a foreground display 52 from a

first or foreground platform with post-session instructions embedded (or otherwise linked)

Application/Control Number: 90/012,496                                                                Page 72
Art Unit: 3992

therein.  After the foreground display 34 loads, the post-session instructions cause a post-session

procedure 43a to be requested 54 and, in turn, the script handler 42 returns a post-session

procedure 43b, 56.  At some point the viewer 26 initiates a load triggering event 58.  This load

triggering event causes a post-session platform to open 60 in the background (physically behind

or otherwise hidden from the viewer) and also causes the post-session platform to request a post-

session display 62….The post-session platform 24 and display 30 remain in the background until

the viewer 26 initiates a view triggering event 68. The viewer 26 views the post-session display

in the post-session platform 69….") and col. 10, line 64-col. 11, line 23 ("View Triggering

Event. At some point after viewing the display 34, the viewer activates a view triggering event.

View triggering events may include, for example, the viewer closing the foreground platform 32,

the viewer selecting the post-session platform 24 from the task bar at the bottom of a media

screen or an alternative menu structure, or the viewer minimizing or moving the foreground

platform 32. Exemplary view triggering events could include clicking on an off-site link or

entering a new address in a dialogue box, load, unload, click, resize, submit, focus, blur, drag,

key press (including a mouse button key), select, change (contents of a field), refresh, open,

close, redirect, enter, exit, maximize, end of program, beginning of program, beginning of

session, end of session, 'switching services,' or change of service. Still other view triggering

events may be time controlled. These view triggering events are meant to be exemplary.  It

should be recognized from the exemplary view triggering events set out in the preceding

paragraph that one feature of a view triggering event is that it is preferably viewer driven. While

a view triggering event is initiated by viewer action, a time delay may also be an aspect of a view

triggering event. For example, a viewer may initiate a view triggering event by clicking an off-

Application/Control Number: 90/012,496                                    Page 73
Art Unit: 3992

site link, but the set of actions to be taken in response to the view triggering event may not occur

for a pre-determined time period. In other words, the view triggering event may be time

delayed.").)

       The view triggering event is an action taken by a user to view the obscured background

window on a display of a computing device.  See discussion of claim 9 and thereby, claim 1,

*supra*, esp. with respect to "a user-initiated action".  Such an act includes, e.g., closing the

foreground platform, selecting the post-session platform from the task bar at the bottom of a

media screen or an alternative menu structure, minimizing or moving the foreground platform,

clicking on an off-site link or entering a new address in a dialogue box, load, unload, click,

resize, submit, focus, blur, drag, key press (including a mouse button key), select, change

(contents of a field), refresh, open, close, redirect, enter, exit, maximize, end of program,

beginning of program, beginning of session, end of session, "switching services," or change of

service.  Exhibits C-1 and C-3 each also show an Archive bar and browser window with an

"active" address and a close button.  Each browser window also shows minimize and maximize

buttons.  Therefore, it is disclosed by or inherent in the teachings of Cotac website that the

second browser window will be displayed in a foreground window after the occurrence of a

view-triggering event, e.g. the user takes some action to move, minimize or close the first

browser window, e.g. click the close or minimize buttons of the foreground platform/browser

window, to bring the second browser window into view.

Claim 33:

**The system of claim 9 where said device comprises a computer.**

Application/Control Number: 90/012,496                                    Page 74
Art Unit: 3992

     (See '229 at, e.g., abstract ("The present invention is directed to a post-session
advertising system that may be used in media such as computers, personal digital assistants,
telephones, televisions, radios, and similar devices…."), BACKGROUND OF THE
INVENTION section, col. 3, lines 43-62 ("Typically, a viewer accesses the Internet using a
platform, such as a Web browser, on media, such as a computer.  For example, a viewer
accessing the Internet using the Internet Explorerm Web browser as a platform on media
consisting of a computer running the WindowsTM operating system observes the platform as
appearing in a window.…") and col. 13, lines 42-52 ("Although the present invention has been
discussed in terms of the Internet, alternative media is also contemplated within the scope of the
invention.  For example, as shown in the exemplary embodiments discussed above, interactive
television and wireless communication devices would be ideally suited to the method described
in this disclosure.  Further, although the terms 'Web server,' 'Web site,' and 'Web page,' are
used throughout this disclosure, they are used in the generic sense and are not meant to exclude
their equivalent as associated with intranets, LANs, WANS, or alternate media.").  See also
discussion of '229 with regard to the claim 9 and thereby, preamble and section (a) of claim 1,
*supra*.)

     Cotac includes a set of webpages (i.e. HTML coded document(s) on the Web (i.e. a
service on the Internet for storing, finding, accessing and disseminating such document(s)) which
are accessible/used by a browser (i.e. application/program for rendering pages on screen,
executing embedded scripts, invoking additional software)) and corresponding source code
(Exhibits C-1-C-6).  The first Cotac webpage (Exhibit C-1) is displayed in a window (i.e. a
frame surrounded viewing area of a screen) of a first web browser (note in upper left corner of

Application/Control Number: 90/012,496                                         Page 75
Art Unit: 3992

frame "Windows Internet Explorer"), and its source code (Exhibit C-2) is executed.  Execution

of the source code causes a second webpage (Exhibit C-3), which includes advertisements for

other webpages and a 1-800 phone service, to be displayed in a window (i.e. a frame surrounded

viewing area of a screen) of a second web browser (note in upper left corner of frame "Windows

Internet Explorer") positioned behind the first browser window (Exhibit C-4).  Exhibit C-4 is a

screen capture of a foreground browser window displaying the archived webpage shown in

Exhibit C-1 and a background browser window showing the archived webpage shown in Exhibit

C-3, the background browser window being a "pop-under" window automatically generated by

the foreground browser window upon execution of the source code shown in Exhibit C-2.  Note

additionally that both windows are within/in front of a screen viewing area contained within a

surrounding frame labeled "Microsoft Word".  (Attention is again invited to the

"BACKGROUND OF THE INVENTION" section of '229, col. 1, line 10-col. 4, line 6

("…Typically, a viewer accesses the Internet using a platform, such as a Web browser, on media,

such as a computer.  For example, a viewer accessing the Internet using the Internet Explorerm

Web browser as a platform on media consisting of a computer running the WindowsTM

operating system observes the platform as appearing in a window….While it is possible to

simultaneously have multiple windows open, only one window may have focus at any time.  If a

window is in the focus state, it always fully visible (i.e., it appears 'on top' of other open

windows) and is sometimes referred to as the 'active' window.  Windows that are in the blur

state are said to be in the 'background' and are at least partially obscured by the window in the

focus state….").)  Therefore, it is disclosed by or inherent in the teachings of Cotac (showing,

e.g., a screen device, i.e. a communication device, running/using Windows®, maintaining a

Application/Control Number: 90/012,496                                                Page 76

Art Unit: 3992

foreground window and at least one background window and displaying plural browsers (i.e.

Windows® Internet Explorer®)), that the "device" is a computer or similar device running/using

Windows® and Windows® Internet Explorer®.


Claim 39:

**The system of claim 9 where said display includes a Web site.**

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purpose of further discussion, these claims are interpreted as requiring a device that

interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content

that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a

platform, e.g. a window (i.e. a screen).", and the discussion of claim 9 and thereby claim 1,

sections (a)  and (b) *supra*.  Therefore, as best understood, "a device" (i.e. a communication

device, e.g. a computer or similar device running/using Windows®,)  "that interacts with a

display to display to a user" (i.e. capable of imparting content, e.g. Web sites/web pages, to a

viewer that can be seen, heard or otherwise sensed within or from a platform, e.g. a web

browser/browser window (i.e. a screen)) as well as "at least one browser" (i.e. Windows®

Internet Explorer®), "each said at least one browser within a respective window", see, e.g.,

Exhibits C-1 and C-3, is disclosed by or inherent in the disclosure of Cotac.


Claim 46:

**The system of claim 9 where said advertisement comprises an HTML frameset**.

Application/Control Number: 90/012,496                                      Page 77
Art Unit: 3992

      (See '229 at not only col. 10, lines 19-25 ("In one preferred embodiment, the event handler delivers a link to an HTML frameset. There is no requirement, however, that the post-session browser link to HTML code. In alternative preferred embodiments, the post-session browser links to any form of network content including sound, animation, streaming video, or any other form of rich media.") but also col. 1, lines 25-29 ("A frameset is the set of subpages that together comprise a Web page. (For example, a Web page may be divided horizontally creating a frameset of two subpages comprising the top and bottom half of the Web page).").

      See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood and for purposes of further discussion, these claims are interpreted as requiring an advertisement or links including such specific claimed form of network content.", and claim 9 *supra*. Therefore it is disclosed by or inherent in the teachings of Cotac that the deliverable link www.cotac.com is the address of the web page/advertisement shown in Exhibit C-5 which shows/comprises a Web page divided horizontally creating a frameset of two subpages comprising the top and bottom half of the Web page, i.e. an HTML frameset as claimed as best understood.


Claim 50:

**The method of claim 19 where said second browser is opened in response to a load triggering event.**

      See the discussion of claim 23 *supra* and claims 51-55 *infra*.


Claim 51:

**The method of claim 50 where said load-triggering event comprises clicking on an off-site link.**

Application/Control Number: 90/012,496                                    Page 78
Art Unit: 3992

>See discussion of claim 24 *supra*.

Claim 52:

**The method of claim 50 where said load-triggering event comprises entering a new address.**

>See discussion of claim 25 *supra*.

Claim 53:

**The method of claim 50 where said load-triggering event comprises refreshing a web site.**

>See discussion of claim 26 *supra*.

Claim 54:

**The method of claim 50 where said load-triggering event comprises exiting a web site.**

>See discussion of claim 27 *supra*.

Claim 55:

**The method of claim 50 where said load-triggering event comprises being redirected to a web site.**

>See discussion of claim 28 *supra*.

Claim 58:

**The method of claim 19 where said second browser is displayed in a foreground window after the occurrence of a view-triggering event.**

>See discussion of claim 31 *supra*.

Application/Control Number: 90/012,496                                    Page 79

Art Unit: 3992

Claim 60:

**The method of claim 19 where said media comprises a computer.**

See discussion of claim 33 *supra.*

Claim 66:

**The method of claim 19 where said display includes a Web site.**

See discussion of claim 39 *supra.*

Claim 73:

**The method of claim 19 where said advertisement comprises an HTML frameset.**

See discussion of claim 46 *supra.*

10.   **Claims 29-30 and 56-57 are rejected under 35 U.S.C. 103(a) as being unpatentable over Cotac alone in view of Cezar or Cotac and Alberts '392 in view of Cezar.**

The reference to Cezar ('651) includes a filing date (April 14, 1999) prior to the earliest effective date of '229 (May 26, 2000) for which benefit may be claimed and thus is available as prior art under 35 USC 102(a) and (e) and 35 USC 103(a).

Claim 29:

**The system of claim 23 where said script handler delays invocation of said post-session procedure for a predetermined time period.**

(See '229 at, e.g., Figures 3A and 4, col. 6, lines 30-39 ("Displays 30, 34 have content that a viewer 26 sees, hears, or otherwise senses within or from a platform 24, 32. Displays 30,

Application/Control Number: 90/012,496                                    Page 80
Art Unit: 3992

34 may include, for example, Internet content (such as streaming video, Web sites, Web pages),

video broadcast content (such as television programs, movies, videos, commercials, and

infomercials), audio broadcast content (such as radio programs, commercials, and sound

recordings or such as commercials or sound recordings played over a telephone connection), and

any other content capable of being transmitted over media.") and col. 8, line 48-col. 9, line 49

("Script Code Delivery.  As shown in FIG. 3A, when a viewer 26 opens a client's 20 display 34

with a foreground platform 32, the post-session instructions that the client 20 added to its display

34 cause the foreground platform 32 to download 43a, 43b a post-session procedure from the

Web server 22.  In one exemplary preferred embodiment the post-session procedure downloaded

from the Web server 22 to the platform 32 is script code....Script Handler.  In the exemplary

preferred embodiment shown in FIGS. 3A and 4, when a viewer requests a display 34 to which

post-session HTML code has been added, a request for a post-session procedure 43a is sent to

the script handler 42.  The time at which the request for the post-session procedure is made is

preferably recorded, noted, and/or stored....The script handler 42 then returns a post-session

procedure 43b to the platform 32.  As illustrated in the exemplary embodiment of FIG. 4,...If a

viewer subsequently requests a second client Web page, a second request for script code is sent

to the script handler 42.  Using the time data that has been recorded, noted, and/or stored, the

length of time that has elapsed between the initial and subsequent requests is determined.  The

script handler 42 determines if the elapsed time is longer or shorter than a specified time period

('time window').  If the elapsed time is shorter than the time window, script code specifying that

no operations are to be performed is returned (blank script).  If the elapsed time is longer than the

time window, normal script code is returned.  Finally, a response is assembled and returned to

the viewer's foreground platform 32.  The reason for determining whether a second request for

script code is made within a time window is to provide the viewer with a reasonable opportunity

to view a display before replacing it with a new display.  If a viewer requests a second Web page

to which the same client's (or, in an alternate embodiment, any client's) post-session HTML

code has been added, a load triggering event occurs.  If this load triggering event occurs within

the time window, a request for script code will result in blank script code being returned.  In

other words, the viewer is not sent a second display.  On the other hand, if this load triggering

event occurs after the time window, the viewer will be sent a second display to replace the first

unseen display.").)

     While Cotac does not explicitly teach a script handler which delays invocation of the

post-session procedure for a predetermined time period, it is the Examiner's first position that the

browser's, i.e. script handler's, (Exhibit C-1), e.g., reading/parsing/evaluating of the web

page/source code ( Exhibit C-2) and displaying the results of the HTML prior to encountering

and activation/execution of the post-session procedure source code, see discussion *supra*, as

taught by Cotac would inherently delay invocation of such procedure for a period of time.  In any

case, i.e. the Examiner's second position, Cotac does teach commercial ad display.  Furthermore

see Cezar at, e.g., col. 1, line 6 ("This invention relates to Internet advertising."), col. 2, lines 22-

39 ("A webserver delivers web pages to a browser while a central controller tracks the extent to

which a particular ad is presented to a particular browser.  The coding for the web pages is such

that the ad does not scroll during browser display of a web page.  The content of the ad includes

a coded timer, which upon timeout causes the browser to report to the central controller.  The

system enables precise controlled advertising to each web page viewing browser and accurate

Application/Control Number: 90/012,496                                    Page 82
Art Unit: 3992

advertising budgeting and programming from the central controller.  As a consequence, browser

advertising is generated which advertising can be monitored and upgraded to meet marketing

needs.  The components participating in the system include a host website partition at a

webserver for transmitting a page.  The webserver transmits software to the browser for

retrieving a non-scrolling ad frame.  Ad content for the non-scrolling ad frame has individual

timers for timing out each ad.  The timers starts commencing with display at the browser."), col.

3, lines 26-43 ("The system uniquely uses the browser in a scheme of precise timed ad display

control.  First, the browser is loaded with code, which code interrogates for the presence of the

non-scrolling ad frame.  If the browser lacks the non-scrolling ad frame, the browser is diverted

to the system controller to load the non-scrolling ad frame.  The non-scrolling frame never

appears at the website.  Second, the browser initiates timer running as each ad is displayed.

Thus, the advertiser is assured that his particular ad content is displayed for the required

minimum time interval.  Third, the browser inquires to the central controller for the ad content

addresses to be displayed.  Thereafter, it is the browser that fetches and loads the ad content to

the non-scrolling ad frame on any displayed web page; this minimizes bandwidth transmission at

the central controller.  Fourth, the browser reports to the system controller the time out of

displayed ad content, enabling a precise record of advertising control to be maintained."), col. 5,

lines 39-53 ("Advertiser webserver C downloads code to browser B. Browser B executes the

code and installs the non-scrolling ad frame 24 to the browser only.  Thereafter, advertiser

webserver C operates normally and without further modification in supplying webpages to the

browser B. Screen 28 of browser B is shown schematically.  Once non-scrolling ad frame 24 is

installed, lead-in ad content 16' is first displayed.  Thereafter, browser B is given identification

Application/Control Number: 90/012,496                                    Page 83
Art Unit: 3992

by system controller S. Under the direction of system controller S, browser B reports ad identity,

and time of display for a minimum time interval to system controller S. After this report, browser

B is given the Internet address of further ad content 16 to be displayed, fetches this ad content 16

and displays the ad content 16 for the appropriate time interval.  As will hereafter become clear,

this cycle essentially endlessly repeats for at least as long as one browser B is connected to one

advertiser webserver C. As will hereafter be demonstrated, it is possible to trace the same

browser B as it visits related (but not the same) advertiser webservers C.") and col. 6, lines 30-32

("The reader will understand that the code loaded by the advertiser webserver C is Java script

code, which code executes immediately upon being loaded to the browser B."), i.e. browser, i.e.

"script handler", delays invocation of the post-session procedure, i.e. subsequent ad, for a

predetermined time period, i.e. coded timer, to ensure display of currently displayed ad content

for a predetermined period of time in order to monitor and upgrade marketing needs.  Therefore

to employ such coded timers as taught by Cezar with the Cotac Internet ad system would be

obvious to one of ordinary skill in the art in view of the recognition that such would insure the

effectiveness of such ad system and the desire for such in any advertising system.


Claim 30:

**The system of claim 29 where said script handler cancels invocation of said post-session
procedure if a user loads a new web site in said first browser before said predetermined
time period has elapsed.**

(See discussion of '229 with respect to claim 29 *supra*.)

While Cotac does not explicitly teach the script handler canceling invocation of said post-

session procedure if a user loads a new web site in said first browser before a predetermined time

Application/Control Number: 90/012,496                                    Page 84
Art Unit: 3992

period has elapsed, it is the Examiner's first position that the browser i.e. script handler, (Exhibit

C-1) as taught by Cotac would inherently cancel invocation of said post-session procedure if a

user loads a new web site in said first browser and thereby before any predetermined time period

has elapsed.  It is noted that the claim does not specific what happens after the predetermined

time period has elapsed.  In any case, i.e. the Examiner's second position, the prior art, see

discussion of claim 29 *supra* in addition to Cezar at col. 4, lines 54-56 ("Frame set servers T are

interactively called when a browser B calls on an advertiser webservers C for the first time."),

col. 5, lines 53-55 ("As will hereafter become clear, this cycle essentially endlessly repeats for at

least as long as one browser B is connected to one advertiser webserver C.") and col. 7, lines 32-

34 ("From this point forward, the reader will understand that the entire system is in an endless

loop for so long as browser B is on advertiser webserver C.").  Therefore canceling invocation of

said post-session procedure by the browser, i.e. script handler, if a user loads a new web site in

said first browser before said predetermined time period has elapsed, i.e. calls on a new server, is

disclosed by or inherent in the teachings of the prior art.


Claim 56:

**The method of claim 50 where implementation of said post-session instructions is delayed
for a predetermined time period.**

See discussion of claim 29 *supra*.


Claim 57:

**The method of claim 56 where implementation of said post-session instructions is canceled
if a user loads a new web site in said first browser before said predetermined time period
has elapsed.**

Application/Control Number: 90/012,496                                     Page 85
Art Unit: 3992

See discussion of claim 30 *supra*.


11.   **Claims 32, 38, 59 and 65 are rejected under 35 U.S.C. 103(a) as being unpatentable over Cotac in view of JavaScript Bible and Cezar alone or Cotac in view of Alberts '392, JavaScript Bible and Cezar.**


Claim 32:

**The system of claim 31 including a focus timer that tracks the duration that said second browser is displayed in said foreground window.**

(See '229 at, e.g., Figures 3B and 6 and col. 11, lines 24-64 ("Post-Session Timer.  As shown in FIGS. 3B and 6, in one preferred embodiment, the post-session procedure optionally includes the loading of a process used for tracking focus time.  When the display 30 on the post-session platform 24 changes or the platform 24 is closed, the focus timer process returns time data to the Web server 22 or secondary server 84.  The duration of time that the post-session platform spends in the foreground, and thus being viewed, is tracked.  In the embodiment shown in FIGS. 3B, 3C, and 6, a focus timer is optionally delivered to a post-session Web browser by the event handler 44 and time data 47 is optionally returned to a focus handler 46.  In an alternative preferred embodiment, the focus timer is incorporated into a post-session platform (the focus timer being implemented as a Java applet embedded in the frameset).  The focus timer is linked to the post-session Web browser and monitors the activation of focus and blur events, signifying that the post-session Web browser has been brought to the foreground, sent to the background, or closed.  In one preferred embodiment, the focus timer is incorporated into the

Application/Control Number: 90/012,496                                        Page 86
Art Unit: 3992

post-session Web browser.  It should be noted that while the focus timer process may only track

the time period between when a post-session platform is brought to the foreground to when the

post-session platform is closed, it may track time periods pertaining to other events relevant to a

client.  In one preferred embodiment, the focus timer process may track the length of the time the

post-session platform is in the foreground although a viewer may bring a post-session platform to

the foreground and return it to the background multiple times before the viewer ultimately closes

the platform.  In another alternative embodiment, the focus timer process tracks the length of

time the post-session browser spends in the background. Focus Handler.  As shown in FIGS. 3C

and 6, the focus handler 46 receives time data 47 from the focus timer and transmits statistical

packets to the count daemon 48 to track the focus time for a display 30 displayed in a post-

session platform 24.  In an exemplary shown embodiment, the focus handler 46 performs only

minimal data lookup and returns a response to the focus timer that indicates that no content body

follows.").)

　　　　While Cotac does not teach a focus timer, Cotac does teach an Internet ad system.   See

also Cezar, esp. the discussion thereof with regard to claims 29-30 and 56-57 *supra* as well as,

e.g., col. 1, lines 41-46 ("A known solution to scrolling is to place the ad content in a non-

scrolling frame.  In such an ad, the non-scrolling frame and the ad content is constantly located

with respect to the viewed screen of the browser.  Thus, both the agencies placing the ad and the

advertisers are relatively sure that the ad remains where it may be viewed.") and col. 3, lines 59-

61 ("…generates an audit trail, which can be used for compensation of the website and a billing

record for the controlled and distributed advertising.") and JavaScript Bible at page 261, first full

paragraph ("If  knowing when a window or frame has been activated or deactivated is important

Application/Control Number: 90/012,496                                      Page 87
Art Unit: 3992

... you can set event handlers that fire under those activities. For example, you can track how

frequently a user switches between two of your windows over a period of time. By saving

timestamps triggered by the onBlur event handler ... you can create a record of the user's

window activity.").  Therefore to employ a focus timer, i.e. event handler onFocus time stamps,

that tracks the duration that the windows/web browsers are in the foreground window, i.e.

displayed to the user, as taught by Cezar and JavaScript Bible in combination with the website of

Cotac would be obvious to one skilled in the art in view of the recognition that such would

generate an audit trail useful not only for compensation and billing purposes but to monitor and

upgrade advertising needs, e.g. to enhance the economic efficiency of advertisements/webpages

and the desirability of such in any advertising system including that of Cotac.


Claim 38:

**The system of claim 32 where said focus timer tracks the duration that said second browser
displaying said advertisement spends in said foreground window even if said second
browser is moved between said foreground window and said background window multiple
times before said second browser is closed, and the time data tracked by said focus timer is
returned to a web server or secondary server.**

See discussion in paragraphs 7-8 *supra*, i.e. "Therefore, as best understood and for

purposes of further discussion, this claim is interpreted as requiring said focus timer tracks the

duration that said second browser displaying said advertisement spends in said foreground even

if said second browser is moved between said foreground and said background multiple times

before said second browser is closed, and the time data tracked by said focus timer is returned to

a web server or secondary server." .  See also the discussion of '229, Cotac, Cezar and JavaScript

Bible with regard to claim 32 *supra*.  Note esp. col. 3, lines 26-44 of Cezar ("The system

Application/Control Number: 90/012,496                                    Page 88
Art Unit: 3992

uniquely uses the browser in a scheme of precise timed ad display control...Second, the browser

initiates timer running as each ad is displayed.  Thus, the advertiser is assured that his particular

ad content is displayed for the required minimum time interval.  Third, the browser inquires to

the central controller for the ad content addresses to be displayed….Fourth the browser reports to

the system controller the time out of displayed ad content, enabling a precise record of

advertising control to be maintained").  See also col. 4, lines 23-24 of Cezar ( "System controller

S includes two major components webservers W and central processor P.")  Therefore tracking,

via focus timer, the duration that said second browser displaying said advertisement spends in

said foreground even if said second browser is moved between said foreground and said

background multiple times before said second browser is closed, and the time data tracked by

said focus timer being returned to a web server or secondary server, as best understood as

claimed, is disclosed by or inherent in the teachings of the prior art.


Claim 59:

**The method of claim 58 including the step of tracking the duration that said second browser is displayed in said foreground window.**

      See discussion of claim 32 *supra*.


Claim 65:

**The method of claim 59 where said tracking the duration that said second browser displays said advertisement in said foreground window continues even if said second browser is moved between said foreground window and said background window multiple times before said second browser is closed, and the time data tracked by said focus timer is returned to a web server or secondary server.**

      See discussion of claim 38 *supra*.

Application/Control Number: 90/012,496                                          Page 89

Art Unit: 3992

12. **Claims 34-37, 41, 43-45, 61-64, 68 and 70-72 are rejected under 35 U.S.C. 103(a) as being unpatentable over Cotac alone in view of Jackson et al '017 or Cotac and Alberts '392 in view of Jackson '017.**

The reference to Jackson '017 includes a filing date ( December 13, 1999) prior to the earliest effective date of '229 (May 26, 2000) for which benefit may be claimed and thus is available as prior art under 35 USC 102(a) and (e) and 35 USC 103(a).

Claim 34:

**The system of claim 9 where said device comprises a PDA.**

(See '229 at, e.g., abstract ("The present invention is directed to a post-session advertising system that may be used in media such as computers, personal digital assistants, telephones, televisions, radios, and similar devices...."), BACKGROUND OF THE INVENTION section, col. 3, lines 43-62 ("Typically, a viewer accesses the Internet using a platform, such as a Web browser, on media, such as a computer.  For example, a viewer accessing the Internet using the Internet Explorerm Web browser as a platform on media consisting of a computer running the WindowsTM operating system observes the platform as appearing in a window....") and col. 13, lines 42-52 ("Although the present invention has been discussed in terms of the Internet, alternative media is also contemplated within the scope of the invention.  For example, as shown in the exemplary embodiments discussed above, interactive television and wireless communication devices would be ideally suited to the method described in this disclosure.  Further, although the terms 'Web server,' 'Web site,' and 'Web page,' are used throughout this disclosure, they are used in the generic sense and are not meant to exclude their equivalent as associated with intranets, LANs, WANS, or alternate media.").  See also

Application/Control Number: 90/012,496                                        Page 90
Art Unit: 3992

discussion of '229 with regard to claim 9 and thereby, the preamble and section (a) of claim 1,

*supra*.)

While Cotac does not teach a the device being a PDA, Cotac does teach show, e.g., a

screen device, i.e. a communication device, running/using Windows®, maintaining a foreground

window and at least one background window and displaying plural browsers (i.e. Windows®

Internet Explorer®)), e.g. that the "device" is a computer or similar device running/using

Windows® and Windows® Internet Explorer®, i.e. the Cotac device is a network connectable

device.  See discussion of Cotac with respect to claim 33 *supra* as well as Cotac Exhibit C-2, e.g.

page 6, line 9 and page 7, line 11, i.e. operating on Java platform. See also '017 at, e.g., col. 7,

line 55-col 8, line 55 ( "In the past, a relatively static number of fixed computer  devices were

managed by a localised support structure able to configure the complex desktop environments.

The future, however, presents us with the prospect of having a profusion of devices, whether

they be computer devices, or other electronic devices such as mobile phones, personal digital

assistant devices (PDAs), electronic organisers, etc. which may or may not be geographically

fixed. This will require an alternative management system which is more flexible. The preferred

embodiments of the present invention aim to provide such an alternative management system for

distributed management of network devices within a network. The term 'network device' as used

herein is intended to refer to a device whose content is managed by the system of preferred

embodiments of the present invention, but is not intended to imply that any such device is

permanently connected to a network. For the purposes of preferred embodiments of the present

invention, it is sufficient that any such 'network device' is capable of making at least occasional

connections to a network, either directly or via some other device. For example, certain devices

Application/Control Number: 90/012,496                                  Page 91
Art Unit: 3992

may delegate their management to other devices which in turn must be able to make occasional

network connections. For example, certain PDA-style devices are not inherently networkable,

but rely on a PC to do certain things for them, such as install new programs. Since the PC can

make occasional network connections, such PDAs will also be 'network devices' which can be

managed by the system in accordance with preferred embodiments of the present invention. Each

network device is in preferred embodiments provided with a client program (which may

alternatively be referred to herein as a device manager) which is arranged to communicate with a

server, the server maintaining details of content (for example, programs or data) desired to be

present on each device. In preferred embodiments, the client program identifies to the server the

network device, and the server sends a profile of the content desired to be present on that device.

The client program then preferably configures the network device so that it contains the content

identified in the profile, any content not currently present on the device, but identified in the

profile, being retrieved in a predetermined manner. In preferred embodiments of the present

invention, the client program and server operate on the Java TM platform. The ubiquity of Java

TM across platforms as various as cable television receivers and mobile telephones, allows the

possibility to centrally control almost any kind of device entirely remotely, provided that at least

occasional successful network connections are established to enable that control to take place.  In

preferred embodiments of the invention, the client program on each network device is

responsible for autonomously updating the device's configuration. Dependent on the kind of

device, the client program executes at defined intervals, namely either: 1. immediately after the

device has been powered; 2. immediately after a network connection has been established; or 3.

after discrete time intervals. The first scenario is designed for bandwidth restricted devices that

Application/Control Number: 90/012,496                                    Page 92
Art Unit: 3992

can only operate with the availability of a network, e.g. GSM receivers. The second will be used

for those devices that are fully operational without network availability, but are assumed to make

occasional connections e.g. portable computers. The third scenario is designed for high

bandwidth, permanently connected devices like cable television receivers and network

computers.") and col. 17, lines 24-41 ("From the above description, it will be appreciated that the

system of preferred embodiments of the present invention provides a platform for managing

disparate, heterogeneous, distributed devices. These devices include, but are not limited to,

computers, digital mobile telephones and set-top boxes. The system of preferred embodiments

provides a unique mechanism for the automatic distribution, installation and removal of almost

any kind of content, including applications, without any user intervention. A system

administrator uses a management tool to build a program of content for each device or group of

devices. At predetermined intervals, a small piece of client-side code compares a profile

generated by the server with a record of the content stored on the device in accordance with the

previous profile. Any new or updated content is automatically retrieved and installed and any

defunct content is removed. In preferred embodiments, the server, management tool, and client

program are all Java-based.")  Therefore to employ/substitute another network connectable

device operable on a Java based platform such as a PDA for the network connectable computer

device operable on a Java based platform as taught by Cotac would be obvious to one skilled in

the art in view of interchangeability as taught by '017.

Claim 35:

**The system of claim 9 where said device comprises a cell phone.**

Application/Control Number: 90/012,496                                        Page 93
Art Unit: 3992

     See the discussion of claims 33 and 34 *supra*.  Therefore to employ/substitute another network connectable device operable on a Java based platform such as a cell phone for the network connectable computer device operable on a Java based platform as taught by Cotac would be obvious to one skilled in the art in view of interchangeability as taught by '017.


Claim 36:

**The system of claim 9 where said device comprises a radio.**

     (See '229 at, e.g., abstract ("The present invention is directed to a post-session advertising system that may be used in media such as computers, personal digital assistants, telephones, televisions, radios, and similar devices…."), BACKGROUND OF THE INVENTION section, col. 3, lines 43-62 ("Typically, a viewer accesses the Internet using a platform, such as a Web browser, on media, such as a computer.  For example, a viewer accessing the Internet using the Internet Explorerm Web browser as a platform on media consisting of a computer running the WindowsTM operating system observes the platform as appearing in a window….") and col. 13, lines 42-52 ("Although the present invention has been discussed in terms of the Internet, alternative media is also contemplated within the scope of the invention.  For example, as shown in the exemplary embodiments discussed above, interactive television and wireless communication devices would be ideally suited to the method described in this disclosure.  Further, although the terms 'Web server,' 'Web site,' and 'Web page,' are used throughout this disclosure, they are used in the generic sense and are not meant to exclude their equivalent as associated with intranets, LANs, WANS, or alternate media.").  See also

Application/Control Number: 90/012,496                                   Page 94
Art Unit: 3992

discussion of '229 with regard to claim 9 and thereby, the preamble and section (a) of claim 1,

*supra*.)

See discussion in paragraph 7 *supra*, i.e. "Therefore, as best understood and for purpose

of further discussion, these claims are interpreted as requiring some device capable of audio

communication as well as a display to display to a user at least one browser within a window.".

See also the discussion of '229 at, e.g., the paragraph bridging cols. 5-6 ("Throughout this

specification terminology will be used to describe the present invention.  The following

definitions and examples of the terminology are not meant to exclude broader concepts,

unspecified examples, or undeveloped technology that would logically fall within the scope of

the invention.  Viewers 26, for example, may be potential voters viewing a television program or

potential customers browsing the Internet on a computer.  The term 'viewer' is also used to

describe a telephone user, a radio listener, or any media user.  Clients 20 are entities that want to

advertise or direct traffic such as commercial enterprises, political, governmental, non-profit, or

charitable organizations, individuals, hobbyists, or any other person or entity that wants to

advertise or direct traffic.  The Web server 22, as will be described in detail below, substantially

controls or directs the system of the present invention.  Media 28 may be any communication

device, including but not limited to computers, personal digital assistants, telephones, televisions,

radios, and similar devices.  Platforms 24, 32 are means through which a viewer accesses a

display to the exclusion of other displays.  A platform may allow the viewer to play, show,

enable, perform, transmit, update, or record the selected display.  Platforms 24, 32 may include,

for example, Web browsers, browser windows, media channels, media stations, media

frequencies, audio connections, streaming media, content delivery applications, media viewing

Application/Control Number: 90/012,496                                  Page 95
Art Unit: 3992

or interacting technology, and similar means.  A foreground platform 32 is a platform that can be

primarily sensed by a viewer 26.  A post-session platform 24 is a platform that begins its life in

the background and that can be fully sensed by a viewer 26 only after it has been brought to the

foreground.  Displays 30, 34 have content that a viewer 26 sees, hears, or otherwise senses

within or from a platform 24, 32.  Displays 30, 34 may include, for example, Internet content

(such as streaming video, Web sites, Web pages), video broadcast content (such as television

programs, movies, videos, commercials, and infomercials), audio broadcast content (such as

radio programs, commercials, and sound recordings or such as commercials or sound recordings

played over a telephone connection), and any other content capable of being transmitted over

media.").)

See discussion of, e.g., claim 35 *supra*.  See also '017 at, e.g., col. 8, line 50, i.e. GSM

receivers.  Therefore to employ/substitute another network connectable device operable on a

Java based platform such as, as best understood, a device capable of audio communication as

well as a display to display to a user at least one browser within a window device, e.g. a

cellphone, for the network connectable computer device operable on a Java based platform as

taught by Cotac would be obvious to one skilled in the art in view of interchangeability as taught

by '017.


Claim 37:

**The system of claim 9 where said device comprises a television.**

See the discussion of claims 33-35 *supra*, esp. '017 at col. 8, lines 54-55, i.e. "cable

television receivers", and col. 17, lines 28-29, i.e. "set-top boxes".  Therefore to

Application/Control Number: 90/012,496                                         Page 96
Art Unit: 3992

employ/substitute another network connectable device operable on a Java based platform such as

a television for the network connectable computer device operable on a Java based platform as

taught by Cotac would be obvious to one skilled in the art in view of interchangeability as taught

by '017.


Claim 41:

**The system of claim 9 where said display includes a television program.**

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purpose of further discussion, these claims are interpreted as requiring a device that

interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content

that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a

platform, e.g. a window (i.e. a screen).", and claim 9, and thereby claim 1, section (a), and claim

37 *supra*.   Therefore, the prior art teaches "a device" (i.e. a communication device, e.g. a

television) "that interacts with a display to display to a user" (i.e. capable of imparting content,

i.e. any television broadcast content, e.g. television programs, to a viewer that can be seen, heard

or otherwise sensed within or from a platform, e.g. a window (i.e. a screen)) as best understood.


Claim 43:

**The system of claim 9 where said display includes a commercial**.

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purpose of further discussion, these claims are interpreted as requiring a device that

Application/Control Number: 90/012,496                                        Page 97
Art Unit: 3992

interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content

that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a

platform, e.g. a window (i.e. a screen).", and claim 9, and thereby, claim 1, section (a), and

claims 37 and 41 *supra*.   Therefore, the prior art teaches "a device" (i.e. a communication

device, e.g. a television) "that interacts with a display to display to a user" (i.e. capable of

imparting content, i.e. any television broadcast content, e.g. television commercials, to a viewer

that can be seen, heard or otherwise sensed within or from a platform, e.g. a window (i.e. a

screen)) as best understood.


Claim 44:

**The system of claim 9 where said display includes an infomercial**.

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purpose of further discussion, these claims are interpreted as requiring a device that

interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content

that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a

platform, e.g. a window (i.e. a screen).", and claim 9, and thereby, claim 1, section (a),  and

claims 37, 41 and 43 *supra*.   Therefore, the prior art teaches "a device" (i.e. a communication

device, e.g. a television) "that interacts with a display to display to a user" (i.e. capable of

imparting content, i.e. any television broadcast content, e.g. television infomercials, to a viewer

that can be seen, heard or otherwise sensed within or from a platform, e.g. a window (i.e. a

screen)) as best understood.

Application/Control Number: 90/012,496                                           Page 98
Art Unit: 3992

Claim 45:

**The system of claim 9 where said display includes a radio program**.

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood and for purpose of further discussion, these claims are interpreted as requiring a device that interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a platform, e.g. a window (i.e. a screen).", and claim 9, and thereby, claim 1, section (a), and claim 36 *supra*.   Therefore, the prior art teaches "a device" (i.e. a communication device, e.g. a cell phone) "that interacts with a display to display to a user" (i.e. capable of imparting content, i.e. audio broadcast content, to a viewer that can be seen, heard or otherwise sensed within or from a platform, e.g. a window (i.e. a screen)) as best understood.


Claim 61:

**The method of claim 19 where said media comprises a PDA.**

See discussion of claim 34 *supra*.


Claim 62:

**The method of claim 19 where said media comprises a cell phone.**

See the discussion of claim 35 *supra*.


Claim 63:

**The method of claim 19 where said device comprises a radio.**

See discussion of claim 36 *supra.*

Application/Control Number: 90/012,496                                    Page 99
Art Unit: 3992

Claim 64:

**The method of claim 19 where said media comprises a television.**

    See the discussion of claim 37 *supra.*

Claim 68:

**The method of claim 19 where said display includes a television program.**

    See the discussion of claim 41 *supra.*

Claim 70:

**The method of claim 19 where said display includes a commercial.**

    See the discussion of claim 43 *supra.*

Claim 71:

**The method of claim 19 where said display includes an infomercial.**

    See the discussion of claim 44 *supra.*

Claim 72:

**The method of claim 19 where said display includes a radio program.**

    See the discussion of claim 45 *supra.*

Application/Control Number: 90/012,496                                    Page 100
Art Unit: 3992

13.  **Claims 40, 42, 47-49, 67, 69 and 74-76 are rejected under 35 U.S.C. 103(a) as being unpatentable over Cotac alone in view of Abramowitz et al '831or Cotac and Alberts '392 in view of Abramowitz et al '831.**

The reference to Abramowitz '831 includes a filing date (April 4, 2000) prior to the earliest effective date of '229 (May 26, 2000) for which benefit may be claimed and thus is available as prior art under 35 USC 102(a) and (e) and 35 USC 103(a).

Claim 40:

**The system of claim 9 where said display includes streaming video.**

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood and for purpose of further discussion, these claims are interpreted as requiring a device that interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a platform, e.g. a window (i.e. a screen)." and the discussion of claim 9, and thereby, claim 1, section (a), *supra*. Therefore, as best understood, Cotac does not teach a display which includes streaming video.  However, Cotac does teach "a device" (i.e. a communication device, e.g. a computer or similar device running/using Windows®,) "that interacts with a display to display to a user" (i.e. capable of imparting content, e.g. Web sites/web pages, to a viewer that can be seen, heard or otherwise sensed within or from a platform, e.g. a web browser/browser window (i.e. a screen)) as well as "at least one browser" (i.e. Windows® Internet Explorer®), "each said at least one browser within a respective window", see, e.g., Exhibits C-1 and C-3, i.e. displaying on

Application/Control Number: 90/012,496                                    Page 101
Art Unit: 3992

a computer information received over the Internet such as image and text.  Also see '831 at

"BACKGROUND" ("Server computers are often used to present information over a network,

such as the Internet, an extranet or an intranet, for display on a client computer. The presented

information may be a time-ordered sequence, or stream, of multimedia information, such as

image frames captured from a moving object or sound amplitude signals associated with a sound

or voice. Macromedia Flash TM, available from Macromedia Inc., is sometimes used to display

files representing multimedia streams. The Macromedia files contain a multimedia presentation

consisting of a timeline of frames. The frames may contain graphics with associated audio,

similar to the frames in a movie clip. Each frame is displayed for predetermined duration before

the next frame in the timeline is displayed. As the timeline advances, the frames are displayed in

sequence, creating an animated picture. Alternatively, the frames may contain commands that

cause Macromedia Flash TM to perform actions that are associated with the commands.")  Note

also '392 at col. 1, lines 12-13 ("A banner ad can have text and still or moving graphics.").

Therefore, as best understood,  to employ streaming video content by Cotac would be obvious to

one of ordinary skill in the art in view of the recognition that such is also image information

displayed on a computer received over the Internet as taught by '831.


Claim 42:

**The system of claim 9 where said display includes a movie.**

        See the discussion of this claim in paragraph 7 *supra* i.e. "Therefore, as best understood

and for purpose of further discussion, these claims are interpreted as requiring a device that

interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content

Application/Control Number: 90/012,496                                                Page 102
Art Unit: 3992

that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a

platform, e.g. a window (i.e. a screen).", and the discussion of claim 9, and thereby, claim 1,

section (a), *supra*. Therefore, as best understood, Cotac does not teach a display which includes a

movie.  However, Cotac does teach "a device" (i.e. a communication device, e.g. a computer or

similar device running/using Windows®,)  "that interacts with a display to display to a user" (i.e.

capable of imparting content, e.g. Web sites/web pages, to a viewer that can be seen, heard or

otherwise sensed within or from a platform, e.g. a web browser/browser window (i.e. a screen))

as well as "at least one browser" (i.e. Windows® Internet Explorer®), "each said at least one

browser within a respective window", see, e.g., Exhibits C-1 and C-3, i.e. displaying on a

computer information received over the Internet such as image and text.  Also see '831 at

"BACKGROUND" ("Server computers are often used to present information over a network,

such as the Internet, an extranet or an intranet, for display on a client computer. The presented

information may be a time-ordered sequence, or stream, of multimedia information, such as

image frames captured from a moving object or sound amplitude signals associated with a sound

or voice. Macromedia Flash TM, available from Macromedia Inc., is sometimes used to display

files representing multimedia streams. The Macromedia files contain a multimedia presentation

consisting of a timeline of frames. The frames may contain graphics with associated audio,

similar to the frames in a movie clip. Each frame is displayed for predetermined duration before

the next frame in the timeline is displayed. As the timeline advances, the frames are displayed in

sequence, creating an animated picture. Alternatively, the frames may contain commands that

cause Macromedia Flash TM to perform actions that are associated with the commands.").  Note

also '392 at col. 1, lines 12-13 ("A banner ad can have text and still or moving graphics.").

Application/Control Number: 90/012,496                                    Page 103
Art Unit: 3992

Therefore, to employ movie content, i.e. "similar to a movie clip", by Cotac would be obvious to

one of ordinary skill in the art in view of the recognition that such is also image information

displayed on a computer received over the Internet as taught by '831.


Claim 47:

**The system of claim 9 where said advertisement comprises sound.**

        (See '229 not only at col. 10, lines 19-25 ("In one preferred embodiment, the event

handler delivers a link to an HTML frameset. There is no requirement, however, that the post-

session browser link to HTML code. In alternative preferred embodiments, the post-session

browser links to any form of network content including sound, animation, streaming video, or

any other form of rich media.") but also col. 6, lines 17-39 ("Platforms 24, 32 are means  through

which a viewer accesses a display to the exclusion  of other displays. A platform may allow the

viewer to play, show, enable, perform, transmit, update, or record the selected display. Platforms

24, 32 may include, for example, Web browsers, browser windows, media channels, media

stations, media frequencies, audio connections, streaming media, content delivery applications,

media viewing or  interacting technology, and similar means….A post-session platform 24 is a

platform that begins its life in the background and that can be fully sensed  by a viewer 26 only

after it has been brought to the  foreground. Displays 30, 34 have content that a viewer 26 sees,

hears, or otherwise senses within or from a platform  24, 32. Displays 30, 34 may include, for

example, Internet content (such as streaming video, Web sites, Web pages), video broadcast

content (such as television programs, movies, videos, commercials, and infomercials), audio

broadcast content (such as radio programs, commercials, and sound  recordings or such as

Application/Control Number: 90/012,496                                    Page 104
Art Unit: 3992

commercials or sound recordings  played over a telephone connection), and any other content

capable of being transmitted over media").

　　　　See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purposes of further discussion, these claims are interpreted as requiring an advertisement

or links including such specific claimed form of network content." and the discussion of claim 9

*supra*. Therefore, as best understood, Cotac does not teach said advertisement or link comprising

sound.  However, Cotac does teach a Web service implemented as a process/process(es) by a

server or servers or client system or on the media, e.g. browser software, i.e., an "event handler",

that receives from an Internet address ( i.e. /http://www.cotac.com//), a link to a webpage, which

webpage includes an advertisement (Exhibit C-3), which said advertisement/webpage (i.e.

computer information received over the Internet such as image and text) is loaded into said

second browser while said second browser is in a said background window (Exhibit C-4).  Also

see '831 at "BACKGROUND" ("Server computers are often used to present information over a

network, such as the Internet, an extranet or an intranet, for display on a client computer. The

presented information may be a time-ordered sequence, or stream, of multimedia information,

such as image frames captured from a moving object or sound amplitude signals associated with

a sound or voice. Macromedia Flash TM, available from Macromedia Inc., is sometimes used to

display files representing multimedia streams. The Macromedia files contain a multimedia

presentation consisting of a timeline of frames. The frames may contain graphics with associated

audio, similar to the frames in a movie clip. Each frame is displayed for predetermined duration

before the next frame in the timeline is displayed. As the timeline advances, the frames are

displayed in sequence, creating an animated picture. Alternatively, the frames may contain

Application/Control Number: 90/012,496                                    Page 105
Art Unit: 3992

commands that cause Macromedia Flash TM to perform actions that are associated with the

commands.").  Therefore, to employ information/advertisement/link including sound content by

Cotac associated with the image/text would be obvious to one of ordinary skill in the art in view

of the recognition that such content combination is also information displayed on a computer

received over the Internet as taught by '831.


Claim 48:

**The system of claim 9 where said advertisement comprises animation.**

    (See '229 not only at col. 10, lines 19-25 ("In one preferred embodiment, the event

handler delivers a link to an HTML frameset. There is no requirement, however, that the post-

session browser link to HTML code. In alternative preferred embodiments, the post-session

browser links to any form of network content including sound, animation, streaming video, or

any other form of rich media.") but also col. 6, lines 17-39 ("Platforms 24, 32 are means  through

which a viewer accesses a display to the exclusion  of other displays. A platform may allow the

viewer to play, show, enable, perform, transmit, update, or record the selected display. Platforms

24, 32 may include, for example, Web browsers, browser windows, media channels, media

stations, media frequencies, audio connections, streaming media, content delivery applications,

media viewing or  interacting technology, and similar means….A post-session platform 24 is a

platform that begins its life in the background and that can be fully sensed  by a viewer 26 only

after it has been brought to the  foreground. Displays 30, 34 have content that a viewer 26 sees,

hears, or otherwise senses within or from a platform  24, 32. Displays 30, 34 may include, for

example, Internet content (such as streaming video, Web sites, Web pages), video broadcast

Application/Control Number: 90/012,496                                        Page 106
Art Unit: 3992

content (such as television programs, movies, videos, commercials, and infomercials), audio

broadcast content (such as radio programs, commercials, and sound  recordings or such as

commercials or sound recordings  played over a telephone connection), and any other content

capable of being transmitted over media").

  See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purposes of further discussion, these claims are interpreted as requiring an advertisement

or links including such specific claimed form of network content.",

and the discussion of claim 9 *supra*. Therefore, as best understood, Cotac does not teach said

advertisement or link comprising animation.  However, Cotac does teach a Web service

implemented as a process/process(es) by a server or servers or client system or on the media, e.g.

browser software, i.e., an "event handler", that receives from an Internet address ( i.e.

/http://www.cotac.com//), a link to a webpage, which webpage includes an advertisement

(Exhibit C-3), which said advertisement/webpage (i.e. computer information received over the

Internet such as image and text) is loaded into said second browser while said second browser is

in a said background window (Exhibit C-4).  Also see '831 at "BACKGROUND" ("Server

computers are often used to present information over a network, such as the Internet, an extranet

or an intranet, for display on a client computer. The presented information may be a time-ordered

sequence, or stream, of multimedia information, such as image frames captured from a moving

object or sound amplitude signals associated with a sound or voice. Macromedia Flash TM,

available from Macromedia Inc., is sometimes used to display files representing multimedia

streams. The Macromedia files contain a multimedia presentation consisting of a timeline of

frames. The frames may contain graphics with associated audio, similar to the frames in a movie

Application/Control Number: 90/012,496                    Page 107
Art Unit: 3992

clip. Each frame is displayed for predetermined duration before the next frame in the timeline is

displayed. As the timeline advances, the frames are displayed in sequence, creating an animated

picture. Alternatively, the frames may contain commands that cause Macromedia Flash TM to

perform actions that are associated with the commands.").  Therefore, to employ

information/advertisement/link including animation content by Cotac would be obvious to one of

ordinary skill in the art in view of the recognition that such content combination is also image

information displayed on a computer received over the Internet as taught by '831.


Claim 49:

**The system of claim 9 where said advertisement comprises streaming video.**

        (See '229 not only at col. 10, lines 19-25 (i.e. "In one preferred embodiment, the event

handler delivers a link to an HTML frameset. There is no requirement, however, that the post-

session browser link to HTML code. In alternative preferred embodiments, the post-session

browser links to any form of network content including sound, animation, streaming video, or

any other form of rich media.") but also col. 6, lines 17-39 ("Platforms 24, 32 are means  through

which a viewer accesses a display to the exclusion  of other displays. A platform may allow the

viewer to play, show, enable, perform, transmit, update, or record the selected display. Platforms

24, 32 may include, for example, Web browsers, browser windows, media channels, media

stations, media frequencies, audio connections, streaming media, content delivery applications,

media viewing or  interacting technology, and similar means....A post-session platform 24 is a

platform that begins its life in the background and that can be fully sensed  by a viewer 26 only

after it has been brought to the  foreground. Displays 30, 34 have content that a viewer 26 sees,

Application/Control Number: 90/012,496                                    Page 108
Art Unit: 3992

hears, or otherwise senses within or from a platform  24, 32. Displays 30, 34 may include, for

example, Internet content (such as streaming video, Web sites, Web pages), video broadcast

content (such as television programs, movies, videos, commercials, and infomercials), audio

broadcast content (such as radio programs, commercials, and sound  recordings or such as

commercials or sound recordings  played over a telephone connection), and any other content

capable of being transmitted over media").

 See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purposes of further discussion, these claims are interpreted as requiring an advertisement

or links including such specific claimed form of network content.", and the discussion of claim 9

*supra*. Therefore, as best understood, Cotac does not teach said advertisement/link comprising

streaming video.  However, Cotac does teach a Web service implemented as a

process/process(es) by a server or servers or client system or on the media, e.g. browser

software, i.e., an "event handler", that receives from an Internet address ( i.e.

/http://www.cotac.com//), a link to a webpage, which webpage includes an advertisement

(Exhibit C-3), which said advertisement/webpage (i.e. computer information received over the

Internet such as image and text) is loaded into said second browser while said second browser is

in a said background window (Exhibit C-4).  Also see '831 at "BACKGROUND" ("Server

computers are often used to present information over a network, such as the Internet, an extranet

or an intranet, for display on a client computer. The presented information may be a time-ordered

sequence, or stream, of multimedia information, such as image frames captured from a moving

object or sound amplitude signals associated with a sound or voice. Macromedia Flash TM,

available from Macromedia Inc., is sometimes used to display files representing multimedia

Application/Control Number: 90/012,496                              Page 109
Art Unit: 3992

streams. The Macromedia files contain a multimedia presentation consisting of a timeline of

frames. The frames may contain graphics with associated audio, similar to the frames in a movie

clip. Each frame is displayed for predetermined duration before the next frame in the timeline is

displayed. As the timeline advances, the frames are displayed in sequence, creating an animated

picture. Alternatively, the frames may contain commands that cause Macromedia Flash TM to

perform actions that are associated with the commands.").  Therefore, to employ

information/advertisement/link including streaming video content by Cotac would be obvious to

one of ordinary skill in the art in view of the recognition that such is also image information

displayed on a computer received over the Internet as taught by '831.


Claim 67:

**The method of claim 19 where said display includes streaming video.**

    See discussion of claim 40 *supra*.


Claim 69:

**The method of claim 19 where said display includes a movie.**

    See discussion of claim 42 *supra*.


Claim 74:

**The method of claim 19 where said advertisement comprises sound.**

    See discussion of claim 47 *supra*

.

Application/Control Number: 90/012,496                                    Page 110
Art Unit: 3992

<u>Claim 75:</u>

**The method of claim 19 where said advertisement comprises animation.**

See discussion of claim 48 *supra*.

<u>Claim 76:</u>

**The method of claim 19 where said advertisement comprises streaming video.**

See discussion of claim 49 *supra*.

14.  **Claims 23-28, 31, 33, 39, 46, 50-55, 58, 60, 66, and 73 are rejected under 35**

**U.S.C. 103(a) as being unpatentable over Unfaithful as evidenced by JavaScript Bible in**

**view of Alberts '392.**

<u>Claim 23:</u>

**The system of claim 9 where said second browser is opened in response to a load-triggering event.**

See discussion of claims 24-28 *infra*.  Note also the rejection of claim 2 essentially as

proposed on pages 11-12 of the Request which is hereby incorporated into this Office Action by

reference and Patent Owner's 9-27-13 response at page 16, first full paragraph.  Note also page

21 of the 9/27/13 PO response and the ***Response to Arguments*** section, **37 CFR 1.131**

**Declaration**.

<u>Claim 24:</u>

**The system of claim 23 where said load-triggering event comprises clicking on an off-site link.**

Application/Control Number: 90/012,496                                    Page 111
Art Unit: 3992

(See the discussion of '229 with respect to claim 24 in paragraph 9 *supra*. See also discussion of '229 with regard to claim 9 and thereby claim 1, sections (a) and (b), in paragraphs 4-6 *supra*.)

The first Unfaithful webpage (Exhibit A) is designed to be loaded into and executed by the first browser when a user enters the address http://www.unfaithful.com/ or otherwise clicks on a link to that address. Upon loading, the source code of the first webpage (Exhibit B) is executed. This source code includes Javascript instructions for causing the second browser to open. See the discussion of Unfaithful with regard to claim 9 and thereby, claim 1, section (b) *supra*. Therefore, it is disclosed by or inherent in the teachings of Unfaithful website that the "second browser is opened in response to a load-triggering event that comprises clicking on an off-site link". Note also the discussion of claim 23 *supra* and Patent Owner's 9-27-13 response at page 16, first full paragraph. Note also page 21 of the 9/27/13 PO response and the ***Response to Arguments*** section, **37 CFR 1.131 Declaration**.


Claim 25:

**The system of claim 23 where said load-triggering event comprises entering a new address.**

See the discussion of claim 24 *supra*. Therefore, it is disclosed by or inherent in the teachings of Unfaithful website that the "second browser is opened in response to a load-triggering event that comprises entering a new address". It is noted that the "new address" is not required to be a different address.

Claim 26:

**The system of claim 23 where said load-triggering event comprises refreshing a web site.**

Application/Control Number: 90/012,496                                   Page 112
Art Unit: 3992

(See discussion of '229 with regard to claims 24-25 and claim 9 and thereby claim 1,

sections (a) and (b), in paragraphs 4-6 *supra.*)

The load triggering event is an action taken by a user to open a browser.  See discussion

of claim 9 and thereby claim 1, *supra*, esp. with respect to "a user-initiated action".  Such an act

includes, e.g., the viewer leaving or exiting the specific display, the viewer closing the

foreground platform, clicking on an off-site link or entering a new address in a dialogue box,

time delay, load, unload, click, resize, submit, focus, blur, drag, key press (including a mouse

button key), select, change (contents of a form field), refresh, open, close, redirect, enter, exit,

move, minimize, maximize, end of program, beginning of program, beginning of session, end of

session, "switching services," or change of service.  The Exhibits, e.g. Exhibit A, show a browser

window/browser windows with an "active" address, e.g. "archive.org" as well as a refresh button

and a stop/escape button to the right thereof .  Therefore, a load-triggering event, e.g. the user

taking some action to open a browser, which comprises refreshing a website, e.g. clicking the

refresh/reload button of the foreground platform/browser window, is disclosed by or inherent in

the teachings of Unfaithful, e.g. refreshing/reloading first Unfaithful webpage (Exhibit A) i.e. re-

executing the source code of the first webpage (Exhibit B), causes the second browser to open.

Note also the discussion of claims 23-25 *supra* and Patent Owner's 9-27-13 response at page 16,

first full paragraph.  Note also page 21 of the 9/27/13 PO response and the ***Response to***

***Arguments*** section, **37 CFR 1.131 Declaration**.


Claim 27:

**The system of claim 23 where said load-triggering event comprises exiting a web site.**

Application/Control Number: 90/012,496                                    Page 113
Art Unit: 3992

(See discussion of '229 with regard to claims 24-26 and claim 9 and thereby claim 1,

section (a) and (b), in paragraphs 4-6 *supra*.)

The load triggering event is an action taken by a user to open a browser.  See discussion

of claim 9 and thereby claim 1, *supra*, esp. with respect to "a user-initiated action".  Such an act

includes, e.g., the viewer leaving or exiting the specific display, the viewer closing the

foreground platform, clicking on an off-site link or entering a new address in a dialogue box,

time delay, load, unload, click, resize, submit, focus, blur, drag, key press (including a mouse

button key), select, change (contents of a form field), refresh, open, close, redirect, enter, exit,

move, minimize, maximize, end of program, beginning of program, beginning of session, end of

session, "switching services," or change of service.  The Exhibits, e.g. Exhibit A shows a

browser window/browser windows with an "active" address, e.g. "archive.org" as well as a

refresh button and a stop/escape button to the right thereof.  Therefore, a load-triggering event,

e.g. the user taking some action to open a browser, which comprises exiting a website, e.g.

clicking the refresh/reload button of the foreground platform/browser window, is disclosed by or

inherent in the teachings of Unfaithful website, e.g. the refreshing/reloading the first Unfaithful

webpage (Exhibit A) replaces/exits the initially loaded webpage, i.e. re-executing the source

code of the first webpage (Exhibit B), which causes the second browser to open. Note also the

discussion of claims 23-25 *supra* and Patent Owner's 9-27-13 response at page 16, first full

paragraph.  Note also page 21 of the 9/27/13 PO response and the ***Response to Arguments***

section, **37 CFR 1.131 Declaration**.

Application/Control Number: 90/012,496                                      Page 114
Art Unit: 3992

Claim 28:

**The system of claim 23 where said load-triggering event comprises being redirected to a web site.**

(See discussion of '229 with regard to claims 24-27, esp. claim 26, and claim 9 and thereby claim 1, sections (a) and (b), *supra*.)

The load triggering event is an action taken by a user to open a browser.  See discussion of claim 9 and thereby claim 1, *supra*, esp. with respect to "a user-initiated action".  Such an act includes, e.g., the viewer leaving or exiting the specific display, the viewer closing the foreground platform, clicking on an off-site link or entering a new address in a dialogue box, time delay, load, unload, click, resize, submit, focus, blur, drag, key press (including a mouse button key), select, change (contents of a form field), refresh, open, close, redirect, enter, exit, move, minimize, maximize, end of program, beginning of program, beginning of session, end of session, "switching services," or change of service.  The Exhibits, e.g. Exhibit A, show a browser window/browser windows with an "active" address, e.g. "archive.org" as well as a refresh button and a stop/escape button to the right thereof.  Therefore, a load-triggering event, e.g. the user taking some action to open a browser, which comprises redirecting to a website, e.g. clicking the refresh/reload/redirect button of the foreground platform/browser window, is disclosed by or inherent in the teachings of Unfaithful website, e.g. refreshing/redirecting to first Unfaithful webpage (Exhibit A) i.e. re-executing the source code of the first webpage (Exhibit B), causes the second browser to open.  It is noted that the web site redirected to is not required to be a different web site.  Note also the discussion of claims 23-25 *supra* and Patent Owner's 9-27-13 response at page 16, first full paragraph.  Note also page 21 of the 9/27/13 PO response and the *Response to Arguments* section, **37 CFR 1.131 Declaration**.

Application/Control Number: 90/012,496                                                    Page 115
Art Unit: 3992

<u>Claim 31:</u>

**The system of claim 9 where said second browser is displayed in a foreground window after the occurrence of a view-triggering event.**

(See '229 at, e.g., Figures 3A-3C and 8 and col. 6, line 65-col. 7, line 35 ("FIG. 8 is a flow diagram showing the sequence of steps in the process of delivering display content in the embodiment of the present invention shown in FIGS. 3A-3C.  In the first step, a client 20 adds post-session instructions to its display 50.  A viewer 26 requests a foreground display 52 from a first or foreground platform with post-session instructions embedded (or otherwise linked) therein.  After the foreground display 34 loads, the post-session instructions cause a post-session procedure 43a to be requested 54 and, in turn, the script handler 42 returns a post-session procedure 43b, 56.  At some point the viewer 26 initiates a load triggering event 58.  This load triggering event causes a post-session platform to open 60 in the background (physically behind or otherwise hidden from the viewer) and also causes the post-session platform to request a post-session display 62….The post-session platform 24 and display 30 remain in the background until the viewer 26 initiates a view triggering event 68. The viewer 26 views the post-session display in the post-session platform 69….") and col. 10, line 64-col. 11, line 23 ("View Triggering Event. At some point after viewing the display 34, the viewer activates a view triggering event. View triggering events may include, for example, the viewer closing the foreground platform 32, the viewer selecting the post-session platform 24 from the task bar at the bottom of a media screen or an alternative menu structure, or the viewer minimizing or moving the foreground platform 32. Exemplary view triggering events could include clicking on an off-site link or entering a new address in a dialogue box, load, unload, click, resize, submit, focus, blur, drag,

Application/Control Number: 90/012,496                                    Page 116
Art Unit: 3992

key press (including a mouse button key), select, change (contents of a field), refresh, open,

close, redirect, enter, exit, maximize, end of program, beginning of program, beginning of

session, end of session, 'switching services,' or change of service. Still other view triggering

events may be time controlled. These view triggering events are meant to be exemplary.  It

should be recognized from the exemplary view triggering events set out in the preceding

paragraph that one feature of a view triggering event is that it is preferably viewer driven. While

a view triggering event is initiated by viewer action, a time delay may also be an aspect of a view

triggering event. For example, a viewer may initiate a view triggering event by clicking an off-

site link, but the set of actions to be taken in response to the view triggering event may not occur

for a pre-determined time period. In other words, the view triggering event may be time

delayed.").)

        The view triggering event is an action taken by a user to view the obscured background

window on a display of a computing device.  See discussion of claim 9 and thereby, claim 1,

*supra*, esp. with respect to "a user-initiated action".  Such an act includes, e.g., closing the

foreground platform, selecting the post-session platform from the task bar at the bottom of a

media screen or an alternative menu structure, minimizing or moving the foreground platform,

clicking on an off-site link or entering a new address in a dialogue box, load, unload, click,

resize, submit, focus, blur, drag, key press (including a mouse button key), select, change

(contents of a field), refresh, open, close, redirect, enter, exit, maximize, end of program,

beginning of program, beginning of session, end of session, "switching services," or change of

service.   The Exhibits, e.g. A and C-D, each also show an Archive bar and browser window with

an "active" address and a close button.  Each browser window also shows minimize and

Application/Control Number: 90/012,496                                      Page 117
Art Unit: 3992

maximize buttons. Therefore, it is disclosed by or inherent in the teachings of Unfaithful website

that the second browser window will be displayed in a foreground window after the occurrence

of a view-triggering event, e.g. the user takes some action to move, minimize or close the first

browser window, e.g. click the close or minimize buttons of the foreground platform/browser

window, to bring the second browser window into view.

Note also the rejection of claim 6 essentially as proposed on page 14 of the Request

which is hereby incorporated into this Office Action by reference and Patent Owner's 9-27-13

response at page 16, first full paragraph. Note also page 21 of the 9/27/13 PO response and the

**Response to Arguments** section, **37 CFR 1.131 Declaration**.


Claim 33:

**The system of claim 9 where said device comprises a computer.**

(See '229 at, e.g., abstract ("The present invention is directed to a post-session

advertising system that may be used in media such as computers, personal digital assistants,

telephones, televisions, radios, and similar devices...."), BACKGROUND OF THE

INVENTION section, col. 3, lines 43-62 ("Typically, a viewer accesses the Internet using a

platform, such as a Web browser, on media, such as a computer. For example, a viewer

accessing the Internet using the Internet Explorerm Web browser as a platform on media

consisting of a computer running the WindowsTM operating system observes the platform as

appearing in a window....") and col. 13, lines 42-52 ("Although the present invention has been

discussed in terms of the Internet, alternative media is also contemplated within the scope of the

invention. For example, as shown in the exemplary embodiments discussed above, interactive

Application/Control Number: 90/012,496                                    Page 118
Art Unit: 3992

television and wireless communication devices would be ideally suited to the method described

in this disclosure.  Further, although the terms 'Web server,' 'Web site,' and 'Web page,' are

used throughout this disclosure, they are used in the generic sense and are not meant to exclude

their equivalent as associated with intranets, LANs, WANS, or alternate media.").  See also

discussion of '229 with regard to claim 9 and thereby, the preamble and section (a) of claim 1,

*supra*.)

      Unfaithful includes a set of webpages (i.e. HTML coded document(s) on the Web (i.e. a

service on the Internet for storing, finding, accessing and disseminating such document(s)) which

are accessible/used by a browser (i.e. application/program for rendering pages on screen,

executing embedded scripts, invoking additional software)) and corresponding source code

(Exhibits A-E).  The first Unfaithful webpage (Exhibit A) is displayed in a window (i.e. a frame

surrounded viewing area of a screen) of a first web browser and its source code (Exhibit B) is

executed.  Execution of the source code causes a webpages (Exhibits C and D), each of which

includes advertisements for other webpages to be displayed in a window (i.e. a frame surrounded

viewing area of a screen) of a web browser (note in upper left corner of frame "Windows

Internet Explorer") positioned behind the first browser window (Exhibit E).  Exhibit E is a screen

capture, after removal of a foreground browser window displaying the archived webpage shown

in Exhibit A, a background browser window showing the archived webpage shown in Exhibit C,

the background browser window being a "pop-under" window automatically generated by the

foreground browser window upon execution of the source code shown in Exhibit B.  (Attention

is again invited to the "BACKGROUND OF THE INVENTION" section of '229, col. 1, line 10-

col. 4, line 6 ("…Typically, a viewer accesses the Internet using a platform, such as a Web

Application/Control Number: 90/012,496                                    Page 119
Art Unit: 3992

browser, on media, such as a computer.  For example, a viewer accessing the Internet using the

Internet Explorerm Web browser as a platform on media consisting of a computer running the

WindowsTM operating system observes the platform as appearing in a window….While it is

possible to simultaneously have multiple windows open, only one window may have focus at

any time.  If a window is in the focus state, it always fully visible (i.e., it appears 'on top' of

other open windows) and is sometimes referred to as the 'active' window.  Windows that are in

the blur state are said to be in the 'background' and are at least partially obscured by the window

in the focus state….").)  Therefore, it is disclosed by or inherent in the teachings of Unfaithful

(showing, e.g., a screen device, i.e. a communication device, running/using Windows®,

maintaining a foreground window and at least one background window and displaying plural

browsers (i.e. Windows® Internet Explorer®)), that the "device" is a computer or similar device

running/using Windows® and Windows® Internet Explorer®. Note also Patent Owner's 9-27-13

response at page 16, first full paragraph. Note also page 26 of the 9/27/13 PO response and the

**Response to Arguments** section, **37 CFR 1.131 Declaration**.


Claim 39:

**The system of claim 9 where said display includes a Web site.**

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purpose of further discussion, these claims are interpreted as requiring a device that

interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content

that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a

platform, e.g. a window (i.e. a screen).", and the discussion of claim 9 and thereby claim 1,

Application/Control Number: 90/012,496                                         Page 120
Art Unit: 3992

sections (a)  and (b) *supra*.  Therefore, as best understood, "a device" (i.e. a communication

device, e.g. a computer or similar device running/using Windows®,)  "that interacts with a

display to display to a user" (i.e. capable of imparting content, e.g. Web sites/web pages, to a

viewer that can be seen, heard or otherwise sensed within or from a platform, e.g. a web

browser/browser window (i.e. a screen)) as well as "at least one browser" (i.e. Windows®

Internet Explorer®), "each said at least one browser within a respective window", see, e.g.,

Exhibits A and C-D, is disclosed by or inherent in the disclosure of Unfaithful.  Note also Patent

Owner's 9-27-13 response at page 16, second to last full paragraph.


Claim 46:

**The system of claim 9 where said advertisement comprises an HTML frameset**.

(See '229 at not only at col. 10, lines 19-25 ("In one preferred embodiment, the event

handler delivers a link to an HTML frameset. There is no requirement, however, that the post-

session browser link to HTML code. In alternative preferred embodiments, the post-session

browser links to any form of network content including sound, animation, streaming video, or

any other form of rich media.") but also col. 1, lines 25-29 ("A frameset is the set of subpages

that together comprise a Web page. (For example, a Web page may be divided horizontally

creating a frameset of two subpages comprising the top and bottom half of the Web page).").

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purposes of further discussion, these claims are interpreted as requiring an advertisement

or links including such specific claimed form of network content.", and claim 9 in paragraph 6

*supra*. Therefore it is disclosed by or inherent in the teachings of Unfaithful that the deliverable

Application/Control Number: 90/012,496                                      Page 121
Art Unit: 3992

link www.integral.com is the address of the web page/advertisement shown in Exhibit C which

shows/comprises a Web page divided horizontally creating a frameset of subpages comprising

the top and bottom halves and left and right halves of the Web i.e. an HTML frameset as claimed

as best understood.

Note also Patent Owner's 9-27-13 response at page 16, last full paragraph.


Claim 50:

**The method of claim 19 where said second browser is opened in response to a load triggering event.**

See the discussion of claim 23 *supra* and claims 51-55 *infra*.  Note also the rejection of

claim 12 essentially as proposed on page 20 of the Request which is hereby incorporated into this

Office Action by reference and Patent Owner's 9-27-13 response at page 16, second full

paragraph.  Note also page 21 of the 9/27/13 PO response and the ***Response to Arguments***

section, **37 CFR 1.131 Declaration**.


Claim 51:

**The method of claim 50 where said load-triggering event comprises clicking on an off-site link.**

See discussion of claim 24 *supra* and Patent Owner's 9-27-13 response at page 16,

second full paragraph. Note also page 21 of the 9/27/13 PO response and the ***Response to***

***Arguments*** section, **37 CFR 1.131 Declaration**.


Claim 52:

Application/Control Number: 90/012,496                                Page 122
Art Unit: 3992

**The method of claim 50 where said load-triggering event comprises entering a new address.**

See discussion of claim 25 *supra* and Patent Owner's 9-27-13 response at page 16, second full paragraph.  Note also page 21 of the 9/27/13 PO response and the ***Response to Arguments*** section, **37 CFR 1.131 Declaration**.


Claim 53:

**The method of claim 50 where said load-triggering event comprises refreshing a web site.**

See discussion of claim 26 *supra* and Patent Owner's 9-27-13 response at page 16, second full paragraph. Note also page 21 of the 9/27/13 PO response and the ***Response to Arguments*** section, **37 CFR 1.131 Declaration**.


Claim 54:

**The method of claim 50 where said load-triggering event comprises exiting a web site.**

See discussion of claim 27 *supra* and Patent Owner's 9-27-13 response at page 16, second full paragraph.  Note also page 21 of the 9/27/13 PO response and the ***Response to Arguments*** section, **37 CFR 1.131 Declaration**.


Claim 55:

**The method of claim 50 where said load-triggering event comprises being redirected to a web site.**

Application/Control Number: 90/012,496                                  Page 123
Art Unit: 3992

      See discussion of claim 28 *supra* and Patent Owner's 9-27-13 response at page 16,

second full paragraph.  Note also page 21 of the 9/27/13 PO response and the ***Response to***

***Arguments*** section, **37 CFR 1.131 Declaration**.


Claim 58:

**The method of claim 50 where said second browser is displayed in a foreground window
after the occurrence of a view-triggering event.**

      See discussion of claim 31 *supra* and Patent Owner's 9-27-13 response at page 16,

second full paragraph.  Note also page 21 of the 9/27/13 PO response and the ***Response to***

***Arguments*** section, **37 CFR 1.131 Declaration**.


Claim 60:

**The method of claim 19 where said media comprises a computer.**

      See discussion of claim 33 *supra* and Patent Owner's 9-27-13 response at page 16,

second full paragraph.  Note also page 26 of the 9/27/13 PO response and the ***Response to***

***Arguments*** section, **37 CFR 1.131 Declaration**.


Claim 66:

**The method of claim 19 where said display includes a Web site.**

      See discussion of claim 39 *supra* and Patent Owner's 9-27-13 response at page 16,

second to last full paragraph.

Application/Control Number: 90/012,496                                      Page 124
Art Unit: 3992

Claim 73:

**The method of claim 19 where said advertisement comprises an HTML frameset.**

See discussion of claim 46 *supra* and Patent Owner's 9-27-13 response at page 16,
second to last full paragraph.

15.   **Claims 40, 42, 47-49, 67, 69 and 74-76 are rejected under 35 U.S.C. 103(a) as**
**being unpatentable over Unfaithful as evidenced by JavaScript Bible and Alberts '392 in**
**view of Abramowitz '831.**

Claim 40:

**The system of claim 9 where said display includes streaming video.**

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood
and for purpose of further discussion, these claims are interpreted as requiring a device that
interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content
that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a
platform, e.g. a window (i.e. a screen)." and the discussion of claim 9, and thereby, claim 1,
section (a), and claim 33 *supra*. Therefore, as best understood, Unfaithful does not teach a
display which includes streaming video.  However, Unfaithful does teach "a device" (i.e. a
communication device, e.g. a computer or similar device running/using Windows®,)  "that
interacts with a display to display to a user" (i.e. capable of imparting content, e.g. Web
sites/web pages, to a viewer that can be seen, heard or otherwise sensed within or from a
platform, e.g. a web browser/browser window (i.e. a screen)) as well as "at least one browser"

Application/Control Number: 90/012,496                                      Page 125
Art Unit: 3992

(i.e. Windows® Internet Explorer®), "each said at least one browser within a respective

window", see, e.g., Exhibits A and C-D , i.e. displaying on a computer information received over

the Internet such as image and text.  Also see '831 at "BACKGROUND" ("Server computers are

often used to present information over a network, such as the Internet, an extranet or an intranet,

for display on a client computer. The presented information may be a time-ordered sequence, or

stream, of multimedia information, such as image frames captured from a moving object or

sound amplitude signals associated with a sound or voice. Macromedia Flash TM, available from

Macromedia Inc., is sometimes used to display files representing multimedia streams. The

Macromedia files contain a multimedia presentation consisting of a timeline of frames. The

frames may contain graphics with associated audio, similar to the frames in a movie clip. Each

frame is displayed for predetermined duration before the next frame in the timeline is displayed.

As the timeline advances, the frames are displayed in sequence, creating an animated picture.

Alternatively, the frames may contain commands that cause Macromedia Flash TM to perform

actions that are associated with the commands.").  Note also '392 at col. 1, lines 12-13 ("A

banner ad can have text and still or moving graphics.").  Therefore, as best understood, to

employ streaming video content by Unfaithful would be obvious to one of ordinary skill in the

art in view of the recognition that such is also image information displayed on a computer

received over the Internet as taught by '831. Note also Patent Owner's 9-27-13 response at page

16, second to last first full paragraph.


Claim 42:

**The system of claim 9 where said display includes a movie.**

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood and for

purpose of further discussion, these claims are interpreted as requiring a device that interacts

with a display to display to a user, i.e. a device capable of imparting to a viewer content that can

be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a platform,

e.g. a window (i.e. a screen)." and the discussion of claim 9, and thereby claim 1, section (a), and

claim 33 *supra*. Therefore, as best understood, Unfaithful does not teach a display which

includes a movie.  However, Unfaithful does teach "a device" (i.e. a communication device, e.g.

a computer or similar device running/using Windows®,)  "that interacts with a display to display

to a user" (i.e. capable of imparting content, e.g. Web sites/web pages, to a viewer that can be

seen, heard or otherwise sensed within or from a platform, e.g. a web browser/browser window

(i.e. a screen)) as well as "at least one browser" (i.e. Windows® Internet Explorer®), "each said

at least one browser within a respective window", see, e.g., Exhibits A and C-D, i.e. displaying

on a computer information received over the Internet such as image and text.  Also see '831 at

"BACKGROUND" ("Server computers are often used to present information over a network,

such as the Internet, an extranet or an intranet, for display on a client computer. The presented

information may be a time-ordered sequence, or stream, of multimedia information, such as

image frames captured from a moving object or sound amplitude signals associated with a sound

or voice. Macromedia Flash TM, available from Macromedia Inc., is sometimes used to display

files representing multimedia streams. The Macromedia files contain a multimedia presentation

consisting of a timeline of frames. The frames may contain graphics with associated audio,

similar to the frames in a movie clip. Each frame is displayed for predetermined duration before

the next frame in the timeline is displayed. As the timeline advances, the frames are displayed in

Application/Control Number: 90/012,496                                    Page 127
Art Unit: 3992

sequence, creating an animated picture. Alternatively, the frames may contain commands that

cause Macromedia Flash TM to perform actions that are associated with the commands."). Note

also '392 at col. 1, lines 12-13 ("A banner ad can have text and still or moving graphics.").

Therefore, to employ movie content, i.e. "similar to a movie clip", by Unfaithful would be

obvious to one of ordinary skill in the art in view of the recognition that such is also image

information displayed on a computer received over the Internet as taught by '831.

Note also Patent Owner's 9-27-13 response at page 16, second to last full paragraph.


Claim 47:

**The system of claim 9 where said advertisement comprises sound.**

(See '229 not only at col. 10, lines 19-25 ("In one preferred embodiment, the event

handler delivers a link to an HTML frameset. There is no requirement, however, that the post-

session browser link to HTML code. In alternative preferred embodiments, the post-session

browser links to any form of network content including sound, animation, streaming video, or

any other form of rich media.") but also col. 6, lines 17-39 ("Platforms 24, 32 are means  through

which a viewer accesses a display to the exclusion  of other displays. A platform may allow the

viewer to play, show, enable, perform, transmit, update, or record the selected display. Platforms

24, 32 may include, for example, Web browsers, browser windows, media channels, media

stations, media frequencies, audio connections, streaming media, content delivery applications,

media viewing or  interacting technology, and similar means….A post-session platform 24 is a

platform that begins its life in the background and that can be fully sensed by a viewer 26 only

after it has been brought to the foreground. Displays 30, 34 have content that a viewer 26 sees,

Application/Control Number: 90/012,496                                                    Page 128
Art Unit: 3992

hears, or otherwise senses within or from a platform 24, 32. Displays 30, 34 may include, for

example, Internet content (such as streaming video, Web sites, Web pages), video broadcast

content (such as television programs, movies, videos, commercials, and infomercials), audio

broadcast content (such as radio programs, commercials, and sound recordings or such as

commercials or sound recordings played over a telephone connection), and any other content

capable of being transmitted over media").

 See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purposes of further discussion, these claims are interpreted as requiring an advertisement

or links including such specific claimed form of network content.", and the discussion of claim 9

*supra*.  Therefore, as best understood, Unfaithful does not teach said advertisement or link

comprising sound.  However, Unfaithful does teach a Web service implemented as a

process/process(es) by a server or servers or client system or on the media, e.g. browser

software, i.e., an "event handler", that receives from an Internet address ( i.e.

/http://www.unfaithfulcotac.com//), a link to a webpage, which webpage includes an

advertisement (Exhibit C), which said advertisement/webpage (i.e. computer information

received over the Internet such as image and text) is loaded into said second browser while said

second browser is in a said background window (Exhibit E).  Also see '831 at

"BACKGROUND" ("Server computers are often used to present information over a network,

such as the Internet, an extranet or an intranet, for display on a client computer. The presented

information may be a time-ordered sequence, or stream, of multimedia information, such as

image frames captured from a moving object or sound amplitude signals associated with a sound

or voice. Macromedia Flash TM, available from Macromedia Inc., is sometimes used to display

Application/Control Number: 90/012,496                                    Page 129
Art Unit: 3992

files representing multimedia streams. The Macromedia files contain a multimedia presentation

consisting of a timeline of frames. The frames may contain graphics with associated audio,

similar to the frames in a movie clip. Each frame is displayed for predetermined duration before

the next frame in the timeline is displayed. As the timeline advances, the frames are displayed in

sequence, creating an animated picture. Alternatively, the frames may contain commands that

cause Macromedia Flash TM to perform actions that are associated with the commands.".)

Therefore, to employ information/advertisement/link including sound content by Unfaithful

associated with the image/text would be obvious to one of ordinary skill in the art in view of the

recognition that such content combination is also information displayed on a computer received

over the Internet as taught by '831. Note also Patent Owner's 9-27-13 response at page 16, last

full paragraph.


Claim 48:

**The system of claim 9 where said advertisement comprises animation.**

(See '229 not only at col. 10, lines 19-25 ("In one preferred embodiment, the event

handler delivers a link to an HTML frameset. There is no requirement, however, that the post-

session browser link to HTML code. In alternative preferred embodiments, the post-session

browser links to any form of network content including sound, animation, streaming video, or

any other form of rich media.") but also col. 6, lines 17-39 ("Platforms 24, 32 are means through

which a viewer accesses a display to the exclusion  of other displays. A platform may allow the

viewer to play, show, enable, perform, transmit, update, or record the selected display. Platforms

24, 32 may include, for example, Web browsers, browser windows, media channels, media

stations, media frequencies, audio connections, streaming media, content delivery applications,

media viewing or  interacting technology, and similar means….A post-session platform 24 is a

platform that begins its life in the background and that can be fully sensed by a viewer 26 only

after it has been brought to the foreground. Displays 30, 34 have content that a viewer 26 sees,

hears, or otherwise senses within or from a platform 24, 32. Displays 30, 34 may include, for

example, Internet content (such as streaming video, Web sites, Web pages), video broadcast

content (such as television programs, movies, videos, commercials, and infomercials), audio

broadcast content (such as radio programs, commercials, and sound recordings or such as

commercials or sound recordings  played over a telephone connection), and any other content

capable of being transmitted over media").

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purposes of further discussion, these claims are interpreted as requiring an advertisement

or links including such specific claimed form of network content." and the discussion of claim 9

*supra*.  Therefore, as best understood, Unfaithful does not teach said advertisement comprising

animation.  However, Unfaithful does teach a Web service implemented as a process/process(es)

by a server or servers or client system or on the media, e.g. browser software, i.e., an "event

handler", that receives from an Internet address ( i.e. /http://www.unfaithful.com//), a link to a

webpage, which webpage includes an advertisement (Exhibit C), which said

advertisement/webpage (i.e. computer information received over the Internet such as image and

text) is loaded into said second browser while said second browser is in a said background

window (Exhibit E).  Also see '831 at "BACKGROUND" ("Server computers are often used to

present information over a network, such as the Internet, an extranet or an intranet, for display on

Application/Control Number: 90/012,496                                    Page 131
Art Unit: 3992

a client computer. The presented information may be a time-ordered sequence, or stream, of

multimedia information, such as image frames captured from a moving object or sound

amplitude signals associated with a sound or voice. Macromedia Flash TM, available from

Macromedia Inc., is sometimes used to display files representing multimedia streams. The

Macromedia files contain a multimedia presentation consisting of a timeline of frames. The

frames may contain graphics with associated audio, similar to the frames in a movie clip. Each

frame is displayed for predetermined duration before the next frame in the timeline is displayed.

As the timeline advances, the frames are displayed in sequence, creating an animated picture.

Alternatively, the frames may contain commands that cause Macromedia Flash TM to perform

actions that are associated with the commands.".)  Therefore, to employ

information/advertisement/link including animation content by Unfaithful would be obvious to

one of ordinary skill in the art in view of the recognition that such content combination is also

image information displayed on a computer received over the Internet as taught by '831. Note

also Patent Owner's 9-27-13 response at page 16 last full paragraph.


Claim 49:

**The system of claim 9 where said advertisement comprises streaming video.**

      (See '229 not only at col. 10, lines 19-25 ("In one preferred embodiment, the event

handler delivers a link to an HTML frameset. There is no requirement, however, that the post-

session browser link to HTML code. In alternative preferred embodiments, the post-session

browser links to any form of network content including sound, animation, streaming video, or

any other form of rich media.") but also col. 6, lines 17-39 ("Platforms 24, 32 are means through

Application/Control Number: 90/012,496                                   Page 132
Art Unit: 3992

which a viewer accesses a display to the exclusion  of other displays. A platform may allow the

viewer to play, show, enable, perform, transmit, update, or record the selected display. Platforms

24, 32 may include, for example, Web browsers, browser windows, media channels, media

stations, media frequencies, audio connections, streaming media, content delivery applications,

media viewing or interacting technology, and similar means….A post-session platform 24 is a

platform that begins its life in the background and that can be fully sensed by a viewer 26 only

after it has been brought to the foreground. Displays 30, 34 have content that a viewer 26 sees,

hears, or otherwise senses within or from a platform 24, 32. Displays 30, 34 may include, for

example, Internet content (such as streaming video, Web sites, Web pages), video broadcast

content (such as television programs, movies, videos, commercials, and infomercials), audio

broadcast content (such as radio programs, commercials, and sound recordings or such as

commercials or sound recordings  played over a telephone connection), and any other content

capable of being transmitted over media").

      See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purposes of further discussion, these claims are interpreted as requiring an advertisement

or links including such specific claimed form of network content." and the discussion of claim 9

*supra*.  Therefore, as best understood, Unfaithful does not teach said advertisement/link

comprising streaming video.  However, Unfaithful does teach a Web service implemented as a

process/process(es) by a server or servers or client system or on the media, e.g. browser

software, i.e., an "event handler", that receives from an Internet address (i.e.

/http://www.cotac.com//), a link to a webpage, which webpage includes an advertisement

(Exhibit C), which said advertisement/webpage (i.e. computer information received over the

Application/Control Number: 90/012,496                              Page 133
Art Unit: 3992

Internet such as image and text) is loaded into said second browser while said second browser is

in a said background window (Exhibit E).  Also see '831 at "BACKGROUND" ("Server

computers are often used to present information over a network, such as the Internet, an extranet

or an intranet, for display on a client computer. The presented information may be a time-ordered

sequence, or stream, of multimedia information, such as image frames captured from a moving

object or sound amplitude signals associated with a sound or voice. Macromedia Flash TM,

available from Macromedia Inc., is sometimes used to display files representing multimedia

streams. The Macromedia files contain a multimedia presentation consisting of a timeline of

frames. The frames may contain graphics with associated audio, similar to the frames in a movie

clip. Each frame is displayed for predetermined duration before the next frame in the timeline is

displayed. As the timeline advances, the frames are displayed in sequence, creating an animated

picture. Alternatively, the frames may contain commands that cause Macromedia Flash TM to

perform actions that are associated with the commands.").  Therefore, to employ

information/advertisement/link including streaming video content by Unfaithful would be

obvious to one of ordinary skill in the art in view of the recognition that such is also image

information displayed on a computer received over the Internet as taught by '831.  Note also

Patent Owner's 9-27-13 response at page 16 last full paragraph.


Claim 67:

**The method of claim 19 where said display includes streaming video.**

    See discussion of claim 40 *supra*.

Application/Control Number: 90/012,496                                      Page 134
Art Unit: 3992

Claim 69:

**The method of claim 19 where said display includes a movie.**

  See discussion of claim 42 *supra.*

Claim 74:

**The method of claim 19 where said advertisement comprises sound.**

  See discussion of claim 47 *supra.*

Claim 75:

**The method of claim 19 where said advertisement comprises animation.**

  See discussion of claim 48 *supra.*

Claim 76:

**The method of claim 19 where said advertisement comprises streaming video.**

  See discussion of claim 49 *supra.*

  16. **Claims 29-30, 32, 38, 56-57, 59 and 65 are rejected under 35 U.S.C. 103(a) as being unpatentable over Unfaithful, JavaScript Bible and Alberts '392 in view of Cezar.**

Claim 29:
**The system of claim 23 where said script handler delays invocation of said post-session procedure for a predetermined time period.**

Application/Control Number: 90/012,496                                    Page 135
Art Unit: 3992

(See '229 at, e.g., Figures 3A and 4, col. 6, lines 30-39 ("Displays 30, 34 have content

that a viewer 26 sees, hears, or otherwise senses within or from a platform 24, 32. Displays 30,

34 may include, for example, Internet content (such as streaming video, Web sites, Web pages),

video broadcast content (such as television programs, movies, videos, commercials, and

infomercials), audio broadcast content (such as radio programs, commercials, and sound

recordings or such as commercials or sound recordings played over a telephone connection), and

any other content capable of being transmitted over media.") and col. 8, line 48-col. 9, line 49

("Script Code Delivery.  As shown in FIG. 3A, when a viewer 26 opens a client's 20 display 34

with a foreground platform 32, the post-session instructions that the client 20 added to its display

34 cause the foreground platform 32 to download 43a, 43b a post-session procedure from the

Web server 22.  In one exemplary preferred embodiment the post-session procedure downloaded

from the Web server 22 to the platform 32 is script code….Script Handler.  In the exemplary

preferred embodiment shown in FIGS. 3A and 4, when a viewer requests a display 34 to which

post-session HTML code has been added, a request for a post-session procedure 43a is sent to

the script handler 42.  The time at which the request for the post-session procedure is made is

preferably recorded, noted, and/or stored....The script handler 42 then returns a post-session

procedure 43b to the platform 32.  As illustrated in the exemplary embodiment of FIG. 4,…If a

viewer subsequently requests a second client Web page, a second request for script code is sent

to the script handler 42.  Using the time data that has been recorded, noted, and/or stored, the

length of time that has elapsed between the initial and subsequent requests is determined.  The

script handler 42 determines if the elapsed time is longer or shorter than a specified time period

('time window').  If the elapsed time is shorter than the time window, script code specifying that

no operations are to be performed is returned (blank script).  If the elapsed time is longer than the

time window, normal script code is returned.  Finally, a response is assembled and returned to

the viewer's foreground platform 32.  The reason for determining whether a second request for

script code is made within a time window is to provide the viewer with a reasonable opportunity

to view a display before replacing it with a new display.  If a viewer requests a second Web page

to which the same client's (or, in an alternate embodiment, any client's) post-session HTML

code has been added, a load triggering event occurs.  If this load triggering event occurs within

the time window, a request for script code will result in blank script code being returned.  In

other words, the viewer is not sent a second display.  On the other hand, if this load triggering

event occurs after the time window, the viewer will be sent a second display to replace the first

unseen display.").)

     While Unfaithful does not explicitly teach a script handler which delays invocation of the

post-session procedure for a predetermined time period, it is the Examiner's first position that the

browser's, i.e. script handler's, (Exhibit A), e.g., reading/parsing/evaluating of the web

page/source code ( Exhibit B) and displaying the results of the HTML prior to encountering and

activation/execution of the post-session procedure source code, see discussion *supra*, as taught

by Unfaithful would inherently delay invocation of such procedure for a period of time.  In any

case, i.e. the Examiner's second position, Unfaithful does teach commercial ad display.

Furthermore see Cezar at, e.g., col. 1, line 6 ("This invention relates to Internet advertising."),

col. 2, lines 22-39 ("A webserver delivers web pages to a browser while a central controller

tracks the extent to which a particular ad is presented to a particular browser.  The coding for the

web pages is such that the ad does not scroll during browser display of a web page.  The content

Application/Control Number: 90/012,496                                          Page 137
Art Unit: 3992

of the ad includes a coded timer, which upon timeout causes the browser to report to the central

controller.  The system enables precise controlled advertising to each web page viewing browser

and accurate advertising budgeting and programming from the central controller.  As a

consequence, browser advertising is generated which advertising can be monitored and upgraded

to meet marketing needs.  The components participating in the system include a host website

partition at a webserver for transmitting a page.  The webserver transmits software to the browser

for retrieving a non-scrolling ad frame.  Ad content for the non-scrolling ad frame has individual

timers for timing out each ad.  The timers starts commencing with display at the browser."), col.

3, lines 26-43 ("The system uniquely uses the browser in a scheme of precise timed ad display

control.  First, the browser is loaded with code, which code interrogates for the presence of the

non-scrolling ad frame.  If the browser lacks the non-scrolling ad frame, the browser is diverted

to the system controller to load the non-scrolling ad frame.  The non-scrolling frame never

appears at the website.  Second, the browser initiates timer running as each ad is displayed.

Thus, the advertiser is assured that his particular ad content is displayed for the required

minimum time interval.  Third, the browser inquires to the central controller for the ad content

addresses to be displayed.  Thereafter, it is the browser that fetches and loads the ad content to

the non-scrolling ad frame on any displayed web page; this minimizes bandwidth transmission at

the central controller.  Fourth, the browser reports to the system controller the time out of

displayed ad content, enabling a precise record of advertising control to be maintained."), col. 5,

lines 39-53 ("Advertiser webserver C downloads code to browser B. Browser B executes the

code and installs the non-scrolling ad frame 24 to the browser only.  Thereafter, advertiser

webserver C operates normally and without further modification in supplying webpages to the

Application/Control Number: 90/012,496                                    Page 138
Art Unit: 3992

browser B. Screen 28 of browser B is shown schematically.  Once non-scrolling ad frame 24 is

installed, lead-in ad content 16' is first displayed.  Thereafter, browser B is given identification

by system controller S. Under the direction of system controller S, browser B reports ad identity,

and time of display for a minimum time interval to system controller S. After this report, browser

B is given the Internet address of further ad content 16 to be displayed, fetches this ad content 16

and displays the ad content 16 for the appropriate time interval.  As will hereafter become clear,

this cycle essentially endlessly repeats for at least as long as one browser B is connected to one

advertiser webserver C. As will hereafter be demonstrated, it is possible to trace the same

browser B as it visits related (but not the same) advertiser webservers C.") and col. 6, lines 30-32

("The reader will understand that the code loaded by the advertiser webserver C is Java script

code, which code executes immediately upon being loaded to the browser B."), i.e. browser, i.e.

"script handler", delays invocation of the post-session procedure, i.e. subsequent ad, for a

predetermined time period, i.e. coded timer, to ensure display of currently displayed ad content

for a predetermined period of time in order to monitor and upgrade marketing needs.  Therefore

to employ such coded timers as taught by Cezar with the Unfaithful Internet ad system would be

obvious to one of ordinary skill in the art in view of the recognition that such would insure the

effectiveness of such ad system and the desire for such in any advertising system. Note page 16,

first full paragraph of PO's 9/27/13 pages 22-24 of the 9/27/13 PO response and the ***Response to

Arguments*** section, **37 CFR 1.131 Declaration**.

Application/Control Number: 90/012,496                                          Page 139
Art Unit: 3992

<u>Claim 30:</u>

**The system of claim 29 where said script handler cancels invocation of said post-session procedure if a user loads a new web site in said first browser before said predetermined time period has elapsed.**

(See discussion of '229 with respect to claim 29 *supra*.)

While Unfaithful does not explicitly teach the script handler canceling invocation of said post-session procedure if a user loads a new web site in said first browser before a predetermined time period has elapsed, it is the Examiner's first position that the browser i.e. script handler, (Exhibit A) as taught by Unfaithful would inherently cancel invocation of said post-session procedure if a user loads a new web site in said first browser and thereby before any predetermined time period has elapsed.  It is noted that the claim does not specific what happens after the predetermined time period has elapsed.  In any case, i.e. the Examiner's second position, the prior art, see discussion of claim 29 *supra* in addition to Cezar at col. 4, lines 54-56 ("Frame set servers T are interactively called when a browser B calls on an advertiser webservers C for the first time."), col. 5, lines 53-55 ("As will hereafter become clear, this cycle essentially endlessly repeats for at least as long as one browser B is connected to one advertiser webserver C.") and col. 7, lines 32-34 ("From this point forward, the reader will understand that the entire system is in an endless loop for so long as browser B is on advertiser webserver C.").  Therefore canceling invocation of said post-session procedure by the browser, i.e. script handler, if a user loads a new web site in said first browser before said predetermined time period has elapsed, i.e. calls on a new server, is disclosed by or inherent in the teachings of the prior art.  Note page 16, first full paragraph of PO's 9/27/13.  Note also pages 22-24 of the 9/27/13 PO response and the *Response to Arguments* section, **37 CFR 1.131 Declaration**.

Application/Control Number: 90/012,496                                    Page 140
Art Unit: 3992

<u>Claim 32:</u>

**The system of claim 31 including a focus timer that tracks the duration that said second browser is displayed in said foreground window.**

(See '229 at, e.g., Figures 3B and 6 and col. 11, lines 24-64 ("Post-Session Timer.  As shown in FIGS. 3B and 6, in one preferred embodiment, the post-session procedure optionally includes the loading of a process used for tracking focus time.  When the display 30 on the post-session platform 24 changes or the platform 24 is closed, the focus timer process returns time data to the Web server 22 or secondary server 84.  The duration of time that the post-session platform spends in the foreground, and thus being viewed, is tracked.  In the embodiment shown in FIGS. 3B, 3C, and 6, a focus timer is optionally delivered to a post-session Web browser by the event handler 44 and time data 47 is optionally returned to a focus handler 46.  In an alternative preferred embodiment, the focus timer is incorporated into a post-session platform (the focus timer being implemented as a Java applet embedded in the frameset).  The focus timer is linked to the post-session Web browser and monitors the activation of focus and blur events, signifying that the post-session Web browser has been brought to the foreground, sent to the background, or closed.  In one preferred embodiment, the focus timer is incorporated into the post-session Web browser.  It should be noted that while the focus timer process may only track the time period between when a post-session platform is brought to the foreground to when the post-session platform is closed, it may track time periods pertaining to other events relevant to a client.  In one preferred embodiment, the focus timer process may track the length of the time the post-session platform is in the foreground although a viewer may bring a post-session platform to the foreground and return it to the background multiple times before the viewer ultimately closes

Application/Control Number: 90/012,496                                    Page 141
Art Unit: 3992

the platform.  In another alternative embodiment, the focus timer process tracks the length of

time the post-session browser spends in the background. Focus Handler.  As shown in FIGS. 3C

and 6, the focus handler 46 receives time data 47 from the focus timer and transmits statistical

packets to the count daemon 48 to track the focus time for a display 30 displayed in a post-

session platform 24.  In an exemplary shown embodiment, the focus handler 46 performs only

minimal data lookup and returns a response to the focus timer that indicates that no content body

follows.").)

        While Unfaithful does not teach a focus timer, Unfaithful does teach an Internet ad

system.   See also Cezar, esp. the discussion thereof with regard to claims 29-30 *supra* and 56-57

*infra* as well as, e.g., col. 1, lines 41-46 ("A known solution to scrolling is to place the ad content

in a non-scrolling frame.  In such an ad, the non-scrolling frame and the ad content is constantly

located with respect to the viewed screen of the browser.  Thus, both the agencies placing the ad

and the advertisers are relatively sure that the ad remains where it may be viewed.") and col. 3,

lines 59-61 ("…generates an audit trail, which can be used for compensation of the website and a

billing record for the controlled and distributed advertising.") and JavaScript Bible at page 261,

first full paragraph ("If  knowing when a window or frame has been activated or deactivated is

important ... you can set event handlers that fire under those activities. For example, you can

track how frequently a user switches between two of your windows over a period of time. By

saving timestamps triggered by the onBlur event handler ... you can create a record of the user's

window activity.").  Therefore to employ a focus timer, i.e. event handler onFocus time stamps,

that tracks the duration that the windows/web browsers are in the foreground window, i.e.

displayed to the user, as taught by Cezar and JavaScript Bible in combination with the website of

Application/Control Number: 90/012,496                                    Page 142
Art Unit: 3992

Unfaithful would be obvious to one skilled in the art in view of the recognition that such would

generate an audit trail useful not only for compensation and billing purposes but to monitor and

upgrade advertising needs, e.g. to enhance the economic efficiency of advertisements/webpages

and the desirability of such in any advertising system including that of Unfaithful.  Note page 16,

first full paragraph of PO's 9/27/13 response.  Note also pages 22-24 of the 9/27/13 PO response

and the *Response to Arguments* section, **37 CFR 1.131 Declaration**.


Claim 38:

**The system of claim 32 where said focus timer tracks the duration that said second browser displaying said advertisement spends in said foreground window even if said second browser is moved between said foreground window and said background window multiple times before said second browser is closed, and the time data tracked by said focus timer is returned to a web server or secondary server.**

        See discussion in paragraphs 7-8 *supra*, i.e. "Therefore, as best understood and for

purposes of further discussion, this claim is interpreted as requiring said focus timer tracks the

duration that said second browser displaying said advertisement spends in said foreground even

if said second browser is moved between said foreground and said background multiple times

before said second browser is closed, and the time data tracked by said focus timer is returned to

a web server or secondary server." .  See also the discussion of '229, Unfaithful, Cezar and

JavaScript Bible with regard to claim 32 *supra*.  Note esp. col. 3, lines 26-44 of Cezar ("The

system uniquely uses the browser in a scheme of precise timed ad display control...Second, the

browser initiates timer running as each ad is displayed.  Thus, the advertiser is assured that his

particular ad content is displayed for the required minimum time interval.  Third, the browser

inquires to the central controller for the ad content addresses to be displayed....Fourth the

Application/Control Number: 90/012,496

Page 143

Art Unit: 3992

browser reports to the system controller the time out of displayed ad content, enabling a precise

record of advertising control to be maintained").  See also col. 4, lines 23-24 of Cezar ("System

controller S includes two major components webservers W and central processor P.")  Therefore

tracking, via focus timer, the duration that said second browser displaying said advertisement

spends in said foreground even if said second browser is moved between said foreground and

said background multiple times before said second browser is closed, and the time data tracked

by said focus timer being returned to a web server or secondary server, as best understood as

claimed, is disclosed by or inherent in the teachings of the prior art.  Note page 16, third full

paragraph of PO's 9/27/13 response.

Claim 56:

**The method of claim 15 where implementation of said post-session instructions is delayed for a predetermined time period.**

See discussion of claim 29 *supra*.

Claim 57:

**The method of claim 56 where implementation of said post-session instructions is canceled if a user loads a new web site in said first browser before said predetermined time period has elapsed.**

See discussion of claim 30 *supra*.

Claim 59:

**The method of claim 58 including the step of tracking the duration that said second browser is displayed in said foreground window.**

Application/Control Number: 90/012,496                                              Page 144
Art Unit: 3992

     See discussion of claim 32 *supra*.


Claim 65:

**The system of claim 59 where said tracking the duration that said second browser displays said advertisement in said foreground window continues even if said second browser is moved between said foreground window and said background window multiple times before said second browser is closed, and the time data tracked by said focus timer is returned to a web server or secondary server.**

     See discussion of claim 38 *supra*.



     17. **Claims 34-37, 41, 43-45, 61-64, 68 and 70-72 are rejected under 35 U.S.C. 103(a) as being unpatentable over Unfaithful as evidenced by JavaScript Bible and Alberts '392 in view of Jackson '017.**


Claim 34:

**The system of claim 9 where said device comprises a PDA.**
     (See '229 at, e.g., abstract ("The present invention is directed to a post-session advertising system that may be used in media such as computers, personal digital assistants, telephones, televisions, radios, and similar devices...."), BACKGROUND OF THE INVENTION section, col. 3, lines 43-62 ("Typically, a viewer accesses the Internet using a platform, such as a Web browser, on media, such as a computer.  For example, a viewer accessing the Internet using the Internet Explorerm Web browser as a platform on media consisting of a computer running the WindowsTM operating system observes the platform as appearing in a window....") and col. 13, lines 42-52 ("Although the present invention has been discussed in terms of the Internet, alternative media is also contemplated within the scope of the

Application/Control Number: 90/012,496                                          Page 145
Art Unit: 3992

invention.  For example, as shown in the exemplary embodiments discussed above, interactive

television and wireless communication devices would be ideally suited to the method described

in this disclosure.  Further, although the terms 'Web server,' 'Web site,' and 'Web page,' are

used throughout this disclosure, they are used in the generic sense and are not meant to exclude

their equivalent as associated with intranets, LANs, WANS, or alternate media.").  See also

discussion of '229 with regard to claim 9 and thereby, the preamble and section (a) of claim 1,

*supra*.)

      While Unfaithful does not teach a the device being a PDA, Unfaithful does teach show,

e.g., a screen device, i.e. a communication device, running/using Windows®, maintaining a

foreground window and at least one background window and displaying plural browsers (i.e.

Windows® Internet Explorer®)), e.g. that the "device" is a computer or similar device

running/using Windows® and Windows® Internet Explorer®, i.e. the Cotac device is a network

connectable device.  See discussion of Unfaithful with respect to claim 33 *supra* as well as

Unfaithful Exhibit B, e.g. page 1, lines 18 and 44, i.e. operating on Java platform. See also '017

at, e.g., col. 7, line 55-col 8, line 55 ("In the past, a relatively static number of fixed computer 5

devices were managed by a localised support structure able to configure the complex desktop

environments. The future, however, presents us with the prospect of having a profusion of

devices, whether they be computer devices, or other electronic devices such as mobile phones,

personal digital assistant devices (PDAs), electronic organisers, etc. which may or may not be

geographically fixed. This will require an alternative management system which is more flexible.

The preferred embodiments of the present invention aim to provide such an alternative

management system for distributed management of network devices within a network. The term

Application/Control Number: 90/012,496                                    Page 146
Art Unit: 3992

'network device' as used herein is intended to refer to a device whose content is managed by the

system of preferred embodiments of the present invention, but is not intended to imply that any

such device is permanently connected to a network. For the purposes of preferred embodiments

of the present invention, it is sufficient that any such 'network device' is capable of making at

least occasional connections to a network, either directly or via some other device. For example,

certain devices may delegate their management to other devices which in turn must be able to

make occasional network connections. For example, certain PDA-style devices are not inherently

networkable, but rely on a PC to do certain things for them, such as install new programs. Since

the PC can make occasional network connections, such PDAs will also be 'network devices'

which can be managed by the system in accordance with preferred embodiments of the present

invention. Each network device is in preferred embodiments provided with a client program

(which may alternatively be referred to herein as a device manager) which is arranged to

communicate with a server, the server maintaining details of content (for example, programs or

data) desired to be present on each device. In preferred embodiments, the client program

identifies to the server the network device, and the server sends a profile of the content desired to

be present on that device. The client program then preferably configures the network device so

that it contains the content identified in the profile, any content not currently present on the

device, but identified in the profile, being retrieved in a predetermined manner. In preferred

embodiments of the present invention, the client program and server operate on the Java TM

platform. The ubiquity of Java TM across platforms as various as cable television receivers and

mobile telephones, allows the possibility to centrally control almost any kind of device entirely

remotely, provided that at least occasional successful network connections are established to

Application/Control Number: 90/012,496                                    Page 147
Art Unit: 3992

enable that control to take place.  In preferred embodiments of the invention, the client program

on each network device is responsible for autonomously updating the device's configuration.

Dependent on the kind of device, the client program executes at defined intervals, namely either:

1. immediately after the device has been powered; 2. immediately after a network connection has

been established; or 3. after discrete time intervals. The first scenario is designed for bandwidth

restricted devices that can only operate with the availability of a network, e.g. GSM receivers.

The second will be used for those devices that are fully operational without network availability,

but are assumed to make occasional connections e.g. portable computers. The third scenario is

designed for high bandwidth, permanently connected devices like cable television receivers and

network computers.") and col. 17, lines 24-41 (i.e. "From the above description, it will be

appreciated that the system of preferred embodiments of the present invention provides a

platform for managing disparate, heterogeneous, distributed devices. These devices include, but

are not limited to, computers, digital mobile telephones and set-top boxes. The system of

preferred embodiments provides a unique mechanism for the automatic distribution, installation

and removal of almost any kind of content, including applications, without any user intervention.

A system administrator uses a management tool to build a program of content for each device or

group of devices. At predetermined intervals, a small piece of client-side code compares a profile

generated by the server with a record of the content stored on the device in accordance with the

previous profile. Any new or updated content is automatically retrieved and installed and any

defunct content is removed. In preferred embodiments, the server, management tool, and client

program are all Java-based.")  Therefore to employ/substitute another network connectable

device operable on a Java based platform such as a PDA for the network connectable computer

Application/Control Number: 90/012,496                                          Page 148
Art Unit: 3992

device operable on a Java based platform as taught by Unfaithful would be obvious to one skilled

in the art in view of interchangeability as taught by '017.  Note page 16, first full paragraph of

PO's 9/27/13 response.  Note also page 21 of the 9/27/13 PO response and the ***Response to***

***Arguments*** section, **37 CFR 1.131 Declaration**.

Claim 35:

**The system of claim 9 where said device comprises a cell phone.**

See the discussion of claims 33 and 34 *supra*.  Therefore to employ/substitute another

network connectable device operable on a Java based platform such as a cell phone for the

network connectable computer device operable on a Java based platform as taught by Unfaithful

would be obvious to one skilled in the art in view of interchangeability as taught by '017.  Note

page 16, first full paragraph of PO's 9/27/13 response.  Note also page 21 of the 9/27/13 PO

response and the ***Response to Arguments*** section, **37 CFR 1.131 Declaration**.

Claim 36:

**The system of claim 9 where said device comprises a radio.**

(See '229 at, e.g., abstract ("The present invention is directed to a post-session

advertising system that may be used in media such as computers, personal digital assistants,

telephones, televisions, radios, and similar devices...."), BACKGROUND OF THE

INVENTION section, col. 3, lines 43-62 ("Typically, a viewer accesses the Internet using a

platform, such as a Web browser, on media, such as a computer.  For example, a viewer

accessing the Internet using the Internet Explorerm Web browser as a platform on media

Application/Control Number: 90/012,496                                    Page 149
Art Unit: 3992

consisting of a computer running the Windows™ operating system observes the platform as

appearing in a window.…") and col. 13, lines 42-52 ("Although the present invention has been

discussed in terms of the Internet, alternative media is also contemplated within the scope of the

invention.  For example, as shown in the exemplary embodiments discussed above, interactive

television and wireless communication devices would be ideally suited to the method described

in this disclosure.  Further, although the terms 'Web server,' 'Web site,' and 'Web page,' are

used throughout this disclosure, they are used in the generic sense and are not meant to exclude

their equivalent as associated with intranets, LANs, WANS, or alternate media.").  See also

discussion of '229 with regard to claim 9 and thereby, the preamble and section (a) of claim 1,

*supra*.)

        See discussion in paragraph 7 *supra*, i.e. "Therefore, as best understood and for purpose

of further discussion, these claims are interpreted as requiring some device capable of audio

communication as well as a display to display to a user at least one browser within a window.".

See also the discussion of '229 at, e.g., the paragraph bridging cols. 5-6 ("Throughout this

specification terminology will be used to describe the present invention.  The following

definitions and examples of the terminology are not meant to exclude broader concepts,

unspecified examples, or undeveloped technology that would logically fall within the scope of

the invention.  Viewers 26, for example, may be potential voters viewing a television program or

potential customers browsing the Internet on a computer.  The term 'viewer' is also used to

describe a telephone user, a radio listener, or any media user.  Clients 20 are entities that want to

advertise or direct traffic such as commercial enterprises, political, governmental, non-profit, or

charitable organizations, individuals, hobbyists, or any other person or entity that wants to

Application/Control Number: 90/012,496                                         Page 150
Art Unit: 3992

advertise or direct traffic.  The Web server 22, as will be described in detail below, substantially

controls or directs the system of the present invention.  Media 28 may be any communication

device, including but not limited to computers, personal digital assistants, telephones, televisions,

radios, and similar devices.  Platforms 24, 32 are means through which a viewer accesses a

display to the exclusion of other displays.  A platform may allow the viewer to play, show,

enable, perform, transmit, update, or record the selected display.  Platforms 24, 32 may include,

for example, Web browsers, browser windows, media channels, media stations, media

frequencies, audio connections, streaming media, content delivery applications, media viewing

or interacting technology, and similar means.  A foreground platform 32 is a platform that can be

primarily sensed by a viewer 26.  A post-session platform 24 is a platform that begins its life in

the background and that can be fully sensed by a viewer 26 only after it has been brought to the

foreground.  Displays 30, 34 have content that a viewer 26 sees, hears, or otherwise senses

within or from a platform 24, 32.  Displays 30, 34 may include, for example, Internet content

(such as streaming video, Web sites, Web pages), video broadcast content (such as television

programs, movies, videos, commercials, and infomercials), audio broadcast content (such as

radio programs, commercials, and sound recordings or such as commercials or sound recordings

played over a telephone connection), and any other content capable of being transmitted over

media.").  Therefore, as best understood, this claim requires some device capable of audio

communication with a display to display to a user at least one browser within a window.

    See discussion of, e.g., claim 35 *supra*.  See also '017 at, e.g., col. 8, line 50, i.e. GSM

receivers.  Therefore to employ/substitute another network connectable device operable on a

Java based platform such as, as best understood, a device capable of audio communication with a

Application/Control Number: 90/012,496                          Page 151
Art Unit: 3992

display to display to a user at least one browser within a window audio broadcast

communication, e.g. a cellphone, for the network connectable computer device operable on a

Java based platform as taught by Unfaithful would be obvious to one skilled in the art in view of

interchangeability as taught by '017.  Note page 16, first full paragraph of PO's 9/27/13

response.


Claim 37:

**The system of claim 9 where said device comprises a television.**

See the discussion of claims 33-35 *supra*, esp. '017 at col. 8, lines 54-55, i.e. "cable

television receivers", and col. 17, lines 28-29, i.e. "set-top boxes".  Therefore to

employ/substitute another network connectable device operable on a Java based platform such as

a television for the network connectable computer device operable on a Java based platform as

taught by Unfaithful would be obvious to one skilled in the art in view of interchangeability as

taught by '017.  Note page 16, first full paragraph of PO's 9/27/13 response.  Note also pages 22-

24 of the 9/27/13 PO response and the ***Response to Arguments*** section, **37 CFR 1.131**

**Declaration**.


Claim 41:

**The system of claim 9 where said display includes a television program.**

See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purpose of further discussion, these claims are interpreted as requiring a device that

interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content

Application/Control Number: 90/012,496                                    Page 152
Art Unit: 3992

that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a

platform, e.g. a window (i.e. a screen).", and claim 9, and thereby claim 1, section (a), and claim

37 *supra*.   Therefore, the prior art teaches "a device" (i.e. a communication device, e.g. a

television, "that interacts with a display to display to a user" (i.e. capable of imparting content,

i.e. any television broadcast content, i.e. television programs, to a viewer that can be seen, heard

or otherwise sensed within or from a platform, e.g. a window (i.e. a screen)), as best understood.

Note page 16, second to last full paragraph of PO's 9/27/13 response.


Claim 43:

**The system of claim 9 where said display includes a commercial**.

        See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood

and for purpose of further discussion, these claims are interpreted as requiring a device that

interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content

that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a

platform, e.g. a window (i.e. a screen).", and claim 9, and thereby claim 1, section (a), claim 37

and claim 41 *supra*.   Therefore, the prior art teaches "a device" (i.e. a communication device,

e.g. a television "that interacts with a display to display to a user" (i.e. capable of imparting

content, i.e. any television broadcast content, e.g. television commercials, to a viewer that can be

seen, heard or otherwise sensed within or from a platform, e.g. a window (i.e. a screen)) as best

understood.  Note page 16, second to last full paragraph of PO's 9/27/13 response.

Application/Control Number: 90/012,496                                    Page 153
Art Unit: 3992

Claim 44:

**The system of claim 9 where said display includes an infomercial**.

      See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood and for purpose of further discussion, these claims are interpreted as requiring a device that interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a platform, e.g. a window (i.e. a screen).", and claim 9, and thereby claim 1, section (a), and claims 37, 41 and 43 *supra*.   Therefore, the prior art teaches "a device" (i.e. a communication device, e.g. a television "that interacts with a display to display to a user" (i.e. capable of imparting content, i.e. any television broadcast content, e.g. television infomercials, to a viewer that can be seen, heard or otherwise sensed within or from a platform, e.g. a window (i.e. a screen)) as best understood.  Note page 16, second to last full paragraph of PO's 9/27/13 response.


Claim 45:

**The system of claim 9 where said display includes a radio program**.

      See the discussion of this claim in paragraph 7 *supra*, i.e. "Therefore, as best understood and for purpose of further discussion, these claims are interpreted as requiring a device that interacts with a display to display to a user, i.e. a device capable of imparting to a viewer content that can be seen, heard or otherwise sensed, i.e. the specific claimed content, within or from a platform, e.g. a window (i.e. a screen).", and claim 9, and thereby claim 1, section (a), and claim 36 *supra*.   Therefore, the prior art teaches "a device" (i.e. a communication device, e.g. a cell phone "that interacts with a display to display to a user" (i.e. capable of imparting content, i.e.

Application/Control Number: 90/012,496                                    Page 154
Art Unit: 3992

audio broadcast content, to a viewer that can be seen, heard or otherwise sensed within or from a

platform, e.g. a window (i.e. a screen)) as best understood.  Note page 16, second to last full

paragraph of PO's 9/27/13 response.

Claim 61:

**The method of claim 19 where said media comprises a PDA.**
    See discussion of claim 34 *supra*.

Claim 62:

**The method of claim 19 where said media comprises a cell phone.**

    See the discussion of claim 35 *supra*.

Claim 63:

**The method of claim 19 where said device comprises a radio.**

    See discussion of claim 36 *supra*.

Claim 64:

**The method of claim 19 where said media comprises a television.**

    See the discussion of claim 37 *supra*.

Claim 68:

**The method of claim 19 where said display includes a television program.**

    See the discussion of claim 41 *supra*.

Application/Control Number: 90/012,496                    Page 155
Art Unit: 3992

Claim 70:

**The method of claim 19 where said display includes a commercial.**

    See the discussion of claim 43 *supra.*


Claim 71:

**The method of claim 19 where said display includes an infomercial.**

    See the discussion of claim 44 *supra.*


Claim 72:

**The method of claim 19 where said display includes a radio program.**

    See the discussion of claim 45 *supra.*


*Conclusion*

**Extensions of Time**

    Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extension of time in *ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

Application/Control Number: 90/012,496                                    Page 156
Art Unit: 3992

## Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 7,353,229 throughout the course of this reexamination proceeding.  The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding.  See MPEP §§ 2207, 2282 and 2286.

## Amendment in Reexamination Proceedings

Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR 1.20(c).  See MPEP § 2250(IV) for examples to assist in the preparation of proper proposed amendments in reexamination proceedings.

## Submissions

In order to insure full consideration of any amendments, affidavits or declarations or other documents as evidence of patentability, such documents must be submitted in response to the first Office action on the merits (which does not result in a close of prosecution). Submissions after the second Office action on the merits, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116, after final rejection and by 37 CFR 41.33 after appeal, which will be strictly enforced.

Application/Control Number: 90/012,496                                    Page 157
Art Unit: 3992

## IDS Submissions

Regarding IDS submissions MPEP 2256 recites the following: "Where patents,
publications, and other such items of information are submitted by a party (patent owner or
requester) in compliance with the requirements of the rules, the requisite degree of consideration
to be given to such information will be normally limited by the degree to which the party filing
the information citation has explained the content and relevance of the information."
Accordingly, the IDS submissions have been considered by the Examiner only with the scope
required by MPEP 2256. The references crossed through could not be identified since they were
not labeled as presented on the IDS, e.g., "Part 6 of 14".

## Service of Papers

After filing of a request for *ex parte* reexamination by a third party requester, any
document filed by either the patent owner or the third party requester must be served on the other
party (or parties where two or more third party requester proceedings are merged) in the
reexamination proceeding in the manner provided in 37 CFR 1.248.  The document must reflect
service or the document may be refused consideration by the Office.  See 37 CFR 1.550(f).

### Correspondence

**All** correspondence relating to this ex parte reexamination proceeding should be directed:

By Mail to:          Mail Stop *Ex Parte* Reexam
                     Central Reexamination Unit
                     Commissioner for Patents
                     United States Patent & Trademark Office
                     P.O. Box 1450
                     Alexandria, VA 22313-1450

Application/Control Number: 90/012,496                                    Page 158
Art Unit: 3992

By FAX to:          (571) 273-9900
                    Central Reexamination Unit


By hand:            Customer Service Window
                    Randolph Building
                    401 Dulany Street
                    Alexandria, VA 22314

     Registered users of EFS-Web may alternatively submit such correspondence via the

electronic filing system EFS-Web, at https://efs.uspto.gov/efile/myportal/efs-registered.  EFS-

Web offers the benefit of quick submission to the particular area of the Office that needs to act

on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically

uploaded) directly into the official file for the reexamination proceeding, which offers parties the

opportunity to review the content of their submissions after the "soft scanning" process is

complete.

     Any inquiry concerning this communication should be directed to the Central

Reexamination Unit at telephone number 571-272-7705.

     Other useful telephone numbers:

     Reexamination Practice (571) 272-7703

/Karin M. Reichle/
Examiner, CRU
Art Unit 3992

Conferees:

/C. Michelle Tarae/
Primary Examiner, Art Unit 3992


/Fred Ferris/
Acting SPRS CRU

Receipt date: 10/30/2013                                    90012496 - GAU: 3992

Doc code: IDS                                                                    PTO/SB/08a (01-10)
Doc description: Information Disclosure Statement (IDS) Filed        Approved for use through 07/31/2012. OMB 0651-0031
                                                                   U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 90012496 |
| | Filing Date | 2012-09-11 |
| | First Named Inventor | Vilcauskas Jr. |
| | Art Unit | 3992 |
| | Examiner Name | Karin M. Reichle |
| | Attorney Docket Number | AAA 12-03 |

**U.S.PATENTS** | Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code¹ | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button. | Add

**U.S.PATENT APPLICATION PUBLICATIONS** | Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code¹ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add

**FOREIGN PATENT DOCUMENTS** | Remove

| Examiner Initial* | Cite No | Foreign Document Number³ | Country Code² ⁱ | Kind Code⁴ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T⁵ |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button | Add

**NON-PATENT LITERATURE DOCUMENTS** | Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T⁵ |
|---|---|---|---|

EFS Web 2.1.17                    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /KR/

| Receipt date: 10/30/2013 | Application Number | 90012496 |  90012496 - GAU: 3992 |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Filing Date | 2012-09-11 | |
| | First Named Inventor | Vilcauskas Jr. | |
| | Art Unit | 3992 | |
| | Examiner Name | Karin M. Reichle | |
| | Attorney Docket Number | AAA 12-03 | |

| | 1 | Google Groups, "change window focus," three on-line posts by three authors, https://groups.google.com/forum/#!topic/comp.lang.javascript/BrJeiN83N83ZAA, 2 pgs. | ☐ |
|---|---|---|---|

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

**EXAMINER SIGNATURE**

| Examiner Signature | /Karin Reichle/ | Date Considered | 10/31/2013 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /KR/

Doc code: IDS                                                                        PTO/SB/08a (01-10)
Doc description: Information Disclosure Statement (IDS) Filed                  Approved for use through 07/31/2012. OMB 0651-0031
                                                                      U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 90012496 |
| | Filing Date | 2012-09-11 |
| | First Named Inventor | Vilcauskas, Jr. |
| | Art Unit | 3992 |
| | Examiner Name | Karin M. Reichle |
| | Attorney Docket Number | AAA 12-03 |

## U.S.PATENTS                                                                 Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.    Add

## U.S.PATENT APPLICATION PUBLICATIONS                                         Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.    Add

## FOREIGN PATENT DOCUMENTS                                                    Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button    Add

## NON-PATENT LITERATURE DOCUMENTS                                             Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

EFS Web 2.1.17          ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /KR/

Receipt date: 10/04/2013

90012496 - GAU: 3992

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 90012496 |
| Filing Date | 2012-09-11 |
| First Named Inventor | Vilcauskas, Jr. |
| Art Unit | 3992 |
| Examiner Name | Karin M. Reichle |
| Attorney Docket  Number | AAA 12-03 |

| | | | |
|---|---|---|---|
| | 1 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 6 of 14, 50 pgs. | ☐ |
| | 2 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 7 of 14, 50 pgs. | ☐ |
| | 3 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 8 of 14, 50 pgs. | ☐ |
| | 4 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 9 of 14, 50 pgs. | ☐ |
| | 5 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 10 of 14, 50 pgs. | ☐ |
| | 6 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 11 of 14, 50 pgs. | ☐ |
| | 7 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 12 of 14, 50 pgs. | ☐ |
| | 8 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 13 of 14, 50 pgs. | ☐ |
| | 9 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 14 of 14, 18 pgs. | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button **Add**

### EXAMINER SIGNATURE

| Examiner Signature | /Karin Reichle/ | Date Considered | 10/23/2013 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /KR/

Receipt date: 10/04/2013

| | Application Number | 90012496 |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | Filing Date | 2012-09-11 |
| | First Named Inventor | Vilcauskas, Jr. |
| | Art Unit | 3992 |
| | Examiner Name | Karin M. Reichle |
| | Attorney Docket Number | AAA 12-03 |

90012496 - GAU: 3992

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /KR/

Doc code: IDS                                                                                          PTO/SB/08a (01-10)
Doc description: Information Disclosure Statement (IDS) Filed                              Approved for use through 07/31/2012. OMB 0651-0031
                                                                                         U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 90012496 |
| Filing Date | 2012-09-11 |
| First Named Inventor | Vilcauskas, Jr. |
| Art Unit | 3992 |
| Examiner Name | Karin M. Reichle |
| Attorney Docket Number | AAA 12-03 |

## U.S.PATENTS                                                              Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 7039872 | B1 | 2006-05-02 | Raheman | |

If you wish to add additional U.S. Patent citation information please click the Add button.        **Add**

## U.S.PATENT APPLICATION PUBLICATIONS                                      Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20020042799 | A1 | 2002-04-11 | Slotznick | |

If you wish to add additional U.S. Published Application citation information please click the Add button.   **Add**

## FOREIGN PATENT DOCUMENTS                                                 Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 1999059097 | WO | A1 | 1999-11-18 | Creative Edge Internet Services Pty, Ltd. | | ☐ |
| | 2 | 2001027802 | WO | A2 | 2001-04-19 | Ideaf-Lood, Inc. | | ☐ |
| | 3 | 2001082178 | WO | A2 | 2001-11-01 | Bay9, Inc. | | ☐ |

| | | |
|---|---|---|
| Receipt date: 10/04/2013 | Application Number | 90012496 |
| | Filing Date | 2012-09-11 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | First Named Inventor | Vilcauskas, Jr. |
| | Art Unit | 3992 |
| | Examiner Name | Karin M. Reichle |
| | Attorney Docket  Number | AAA 12-03 |

**90012496 - GAU: 3992**

| If you wish to add additional Foreign Patent Document citation information please click the Add button | Add |
|---|---|

**NON-PATENT LITERATURE DOCUMENTS** Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc) date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T⁵ |
|---|---|---|---|
| | 1 | Yoshinori Hijikata article "Estimating a User's Degree of Interest in a Page During Web Browsing," IEEE, 1999, 6 pgs. | ☐ |
| | 2 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 1 of 21, 50 pgs. | ☐ |
| | 3 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 2 of 21, 50 pgs. | ☐ |
| | 4 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 3 of 21, 50 pgs. | ☐ |
| | 5 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 4 of 21, 50 pgs. | ☐ |
| | 6 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 5 of 21, 50 pgs. | ☐ |
| | 7 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 6 of 21, 50 pgs. | ☐ |
| | 8 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 7 of 21, 50 pgs. | ☐ |
| | 9 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 8 of 21, 50 pgs. | ☐ |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /KR/

| Receipt date: 10/04/2013 | | Application Number | 90012496 | 90012496 - GAU: 3992 |
|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | | Filing Date | 2012-09-11 | |
| | | First Named Inventor | Vilcauskas, Jr. | |
| | | Art Unit | 3992 | |
| | | Examiner Name | Karin M. Reichle | |
| | | Attorney Docket Number | AAA 12-03 | |

|  | 10 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 9 of 21, 50 pgs. | ☐ |
|---|---|---|---|
|  | 11 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 10 of 21, 50 pgs. | ☐ |
|  | 12 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 11 of 21, 50 pgs. | ☐ |
|  | 13 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 12 of 21, 50 pgs. | ☐ |
|  | 14 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 13 of 21, 50 pgs. | ☐ |
|  | 15 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 14 of 21, 50 pgs. | ☐ |
|  | 16 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 15 of 21, 50 pgs. | ☐ |
|  | 17 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 16 of 21, 50 pgs. | ☐ |
|  | 18 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 17 of 21, 50 pgs. | ☐ |
|  | 19 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 18 of 21, 50 pgs. | ☐ |
|  | 20 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 19 of 21, 50 pgs. | ☐ |

EFS Web 2.1.17                    ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /KR/

| | | | | |
|---|---|---|---|---|
| | | Application Number | 90012496 | |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | | Filing Date | 2012-09-11 | |
| | | First Named Inventor | Vilcauskas, Jr. | |
| | | Art Unit | 3992 | |
| | | Examiner Name | Karin M. Reichle | |
| | | Attorney Docket  Number | AAA 12-03 | |

| | | | |
|---|---|---|---|
| | 21 | File history of U.S. Patent App. No. 09/419,698, entitled Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 20 of 21, 50 pgs. | ☐ |
| | 22 | File history of U.S. Patent App. No. 09/419,698, entitled "Method and Apparatus for Providing Content to Users," Brian Shuster, Inventor, filed Oct. 14, 1999, Part 21 of 21, 34 pgs. | ☐ |
| | 23 | File history of U.S. Provisional App. No. 60/187,577, entitled "System and Method for Adding a Floating Window of the User's Choice to a Browser's Home Page (Home Page Plus)," Benjamin Slotznick, Inventor, filed Mar. 7, 2000, 23 pgs. | ☐ |
| | 24 | Danny Goodman, JavaScript Bible, 3rd Edition, ©1998, 16 pgs. | ☐ |
| | 25 | Danny Goodman, JavaScript Bible, 3rd Edition, ©1998, 59 pgs. | ☐ |
| | 26 | ~~Client-Side JavaScript Guide, ©1999 Netscape Communications Corporation, Version 1.3, Part 1 of 6, 55 pgs.~~ | ☐ |
| | 27 | ~~Client-Side JavaScript Guide, ©1999 Netscape Communications Corporation, Version 1.3, Part 2 of 6, 55 pgs.~~ | ☐ |
| | 28 | ~~Client-Side JavaScript Guide, ©1999 Netscape Communications Corporation, Version 1.3, Part 3 of 6, 55 pgs.~~ | ☐ |
| | 29 | ~~Client-Side JavaScript Guide, ©1999 Netscape Communications Corporation, Version 1.3, Part 4 of 6, 55 pgs.~~ | ☐ |
| | 30 | ~~Client-Side JavaScript Guide, ©1999 Netscape Communications Corporation, Version 1.3, Part 5 of 6, 55 pgs.~~ | ☐ |
| | 31 | Client-Side JavaScript Guide, ©1999 Netscape Communications Corporation, Version 1.3, Part 6 of 6, 34 pgs. | ☐ |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /KR/

| Receipt date: 10/04/2013 | | | | |
|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | 90012496 | | |
| | Filing Date | 2012-09-11 | | |
| | First Named Inventor | Vilcauskas, Jr. | | |
| | Art Unit | 3992 | | |
| | Examiner Name | Karin M. Reichle | | |
| | Attorney Docket Number | AAA 12-03 | | |

| | | | |
|---|---|---|---|
| | 32 | Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 1 of 14, 50 pgs. | ☐ |
| | 33 | Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 2 of 14, 50 pgs. | ☐ |
| | ~~34~~ | ~~Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 3 of 14, 50 pgs.~~ | ☐ |
| | 35 | Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 4 of 14, 50 pgs. | ☐ |
| | ~~36~~ | ~~Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 5 of 14, 50 pgs.~~ | ☐ |
| | 37 | Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 6 of 14, 50 pgs. | ☐ |
| | ~~38~~ | ~~Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 7 of 14, 50 pgs.~~ | ☐ |
| | ~~39~~ | ~~Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 8 of 14, 50 pgs.~~ | ☐ |
| | ~~40~~ | ~~Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 9 of 14, 50 pgs.~~ | ☐ |
| | ~~41~~ | ~~Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 10 of 14, 50 pgs.~~ | ☐ |
| | ~~42~~ | ~~Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 11 of 14, 50 pgs.~~ | ☐ |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /KR/

| Receipt date: 10/04/2013 | Application Number | 90012496 | 90012496 - GAU: 3992 |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Filing Date | 2012-09-11 | |
| | First Named Inventor | Vilcauskas, Jr. | |
| | Art Unit | 3992 | |
| | Examiner Name | Karin M. Reichle | |
| | Attorney Docket Number | AAA 12-03 | |

| | 43 | Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 12 of 14, 50 pgs. | ☐ |
|---|---|---|---|
| | 44 | Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 13 of 14, 50 pgs. | ☐ |
| | 45 | Client-Side JavaScript Reference, ©1999 Netscape Communications Corporation, Version 1.3, Part 14 of 14, 47 pgs. | ☐ |
| | 46 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 1 of 14, 50 pgs. | ☐ |
| | 47 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 2 of 14, 50 pgs. | ☐ |
| | 48 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 3 of 14, 50 pgs. | ☐ |
| | 49 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 4 of 14, 50 pgs. | ☐ |
| | 50 | David Flannagan, "JavaScript The Definitive Guide," Second Edition, Jan. 1997, Part 5 of 14, 50 pgs. | ☐ |

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

| **EXAMINER SIGNATURE** | | | |
|---|---|---|---|
| Examiner Signature | /Karin Reichle/ | Date Considered | 10/23/2013 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /KR/

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

BOARD OF PATENT APPEALS AND INTERFERENCES

| | | | | |
|---|---|---|---|---|
| Patent No. | : 7,386,555 | | Issued | : June 10, 2008 |
| App. No. | : 10/784,663 | | Filed | : February 23, 2004 |
| Control No. | : 90/012,344 | | Reexamination Filed: | June 8, 2012 |
| Examiner | : Karin M. Reichle | | Art Unit | : 3992 |
| Docket No. | : 8096.0034 | | Confirmation No. | : 6288 |
| Title | : POST-SESSION INTERNET ADVERTISING SYSTEM | | | |
| Inventor | : Vilcauskas et al. | | | |
| Appellant | : ExitExchange Corp. | | | |

Considered
/KR/

Chernoff Vilhauer McClung & Stenzel, LLP
601 SW Second Ave., Suite 1600
Portland, Oregon 97204

August 12, 2013

**Mail Stop Ex Partes Reexamination**
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

### DECLARATION OF PRIOR INVENTION IN THE UNITED STATES TO OVERCOME CITED PATENT OR PUBLICATION (37 C.F.R. § 131)

Dear Sir:

### PURPOSE OF DECLARATION

1.      This declaration is to establish reduction to practice of the claimed invention of this application in the United States at a date prior to October 12, 1999, which is the effective date of the "Unfaithful.com" reference cited by the Examiner.

2.      The persons making this declaration are the surviving inventors, Andrew Vilcauskas, Jr., and Robert Bloodgood, III. Matthew Middleton is deceased.

### FACTS AND DOCUMENTARY EVIDENCE

3.      Attached to this declaration is an Exhibit showing an html document containing a script that, when executed in a foreground browser window, opens another browser window containing content such as an advertisement, which is then a background browser window.